**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **RACHEL RAMSBOTTOM,** | : | |
| **ALEXIS BOWLING** | : | |
| **Plaintiffs,** | : | |
| | : | **CIVIL ACTION NO.** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **LORIN ASHTON,** | : | |
| **AMORPHOUS MUSIC, INC.,** | : | |
| **BASSNECTAR TOURING, INC.,** | : | |
| **REDLIGHT MANAGEMENT, INC.,** | : | |
| **C3 PRESENTS, L.L.C,** | : | |
| **INTERACTIVE GIVING FUND,** | : | |
| **Defendants.** | : | |

## COMPLAINT- CIVIL ACTION

Plaintiffs Rachel Ramsbottom and Alexis Bowling, by and through undersigned counsel, hereby states as follows in support of their Complaint against Defendants Lorin Ashton a/k/a Bassnectar ("Bassnectar"), Amorphous Music, Inc. ("Amorphous"), Bassnectar Touring, Inc. ("Bassnectar Touring"), Redlight Management, Inc. ("Redlight"), C3 Presents, L.L.C ("C3") and Interactive Giving Fund ("Interactive") herein collectively referred to as "Defendants."

## INTRODUCTION

1.      With the rapid rise of technological advances in the twenty-first century, a new genre of music was born. Electronic Dance Music, popularly known as EDM, captured a generation. As this new genre rose in popularity, so did the industry around it. Festivals and concerts became an immensely profitable venture as hundreds of thousands of youth flocked to these events around the country.

2.      Lorin Ashton, popularly known by his stage name "Bassnectar," was regarded as one of the leading artists of the EDM scene, traveling from coast to coast performing shows and

headling large festivals. His dubstep-tinged electronica and strobe-light experience was showcased in large clubs like the 9:30 Club in Washington, D.C. and New York's Terminal 5.[1]

3.  Bassnectar's popularity became so great, in fact, that he began to host his own festivals including "Bass Center" and "Bass Island." Out of nine headlining shows reported to Billboard Boxscore in 2011, Bassnectar sold out eight of them and grossed $1.1 million dollars.[2]

4.  Bassnectar's following was a cultural movement in itself. His fans, dubbed "Bass Heads" (not unlike the Grateful Dead's "Deadheads") would travel around the country making just enough money to get to the next show, some attending upwards of thirty-five (35) shows in a year. SF Weekly describes the Bassnectar culture as follows:

> "In a lot of ways, Bassnectar is a cult of personality. Ashton serves as a kind of tribal leader for his fans, a big brother with bass. He sees the project as a cultural and social concern, not merely a musical one, and speaks of his hardcore fans, known as Bass Heads, like a family . . . Bass Heads in turn show loyalty for Ashton and a communitarian spirit. It's a subculture of thousands across the country who are ready to show up anywhere he plays . . ."[3]

5.  Unlike many artists, whose success relies on their record sales, Bassnectar's clout was in his live performances. According to Bassnectar "[b]ecause our touring numbers were so monstrous last year, I just realized I could put out a CD and every noteworthy publication in the world could ignore it. But we're still going to have 3,000 kids show up on a Monday night in Kentucky with my logo tattooed on their fucking neck."[4]

6.  Self-described on Twitter as "a collaborate music project, not a person," Bassnectar utilized his platform to encourage adolescents and young people to become activists. He developed a charity for this purpose called the Interactive Giving Fund, formerly known as "BeInteractive."

[1] Jason Lipshutz, *Let the Bass Build World Radio History* (2012), https://worldradiohistory.com/hd2/IDX-Business/Music/Billboard-Index/IDX/2012/2012-04-28-Billboard-Page-0036.pdf (last visited Feb 8, 2021).
[2] *Id.*
[3] Ian S. Port, *Bass Instincts: How Bassnectar Came to Rule American Dance Music* (2012), https://archives.sfweekly.com/sanfrancisco/bass-instincts-how-bassnectar-came-to-rule-american-dance-music/Content?oid=2187208&amp;storyPage=2 (last visited Feb 5, 2021).
[4] *Id.*

It partnered with organizations like Rock the Vote to get "Bass Heads" registered to vote and Conscious Alliance to organize fans to help work with local food shelters. On multiple occasions, Bassnectar also offered therapy scholarships through various organizations.

7. A feature of the charity was its "amBASSadors" program—a carefully selected group of young people tasked with generating ideas and connecting with the "Bass Head" community. AmBASSadors were also found at shows where they would search for others "like them," even selecting fans for opportunities to get backstage and meet Bassnectar.

8. As described by a former fan, Bassnectar was postured as an altruistic, activist organization originated by one man who provided a sense of belonging and righteousness to youth that may have felt like they never got that in their lives before. He gave them friends, fun and a purpose.[5] In many ways he was held out by himself and others to his followers—both adults and children—as God-like.

9. Yet, Bassnectar's purported noble actions and reputation of being in service to some greater good were nothing more than a veil to mask to his sinister desires and actions and a means to use his power and influence to groom and ultimately sexually victimize underage girls.

10. Bassnectar solicited underage girls through various means, including, but not limited to, Twitter, the BeInteractive amBASSadors, and live shows, presenting himself as an advisor and peer in order to gain young girls trust, despite the fact that he was in his mid-thirties at the time. Bassnectar was able to conceal yet maintain consistent contact with these underage girls through secretive messaging apps which he required all communication to be funneled through so that he could groom them for eventual commercial sex acts, get them to send him sexually explicit photographs and further exploit them for his own gratification.

---

[5] Alycia Grace, *Evidence Against Bassnectar [Interview] This is Perfect Harmony, LLC* (2020), https://thisisperfectharmony.com/2020/11/16/evidence-against-bassnectar-interview/ (last visited Feb 8, 2021).

11.     After ingratiating himself into their lives, Bassnectar provided these underage girls tickets to his shows, exposing them to his thousands of young followers, "Bass Heads," and a culture premised on ideals such as community and collectivism.

12.     Bassnectar would also dictate how these underage girls were to behave, who the underage girls could hang out with and mandate that their contact with him be hidden from their parents and the public.

13.     After performances, Bassnectar would invite these underage girls to his hotel room and demand that the girls shower so that they were "clean." He would then have sex with them, requiring the sex to be unprotected, without a condom, and would provide large sums of cash and other items of value in exchange.

14.     Bassnectar would also require these underage girls to take sexually explicit photographs of themselves with their cell phones and send them to him in violation of child pornography statute 18 U.S. § 2252.

15.     This action for damages is brought by Plaintiffs who are minor victims of sex trafficking, child pornography, and other tortious acts and omissions who were groomed and ultimately exploited at the hands of Bassnectar.

16.     It was abundantly clear that Bassnectar was targeting and engaging in commercial sex acts with minors and utilizing his shows and organizations to accomplish the exploitation of young girls for his own sexual gratification. In fact, it was a running joke among those associated with Bassnectar that he would have to find a date at a high school dance.

17.     As such, remaining Defendants are companies that participated in a venture and benefitted economically from Bassnectar and his companies while he was trafficking the Plaintiffs and other underage girls. As a result of Bassnectar's trafficking of minor girls and solicitation and

possession of child pornography, the remaining defendants knew or, in the very least, should have known Bassnectar was trafficking minor girls for commercial sex and other illegal activity.

18.     As such, each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly participated in or benefited from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

## PARTIES

19.     Plaintiff, Rachel Ramsbottom, is an adult female and a citizen of the state of Tennessee.

20.     Plaintiff, Alexis Bowling, is an adult female and a citizen of the state of Kentucky.

21.     Plaintiffs' claims are properly joined pursuant to Fed. R. Civ. Pro. 20 as they arise out of the same transaction, occurrence, or series of transactions or occurrences and involve common questions of law and/or fact, namely, the systematic grooming, trafficking and solicitation/possession of child pornography by Bassnectar and the knowledge of same by the other Defendants.

22.     Defendant, Lorin Ashton (hereinafter "Bassnectar"), an individual, is an adult male and resident of California with a home address of 5850 Romany Road, Oakland, CA 94618

23.     Defendant Amorphous Music Inc. (hereinafter "Amorphous"), a corporation, is incorporated in the state of California, and headquartered at 235 Park Avenue South, 9th Floor New York, New York 10003. Ashton is the founder, chairman, figurehead, chief executive, and icon of Amorphous Music Inc.

24.     Defendant Bassnectar Touring, Inc. (hereinafter "Bassnectar Touring"), a corporation, is incorporated in the state of Delaware, and maintains an office in New York at: 235 Park Avenue South, 9th Floor New York, New York 10003. Ashton is the founder, chairman, figurehead, chief executive, and icon of Bassnectar Touring Inc. Bassnectar utilized Bassnectar

Touring to target, recruit and ultimately victimize young girls, like Plaintiffs, for sexual exploitation.

25.     Defendant Interactive Giving Fund (formerly known as "BeInteractive" and hereinafter referred to as "IGF"), is a California Corporation with headquarters located at 5800 Bristol Parkway, Culver City, CA 90230. Bassnectar is the founder and former chairman, figurehead, chief executive, and icon of the IGF. Bassnectar utilized IGF to target, recruit and ultimately victimize young girls, like Plaintiffs, for sexual exploitation.

26.     Defendant Red Light Management, L.L.C. (hereinafter "Red Light"), a corporation, is incorporated in the state of Oregon and is headquartered at 10 E 40th St #22, New York, NY 10016. Red Light Management participated in a venture with Bassnectar in which it managed, promoted, recruited and profited from its' venture with Ashton. Red Light knew, or should have known, Bassnectar was engaging in the trafficking of and unlawful conduct with minors.

27.     Defendant C3 Presents, L.L.C. (hereinafter C3), a corporation, is incorporated in the state of Texas and is headquarter at  1645 E 6TH St Ste 150 Austin , TX, 78702-3386. C3 Presents, at all relevant times, managed Bassnectar and produced large festivals where Bassnectar performed, including Electric Daisy Carnival, Camp Bisco, and Lalapalooza. Bassnectar utilized these festivals, concerts and events to target young girls, like Plaintiffs, for sexual exploitation. C3 Presents participated in managing, promoting, recruiting, and profiting from its venture with Ashton. C3 knew, or should have known, Bassnectar was engaging in the trafficking of minors.

## JURISDICTION

28.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 in that Plaintiffs and Defendants are citizens of different states and the amount in controversy is in excess of $75,000.

29.     This Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

30.     This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. §1595.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

<u>FACTS COMMON TO ALL PLAINTIFFS</u>

32.     Like many of their peers in high school, Plaintiffs had an interest in electronic dance music ("EDM") and were fans of "Bassnectar."

33.     Plaintiffs followed @Bassnectar on Twitter.

34.     Bassnectar maintained control of the @Bassnectar Twitter account and used it to interact with fans.

35.     Through the Bassnectar twitter account, Bassnectar found Plaintiffs and contacted them through direct messages, providing his personal number and email to maintain communication.

36.     Bassnectar maintained consistent communication with Plaintiffs through text, email, and secretive communication apps.

37.     In an effort to groom Plaintiffs, Bassnectar asked about personal details of Plaintiffs' lives and provided advice, including encouraging them to watch "American Beauty," a movie about an older man having a relationship with a young girl. Bassnectar referenced American Beauty at his shows too. He used the visual of the scene with the actress laying in rose petals and had rose petals fall from the sky at one of his New Years Eve shows.

38.     Through these communications, Bassnectar had personal knowledge that both Plaintiffs were underage.

39.     Nevertheless, Bassnectar supplied tickets and travel arrangements for Plaintiffs to attend his performances.

40.     Plaintiffs were subsequently invited to his hotel room where Bassnectar had sex with them which Bassnectar mandated be without the use of a condom.

41.     In exchange for the sexual encounters, Bassnectar gave Plaintiffs cash—in amounts ranging from three-hundred ($300) to one thousand six hundred ($1,600) dollars.

42.     Bassnectar maintained tight control over Plaintiffs, requiring them to follow certain rules including:

        a.      Keeping the relationship secret; this included avoiding being seen in public together;

        b.      Not allowing Plaintiffs to leave hotel rooms or answer the phone in Bassnectar's hotel room;

        c.      Demanding that any sexual intercourse be unprotected (without the use of a condom);

        d.      Demanding that the Plaintiffs shower before Bassnectar had unprotected sex with them so that they were "clean;"

        e.      Requiring Plaintiffs to take sexually explicit photographs of themselves and send them to Bassnectar; and

        f.      Plaintiffs were not allowed to have sex with anyone else, but Bassnectar could have sex with other women.

43.     At the heart of this action is Bassnectar's use of the Bassnectar Companies to facilitate and enable the sex trafficking of underaged girls in the United States.

44.     The Bassnectar Companies fund and support Bassnectar's illegal sex trafficking venture, and Bassnectar uses the Bassnectar Companies' brand, resources, and promotional events to recruit, lure, entice, and/or groom his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts.

45.     In turn, the Bassnectar Companies knowingly benefit from their participation in Bassnectar's venture by the continued promotion of the Bassnectar brand.

46.     Bassnectar, using the Bassnectar Companies' resources, engaged in a pattern and practice of recruiting, luring, enticing, obtaining, and grooming underaged girls, and causing them through force, fraud or coercion, or knowing that the victim had not yet attained the age of eighteen years, to engage in commercial sex acts through, among other means, providing cash payments and other commercially lucrative benefits such as transportation and concert/event tickets.

47.     The Bassnectar Companies have actual knowledge of Bassnectar's unlawful commercial sex acts through him, as he is the founder of the Bassnectar Companies and intimately involved in their day-to-day operations.

48.     Further, the Bassnectar Companies knowingly aided and abetted, facilitated, and participated in Bassnectar's illegal sex trafficking venture by being integrally involved in the recruitment of the underaged victims and the logistical steps necessary for Bassnectar to recruit, lure, entice, obtain, and groom the underaged victims.

49.     Bassnectar intentionally used the Bassnectar Companies' resources to recruit, lure, and entice children to cause them to engage in commercial sex acts and other degrading acts, for which he always provided Bassnectar Companies' resources as value.

50.     Further, the Bassnectar Companies knowingly financed Bassnectar's commercial sex acts.

51.     Bassnectar's conduct, as outlined above, violates the TVPA and TVPRA, which outlaws using means of interstate or foreign commerce to recruit, entice, obtain, or lure a person and force or coerce that person, or knowing that the person had not attained the age of eighteen years, to engage in commercial sex acts. The Bassnectar Companies are guilty of aiding and abetting Bassnectar's violations of the TVPA and TVPRA by knowingly facilitating and enabling his illegal conduct.

52.     The Bassnectar Companies also directly violated the TVPA because they knowingly benefitted from participation in Ashton's venture with knowledge, or in reckless disregard of the fact, that Bassnectar used means of force, threats of force, fraud, and coercion to force children and women into engaging in commercial sex acts.

53.     In June 2020, an Instagram account was created titled "@evidenceagainstbassnectar"[6] where dozens of young and underage women detailed the ways in which they were victimized by Bassnectar.

54.     Terrified of his illegal conduct being exposed, Bassnectar contacted Plaintiffs, telling them they were special, and that he would always love them, going so far as to offer money in an attempt to coerce and manipulate Plaintiffs into staying silent.

## PLAINTIFF RACHEL RAMSBOTTOM

55.     Plaintiff, Rachel Ramsbottom, became a fan of Bassnectar in high school and followed the @Bassnectar Twitter account.

56.     In September 2012, after tweeting about a Bassnectar show cancellation, Rachel was contacted by Defendant Bassnectar through a private message on Twitter.

57.     Bassnectar informed Rachel that he would be playing a show in Nashville, in her home state of Tennessee. The first Bassnectar show Rachel went to was his New Years Eve show

---

[6] https://linktr.ee/evidenceagainstbassnectar

in Nashville in 2012. Bassnectar knew Rachel was underage at the time but had wanted to see Rachel the next day regardless. Rachel did not meet with him because she was with her brother at the time.

58. However, Bassnectar provided his phone number and email address and maintained communication with Rachel every day or every other day from the end of September 2012 until May 2013.

59. During this time, Bassnectar was aware that Rachel was a minor and in high school. Bassnectar would read Rachel's school assignments and even asked her to write one for him. Bassnectar said the paper he wanted Rachel to write him would take about 4-5 hours.

60. Bassnectar manipulated Rachel and gained the trust of Rachel by presenting himself as a friend and a mentor, discussing school and offering his advice. Yet, his communications had sexual undertones, grooming Rachel for what would later become Bassnectar sexually abusing and exploiting Rachel while she was still a child under the age of eighteen. Examples include, but are not limited to:

       a.      Asking her what she would want to do if they met;

       b.      Telling her that every guy wants to have sex with her;

       c.      Directing Rachel to break up with her high school boyfriend at the time, which she did;

       d.      Telling Rachel her last name "blows [him] away" and was "really sexy;"

       e.      Asking about her social life; and

       f.      Having Rachel engage in phone sex with him.

61. In May 2013, Bassnectar was in Memphis performing at the Beale Street Music Festival.

62. On or about May 3, 2013 Rachel met Bassnectar at the Marriott Hotel in Memphis.

63.     Instead of meeting in the lobby as originally planned, Bassnectar directed Rachel to meet him in the elevator. When she did, Bassnectar did not say a word to Rachel.

64.     Instead, Bassnectar took Rachel to his hotel room and had sex with her. Bassnectar refused to wear a condom and never asked if Rachel was on birth control.

65.     Bassnectar provided Rachel with one thousand ($1,000) dollars in mixed bills after he had sex with her.

66.     Approximately several weeks later, Bassnectar wanted to celebrate Rachel's birthday in Nashville and invited Rachel to stay with him at the Lowe's hotel.

67.     Bassnectar kept Rachel in the hotel room  for approximately four (4) days.

68.     During this time, Bassnectar required Rachel to hide when room service arrived and became angry when Rachel answered the phone.

69.     In addition to the sexual abuse described herein, Bassnectar was very controlling of Rachel including, but not limited to:

    a.     Advising Rachel of the friends she should have;

    b.     Telling Rachel she could not pursue modeling; and

    c.     Directing her choice of major in college; and

    d.     Pressuring Rachel to change her last name of no one would ever take her seriously.

70.     Further, Rachel was required to follow Bassnectar's rule: she was not allowed to have sex with anyone else, but he could have sex with whomever he wanted and unprotected sex with Rachel whenever he wanted.

71.     On numerous occasions, when Rachel was a minor, Bassnectar solicited Rachel to take and send sexually explicit photographs of herself while naked. Rachel complied. As such,

Bassnectar engaged in the manufacture and possession of child pornography on numerous occasions.

72. November, 2013 was the last time Bassnectar and Rachel saw each other in person.

73. After the "MeToo" movement began in 2016, Bassnectar reached out to Rachel, checking in with her often and telling her "you know I love you."

74. In 2019, shortly after Rachel had started therapy as a result of what Bassnectar did to her, she decided to tell Bassnectar for the first time that she was suffering as a result of what he did to her when she was a minor. Bassnectar attempted to justify his behavior, again using manipulation tactics. Bassnectar offered to pay for Rachel's therapy or fly out for a therapy session with Rachel.

75. After being publicly exposed in June 2020, Bassnectar began incessantly reaching out to Rachel; when she blocked his number he continued to attempt to initiate contact via the messaging app "WhatsApp." Bassnectar also emailed Rachel before his last attempt to contact her on "Whatsapp."

76. Eventually, Rachel agreed to have a phone conversation with him.

77. Bassnectar and Rachel spoke on June 3, 2020. During the phone conversation, Rachel confronted Bassnectar about the fact that she was taken advantage of, trafficked and that what happened between them was statutory rape.

78. In response, Bassnectar admitted his abuse of Rachel was "so inappropriate" and that what he did was "completely wrong."

79. Bassnectar admitted that he engaged with multiple women who were "too young," and acknowledged in his own words that there was an imbalance of power dynamic due to his age, the fan/celebrity dynamic, his male privilege, and his celebrity privilege.

80.     During the call, Bassnectar confessed that he abused his power, stating that "you weren't complicit," going so far as to apologize to Rachel for "exploiting you and taking advantage of you when you were so impressionable."

81.     Ironically, Bassnectar repeatedly stated that he wanted to "take accountability" and "make an example of myself" yet blamed Rachel for his inability to do so: "I could be doing so much more if it wasn't for one person who could push a button and put me in fucking jail."

82.     Importantly, Bassnectar admitted his conduct was illegal and referenced his risk of going to jail numerous times throughout the conversation:

a.     "If you think it's worth me living forever in a Tennessee jail to be raped or beat to death…"

b.     "Do you think I deserve to be in jail in Tennessee?"

c.     "The one thing that gets in the way is if I have to go to a Tennessee jail for life."

d.     "Do you understand me taking accountability over the phone with you right now . . . is colored by the fact that me talking to you can result in a Tennessee jail that is not a six month sentence."

e.     "There is only one person who has the potential to take me from being really sorry . . . to being raped in a Tennessee jail."

83.     During the phone conversation, Bassnectar repeatedly offered Rachel money and other benefits in an attempt to coerce her into remaining silent.

84.     Rachel has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked.

**PLAINTIFF ALEXIS BOWLING**

85.     Alexis was a fan of Bassnectar in high school and tweeted to Bassnectar on or around her 17th birthday.

86.     Bassnectar contacted Alexis through a direct message wishing her happy birthday. Throughout her senior year, Bassnectar, through the @Bassnectar twitter account, would reply to her tweets.

87.     Around April 2014, Bassnectar provided Alexis with his personal email and contacted her via email offering her tickets to his Las Vegas show.

88.     Alexis drove to Las Vegas, but was not permitted in the venue because she was under the age of 18.

89.     Alexis reached out to Bassnectar to see if there was anything he could do, but he could not help her. Instead, Bassnectar directed her and arranged for her to meet him near his hotel.

90.     Bassnectar met Alexis near his hotel where he took her into the bushes and hid for approximately six (6) hours, kissing and touching Alexis

91.     Afterwards, Bassnectar paid Alexis $300 in cash and instructed her to download the Wickr messaging app so they could stay in touch.

92.     On or around July 1, 2014, Bassnectar flew to Kentucky to visit Alexis She picked him up from the airport and took him to the Lexington Griffin Gate Marriott where he stayed for four days. During this visit, Ashton had sex with Alexis

93.     Bassnectar paid Alexis $1600 after he had sex with her.

94.     Approximately two weeks later, Bassnectar again visited Alexis again and stayed at the Hyatt Hotel in Cincinnati for three or four days.

95.     On approximately August 1, 2014, Bassnectar again visited Alexis and stayed at a hotel in Covington, Kentucky. He again stayed for three or four days. During each visit, Bassnectar had sex with Alexis multiple times.

96. On numerous occasions, Bassnectar solicited Alexis to take and send sexually explicit photographs of herself while naked. Alexis complied.

97. Each time Bassnectar coerced Alexis, a minor, to take nude sexually explicit photos of herself and send them to him he engaged in the manufacture and possession of child pornography.

98. Following the death of her Father, Bassnectar told Alexis that he could offer guidance and advice to Alexis like a father and do all the things a father would do for her.

99. Bassnectar dictated and controlled every aspect of Alexis's life, telling her what she could or could not do, who she could hang out with, what she could wear, etc.

100. Bassnectar required that Alexis not tell anyone about Bassnectar's contact with her, physical or otherwise. Bassnectar also ensured and required that he was not be seen in public with Alexis and vice versa.

101. Bassnectar lied to Alexis telling her that the reason she couldn't tell anyone about their contact or be seen in public with her is because he had never dated a younger girl, he didn't want to be judged and that no one would understand their love.

102. Between 2014-2016, Bassnectar paid for and flew Alexis all over the country to see him while he was on tour. On most of these visits Bassnectar would make Alexis stay in his hotel room the entire time. Bassnectar would have sex with Alexis during these visits. This occurred in approximately ten (10) different states.

103. In December 2015, Bassnectar had Alexis fly to California to visit him at his home in Oakland. Upon arrival, Bassnectar directed Alexis to take an Uber to a mini-mart, near his house. This store was located at the base of his neighborhood and Bassnectar picked her up there.

104. The majority of the visit was spent in Bassnectar's home. Bassnectar had sex with Alexis during this visit. Afterwards, Bassnectar gave Alexis tickets to his show in Virginia.

105. Alexis was studied interior design and Bassnectar informed Alexis that he could get her a job with the prestigious Deborah Berke design firm.

106. Alexis applied for the job and was scheduled for a telephone interview. Bassnectar was present for the telephone interview as Alexis was at his house in California at the time.

107. During the telephone interview, Alexis was asked why she knew about the San Francisco position given that she had a Kentucky address. At that point, Bassnectar took the phone and hung up.

108. In October 2016, Bassnectar had Alexis fly out to see Bassnectar at his home for the last time.

109. On June 13, 2020 Bassnectar contacted Alexis and told her about allegations of a music teacher of his in high school having sexual contact with a minor. However, in an attempt to manipulate Alexis, Bassnectar told Alexis that what happened between them was nothing like that. He told Alexis how special she was to him and that he would "always love her" in an attempt to maintain Alexis's loyalty and prevent her from speaking out against his unlawful conduct.

110. Moreover, following the posting of "@evidenceagainstbassnectar on Instagram, the head of Bassnectar's charitable organization contacted Alexis in an attempt to further manipulate and silence Alexis from speaking out about what Bassnectar did to her as a minor.

111. Alexis has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked.

## CAUSES OF ACTION

### COUNT I:
### CONDUCT IN VIOLATION OF THE TRAFFICKING VICTIM PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1591(a)
### PLAINTIFFS v. DEFENDANT LORIN ASHTON A/KA BASSNECTAR

112. Plaintiffs incorporate each forgoing allegation herein.

113.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

114.     Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, *both* the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work *and* those who obtain, solicit, or patronize forced commercial sex work.

115.     Pursuant to 18 U.S.C. §1591(a), anyone under the age of 18 engaging in the act of commercial sex is considered to be a victim of human trafficking.

116.     Bassnectar, with the help of the Defendants and their resources, used his fame and popularity through the Bassnectar brand, to recruit, solicit, and coerce underage girls into commercial sex acts.

117.     Rachel Ramsbottom is a victim of sex trafficking with the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

118.     Alexis Bowling is a victim of sex trafficking with the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

119.     The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

120.     Plaintiffs have suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited by Defendants in violation of 18 U.S.C. §1591(a).

## <u>COUNT II:</u>
### BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591 AND 1595

**(Plaintiffs and the All Defendants)**

121.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

122.    Under 18 U.S.C. §1591 liability arises for entities who: (1) knowingly benefitted financially or by receiving anything of value (2) from participation in a venture (3) it knew or should have known was engaged in sex trafficking.

123.    Pursuant to 18 U.S.C. §1591(a), anyone under the age of 18 engaging in the act of commercial sex is considered to be a victim of human trafficking.

124.    Defendants' acts, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendants had a statutory obligation not to participate in or benefit from a venture that they knew, or should have known, was engaged in violations of 18 U.S.C. §1591(a). At all relevant times, Defendants breached this duty by participating in, and facilitating, the harboring and provision of Plaintiffs for the purpose of commercial sex induced by fraud and coercion by their acts, omissions, and commissions.

125.    Defendants knew, or were in reckless disregard of the fact, that it was Bassnectar's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, as well as Defendants' resources to entice or recruit young and underage female fans into commercial sex acts.

126.    Defendants knowingly benefited from, and received value for, their participation in the venture, in which Ashton, with the Defendants knowledge, or in reckless disregard of the fact, that Bassnectar would utilize his fame and influence through the Bassnectar brand, to solicit and coerce Plaintiffs, who were under the age of eighteen, to engage in commercial sex acts.

127.    Defendants have financially benefitted as a result of these acts, omissions, and/or commissions by their participation in managing, promoting, recruiting, and profiting off the success of the Bassnectar brand.

128.    Rachel Ramsbottom is a victim of sex trafficking with the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

129.    Alexis Bowling is a victim of sex trafficking with the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

130.    Defendants' conduct was in, or affected, interstate and/or foreign commerce. Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

131.    Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless disregard of the fact that the Plaintiffs were engaged in commercial sexual acts while under the age of eighteen.

132.    Defendants' employees and agents had actual knowledge or should have known that they were facilitating and participating in a scheme to profit from the commercial sex acts of minor children.

133.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595.  Specifically, Defendants had a statutory obligation not to benefit in any way from a venture they knew, or should have known, to engage in violations of 18 U.S.C. §1591(a).  At all relevant times, Defendants breached this duty by causing a person under the age of 18 to engage in a commercial sex act.

134.    Defendants' conduct has caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**COUNT III:**
**RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY, 18 U.S.C. § 2252 and**
**2252A**
**(Plaintiffs Against Defendant Loin Ashton a/k/a Bassnectar )**

135.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

136.     The Defendant committed multiple violations of 18 U.S.C. § 2252.

137.     Plaintiffs were minors and victims of these violations of Sections 1591, 2252, and 2252A and suffered personal injury as a result of such violations and are eligible to sue and recover damages and other forms of relief under 18 U.S.C. § 2255.

138.     Defendant knowingly solicited, manufactured, received and possessed child pornography depicting Plaintiffs.

139.     As a proximate result of Defendants' violation of 18 U.S.C. § 2252A, Plaintiffs suffered serious harm, including physical, psychological, financial, and reputational harm.

140.     Defendant's conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights.  They are entitled to compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

**WHEREFORE,** in consideration of the above claims, Plaintiffs Rachel Ramsbottom and Alexis Bowling request that a jury be selected to hear this case and render a verdict for the Plaintiffs, and against the Defendants, and that the jury selected award damages to the Plaintiffs in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrong and injuries to the Plaintiffs due to the Defendants' faulty conduct, including but not limited to:

a.     All available compensatory damages for the described losses with respect to each cause of action;

b.     Past and future medical expenses, as well as the costs associated with past and future life care;

c.     Past and future lost wages and loss of earning capacity;

d.     Past and future emotional distress;

e.     Consequential and/or special damages;

f.     All available non-economic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.     Punitive damages with respect to each cause of action;

h.     Reasonable and recoverable attorney's fees;

i.     Costs of this action; and

j.     Pre-judgement and all other interest recoverable.

Further, Plaintiffs request that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

/s/ Phillip Miller
Phillip Miller, #006873
*Attorney for the Plaintiff*
631 Woodland Street
Nashville, TN  37206
615-356-2000 phone
615-242-1739 fax
pmiller@seriousinjury.com

Brian Kent*
M. Stewart Ryan*
Alexandria MacMaster*
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
(T): (215) 399-9255
(E): bkent@lbk-law.com
      sryan@lbk-law.com
      amacmaster@lbk-law.com

Date: April 5, 2021                    *pro hac vice application forthcoming*