# IN THE UNITED STATE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RACHEL RAMSBOTTOM | ) | |
| ALEXIS BOWLING | ) | |
| JENNA HOUSTON | ) | |
| JANE DOE #1 | ) | CIVIL ACTION |
| | ) | |
| Plaintiffs | ) | No. 3:21-cv-00272 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| LORIN ASHTON, | ) | |
| AMORPHOUS MUSIC, INC., | ) | |
| BASSNECTAR TOURING, INC., | ) | |
| C3 PRESENTS, L.L.C., | ) | |
| INTERACTIVE GIVING FUND, | ) | |
| GNARLOS INDUSTRIES, LLC, | ) | |
| CARLOS DONOHUE; ABC | ) | |
| CORPORATIONS, ONE THROUGH | ) | |
| TEN (said Names Being Fictitious), | ) | |
| JOHN DOES, ONE THROUGH TEN | ) | |
| (said Names Being Fictitious) | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO DEFENDANT C3 PRESENTS, L.L.C.'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

### I.      INTRODUCTION

This case arises from the solicitation and sexual victimization of underaged Plaintiffs who were coerced and/or defrauded into engaging in commercial sex acts and the manufacture and dissemination of child pornography. Plaintiffs were targeted, groomed, and sexually exploited by electronic dance music ("EDM") musician "Bassnectar" (true name Lorin Ashton), who utilized his fame, shows, and organizations to engage in recruitment of underaged females, including

Plaintiffs, for the purposes of grooming and, ultimately, sexually abusing, victimizing, and trafficking. With the funding and accommodation of the Defendant companies, including Defendant C3 Presents, LLC (hereinafter "C3 Presents" or "Moving Defendant"), who knew or should have known that Bassnectar was trafficking minor females, Bassnectar used his position of power not only to coerce Plaintiffs into having sexual intercourse with him for money and other things of value, but insisted that Plaintiffs take sexually explicit and/or pornographic photos of themselves and send them to Bassnectar for his sexual gratification. Bassnectar would utilize the services, funds, and support of Defendants to engage in this illegal sex trafficking venture.

At the outset of their motion, Moving Defendant misstates its own business to direct this Honorable Court away from the allegations in Plaintiffs well-pled First Amended Complaint (hereinafter "FAC"). C3 Presents claims it is nothing more than a "live events promoter" and that it worked with Defendant Bassnectar in this fashion. Moving Defendant was not, and is not, merely a live event promoter but is instead an artist management agency that "provides full-service artist management solutions for a variety of music business clients" including, at all relevant times, Defendant Bassnectar.[1] Nor have Plaintiffs pled anything otherwise.[2]

Bassnectar, with the aid, participation, and assistance of employees of the other Defendants named in Plaintiffs' FAC, including Moving Defendant, would target and recruit underage girls to come to Bassnectar's shows including shows being promoted and managed by Moving Defendant. On a regular basis, minors were provided backstage passes which at times included hotel room

---

[1] *See* C3 Presents, LLC website *available at* https://www.c3presents.com; *see also The Hollywood Reporter,* "C3 Presents Forms Partnership With Big Day Out Fest," Jan. 4, 2012, available at https://www.hollywoodreporter.com/news/music-news/c3-presents-big-day-out-partners-278071/ ("C3 also includes a management division with such artists as Bassnectar . . .").
[2] Moving Defendant also refers to Plaintiffs, now adult-women who were groomed and sexually abused while minors, as "former fans" of their sexual abuser Bassnectar. This descriptor suggest C3 Presents may be attempting to minimize and dismiss the sexual abuse suffered by Plaintiffs. Plaintiffs' collective truth, outlined in the FAC, speaks for itself.

2

keys. Bassnectar regularly flew Plaintiffs and other underage girls out to shows and would arrange for them to stay in hotel rooms so that he could engage in illegal sexual activity with them all with the aid, participation, and assistance of the other Defendants named in Plaintiffs' FAC, including Moving Defendant. The solicitation of minors for the sexual gratification of Bassnectar was happening out in the open including within the view of Moving Defendant. *See* A true and correct copy of Plaintiffs' FAC attached hereto as Exhibit "A" at ¶¶ 31, 17 − 18, 64 − 68, 72, 75, 191, 201 − 204, 210 − 212.

Defendant C3 Presents managed Bassnectar's music career at all relevant times over the course of multiple years in which he was engaged in the sexual trafficking and exploitation of Plaintiffs. *Id*. at ¶ 31. Defendant C3 Presents knew or should have known that this systematic targeting of young girls was being perpetrated by Bassnectar, with the support and accommodation of C3 Presents and the other Defendants, and that it was occurring at shows and concerts it also promoted and managed. In partnering with Bassnectar—by participating in a business venture with him and the remaining Defendants—C3 Presents knowingly received a financial benefit and other things of value from their partnership with Bassnectar. *Id*. at ¶¶ 64 − 68, 72, 191, 201 − 204, 210 − 212. Therefore, Defendant C3 Presents received a knowing benefit from their participation in a venture that they knew or should have known was engaged in sex trafficking and other offenses in violation of the Trafficking Victim Protection Reauthorization Act (TVPRA).

For the reasons discussed above and below, Plaintiffs respectfully request this Honorable Court to deny Defendant C3 Presents' motion to dismiss Plaintiff's First Amended Complaint.

## II.   ARGUMENT

### A. Standard of Review

1. Fed. R. Civ. P. 12(b)(6)

A motion to dismiss pursuant to the Federal Rules of Civil Procedure rule 12(b)(6) challenges the legal sufficiency of a complaint specifically arguing that a plaintiff "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). However, such a motion should not be brought as "a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958-59 (6th Cir. 2005). When presented with a motion to dismiss, a court must construe the complaint in the light most favorable to the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008).[3] The Sixth Circuit has provided a three-step process for determining a complaint's sufficiency under 12(b)(6), in which the trial court must: (1) accept all of plaintiff's factual allegations as true; (2) draw all reasonable inferences in plaintiff's favor; and (3) determine whether the alleged facts and inferences plausibly give rise to an entitlement to relief. *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

### 2.  Fed. R. Civ. P. 12(b)(3)

A defendant may move to dismiss a claim under Fed. R. Civ. P. 12(b)(3) for improper venue. Under 28 U.S.C. § 1391(b), "the plaintiff may file [her] complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose; this includes any forum with a substantial connection to the plaintiff's claim." *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998); *see also* 28 U.S.C. § 1391(b)(2). Plaintiffs are not required to file a complaint in the district where the most substantial events giving rise to the claim occurred. *See Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 671 (S.D. Ohio 2011). In

---

[3] The Court is not required to accept mere legal conclusions unsupported by factual allegations, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and a complaint's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plausibility standard "is not akin to a probability requirement" but is a "context-specific" inquiry drawing on our "judicial experience and common sense." *Iqbal*, 556 U.S. at 678, 679, (citing *Twombly*, 550 U.S. at 556, 557) (internal quotations omitted).

other words, venue may be proper in more than one district even though most of the events occurred in only one of the districts. *Id.* at 672. Nevertheless, "only those acts or omissions with substantial, rather than tangential, connections to a plaintiff's claims can establish venue." *Reilly v. Meffe*, 6 F. Supp. 3d 760, 765 (S.D. Ohio 2014).[4] Courts consider both the plaintiff's and defendant's activities in analyzing whether venue is proper under § 1391(b)(2). *Id.* at 767. In addressing a 12(b)(3) motion to dismiss, "[t]he Court may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Good v. City of Southhaven*, No. 16-02029, 2017 WL 11316500, at *5 (W.D. Tenn. Mar. 30, 2017) (citing *Gone to the Beach, LLC v. Choicepoint Servs., Inc.,* 434 F. Supp. 2d 534, 536–37 (W.D. Tenn. 2006) (quotation marks omitted).

### B. The Plaintiffs' First Amended Complaint is Sufficient Under the TVPRA

The Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1591, *et seq.,* criminalizes the sex trafficking of children and the sex trafficking of adults by force, fraud, or coercion. Separately, § 1595 of the TVPRA provides victims of sex trafficking with a civil remedy against the perpetrators or beneficiaries of sex trafficking. *See* 18 U.S.C. § 1595(a). Count Two of the Plaintiffs' Amended Complaint, i.e., "COUNT II: Benefitting from a Sex Trafficking Venture in Violation of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591 and 1595 (All Plaintiffs and All Defendants)" explicitly and unequivocally states a beneficiary theory of liability against Moving Defendant pursuant to § 1595 of the TVPRA, not a perpetrator theory of liability pursuant to § 1591. *See* Plaintiffs' FAC at ¶¶ 198–213. The references to § 1591(a) in this count are directed toward the Plaintiffs' status as "victims" of human trafficking,

---

[4] "Substantiality" is intended to preserve fairness so that a defendant is not forced to defend litigation in a remote district with no relationship to the dispute. *Sazerac Co. v. Hood River Distillers, Inc.*, No. 3L12CV-79-S, 2012 WL 6645730, at *3 (W.D. Ky. Dec. 20, 2012).

*Id.* at ¶¶ 205–208, and Defendant C3 Presents' participation in a venture which it knew or should have known was engaged in sex trafficking. *See Id.* At ¶ 201–204, 209–212. Despite Defendant C3 Presents' efforts to conflate the Plaintiffs' factual allegations pursuant to their stated beneficiary liability cause of action with a perpetrator liability cause of action, the FAC clearly and sufficiently states a claim for relief under § 1595 of the TVPRA.

### 1. The Relevant History of the TVPRA

Congress passed the Victims of Trafficking and Violence Protection Act in 2000 ("TVPA"). Pub. L. No. 106–386, 114 Stat. 1466 (2000) (codified as amended in Title 22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code). The TVPA has been reauthorized several times in the years since including 2003, 2005, 2008, 2011, 2013, and 2017. With the enactment of the TVPA in 2000 and through its subsequent reauthorizations, Congress recognized that human trafficking constitutes "modern-day slavery." *See* Markup of H.R. 2620 before House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep. Christopher Smith). In both the text of the TVPA and the associated legislative history, Congress revealed a strong intent to provide a means of recovery for victims of sex trafficking by allowing them to pursue civil actions for human trafficking violations.

The 2003 version of 18 U.S.C. 1595(a) was a narrow remedial statute that looked solely to establish a statutory civil cause of action against perpetrators who were or could have been held criminally liable for their misconduct, to wit: "An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees." *See* Pub. L. No. 108–193, 117 Stat. 2878 (2003). Under the 2003 language, only those criminally liable under § 1591 could be held civilly liable under § 1595. However, in 2008, 18

U.S.C. 1595(a) was intentionally amended with substantially different language that created a category of defendants that could be held liable civilly even in the absence of criminal culpability.

By amending 18 U.S.C. § 1595 in 2008 as part of the Trafficking Victim Protection Reauthorization Act ("TVPRA"), Congress required "whoever," i.e., all businesses, including those in the music and entertainment industry, to comply with the new law or face new civil liability. *See* Amended Pub. L. No. 110–457, title II, § 221(2), Dec. 23, 2008 (the TVPRA was amended "by inserting '(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)' after 'perpetrator'"). This amendment to our nation's human trafficking legislation necessitated a paradigm shift in the music and entertainment industry.[5] Since this amendment to the TVPRA, some businesses have elected to comply with § 1595, as amended, while others have chosen not to comply.

Compliance with the TVPRA requires businesses, including businesses in the music and entertainment industry, to conduct a proactive analysis to determine whether the business financially benefits from participation in a sex trafficking venture. Businesses in the music and entertainment industry must take affirmative steps to determine whether they financially benefit from sex trafficking—and if so, prevent sex trafficking on their properties or through their businesses, at the events they manage and promote, and/or in their partnerships or ventures with

---

[5] For example, Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, introduced an even broader paradigm shift by requiring change nationally across all business sectors. Employers could no longer discriminate on the basis of race, religion, sex, or national origin. *Id.* Employers were of course free to maintain the status quo and continue to discriminate against their employees, but because of the new law they were liable for damages on a going forward basis for continuing to discriminate after discrimination was prohibited by law. Similarly, businesses within the music and entertainment industry are free to maintain the status quo pre-2008 and do nothing to determine whether they benefit financially from sex trafficking being perpetrated at concerts, shows, or festivals they organize, manage, and promote or from sex trafficking perpetrated by musical artists, their agents, employees, or associates such businesses manage, promote, or otherwise partner. However, choosing to maintain this status quo post-2008 following the amendment to § 1595 of the TVPRA exposes businesses in the music and entertainment industry to liability for their purposeful inaction and noncompliance with the law.

7

the artists they manage and promote, and thus the attendant financial benefit derived from the occurrence of sex trafficking. To make this determination—to find out what they should know—businesses like concert promoters and talent managers within entertainment industry must exert some meaningful effort to apprise themselves of the activities—especially flagrant criminal activities—of the artists they manage and promote and the activities of those artists and their agents on location at their shows, concerts, and festivals.

It is axiomatic that the effects of sex trafficking are devastating to its victims, especially child victims. And it is facially evident that in amending the TVPRA in 2008, Congress attempted to address these devastating effects by providing a ten (10) year statute of limitations for sex trafficking claims because the trauma and harm sex trafficking inflicts on its victims is typically so debilitating that survivors face severe mental and emotional struggles as to whether they decide to pursue a civil claim, a process that sometimes takes years. This ten (10) year statute of limitations accounts for survivors' understandable struggles with the decision to pursue litigation which are only compounded by the corresponding difficulties in obtaining remedies from the financial beneficiaries of sex trafficking—such as Moving Defendant, the concert promoter and music manager of the predator that trafficked the Plaintiffs for sex. In light of the harsh realities of sex trafficking—both the horrors of its perpetrators' misconduct and the unimaginable trauma to its victims—Congress enacted a very broad remedial law, as of 2008, that imposed liability on businesses, such as those in the music and entertainment industry, that facilitate and financially benefit from sex trafficking.

The Plaintiffs' assertions of the significance of this change in the statutory language are supported by well-established principles of statutory interpretation. As a general rule, when interpreting a statute, one must "consider not only the bare meaning of the critical word or phrase

but also its placement and purpose in the statutory scheme." *Holloway v. United States*, 526 U.S. 1, 6 (1999) (internal citation and quotations omitted); *see also Williams v. Taylor*, 529 U.S. 362, 364 (2000) ("In light of the cardinal principles of statutory construction that courts must give effect to every clause and word of a statute."). There is "a canon of construction that remedial statutes should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968). This canon of statutory construction is especially applicable to the TVPRA considering that the language of 18 U.S.C. §1595(a) was amended in 2008 to be even broader, for when a "statute is remedial in nature, its terms must be construed in a liberal fashion." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985). claim for relief under § 1595 of the TVPRA.

2. Defendant C3 Presents Knowingly Benefitted Financially in Violation of § 1595

The Congressionally mandated mechanism to civilly enforce the TVPRA is explicitly stated in § 1595. Since 2008, victims of sex trafficking have been empowered to bring civil claims against whoever financially benefits from what they should have known was a sex trafficking venture. The Plaintiffs have plausibly alleged this Defendant knew or should have known it financially benefitted from their participation in a sex trafficking venture. *See* Ex. "A" at ¶¶ 17– 18, 31, 54 –72, 75, 203–204, 209–212. Defendant C3 Presents, as the manager for Bassnectar, profited from their business venture and relationship with him and from the shows and concerts he performed, some of which were also promoted and managed by C3 Presents, all while Bassnectar and the other Defendants were in violation of the TVPRA. Simply put, the Plaintiffs' theory of beneficiary liability related to Defendant C3 Presents is expressed in their Amended Complaint as follows: "Defendants' employees and agents had actual knowledge or should have known that they were facilitating and participating in a scheme to profit from a venture involved in commercial sex acts with minor children." *See* Ex. "A" at ¶ 211. As alleged, Moving Defendant's knew or should

have known of, *inter alia*, Bassnectar utilizing his fame, fortune, celebrity, live events, and "philanthropic" AmBASSadors program to recruit and groom underage female fans for the ultimate purposes of sexual abuse and manufacture of child pornography. *See* Plaintiffs' FAC at ¶¶ 54 − 68.

Since 2008 there have been at least three distinct causes of action under § 1595: (1) § 1595 perpetrator trafficking claims against a person who directly violates § 1591(a)(1); (2) § 1595 perpetrator financial beneficiary claims against a person who directly violates § 1591(a)(2); and (3) § 1595 financial beneficiary claims against a civil defendant who has not violated § 1591 at all, but who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that *person knew or should have known* has engaged in an act in violation of this chapter." *See* 18 U.S.C.A. § 1595(a) (emphasis added).

To state either a perpetrator trafficking claim or a perpetrator financial beneficiary claim, a victim must allege actual knowledge and knowing participation in the sex trafficking venture itself because the plaintiff must prove the criminal violation of § 1591. She must prove the defendant is a perpetrator. A perpetrator trafficking claim requires knowing participation in the direct sex trafficking activities listed in § 1591(a)(1). A perpetrator financial beneficiary claim requires allegations the defendant "knowingly assist[ed], support[ed], or facilitate[ed]" the direct sex trafficking violation of § 1591(a)(1) and financially benefitted therefrom.

A financial beneficiary claim however, as alleged in this case with respect to Defendant C3 Presents, differs from the perpetrator claims in important ways. In the 2008 amendment to the TVPRA, Congress determined that civil liability would attach to a financial beneficiary if that person or entity knew or should have known the venture in which it was engaged involved a violation of the TVPRA. A financial beneficiary claim, therefore, need not allege knowing

assistance or actual knowledge that the venture in which it participated violated the TVPRA, only that the entity should have known the venture from which it benefitted violated the TVPRA. By providing an explicit constructive knowledge standard, Congress determined the definition of "participation in a venture" from § 1591(e)(6) did not apply to financial beneficiary claims under § 1595. Thus, a financial beneficiary claim has three elements: (1) a knowing benefit; (2) participation in a venture; (3) that the person or entity knew or should have known the venture engaged in a violation of the TVPRA. *See* 18 U.S.C. § 1595(a).

The availability of both a financial beneficiary claim and a perpetrator financial beneficiary claim has created confusion as litigants have stretched for cites from the scant case law applying the novel statutory scheme. However, the distinction between the knowledge requirement in a perpetrator claim as compared to a financial beneficiary claim is significant in this case. Criminal cases under the TVPRA such as *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) are inapposite to civil financial beneficiary claims because in *Afyare* the Sixth Circuit considered only the type of participation which Congress criminalized under § 1591(a)(2). As discussed, perpetrator claims alleging a criminal violation of § 1591(a)(1)–(2) do require actual knowing participation in the sex trafficking venture. A financial beneficiary claim does not require actual knowing participation in the sex trafficking venture.

Indeed the reliance of Moving Defendant on the *Afyare* case, which is a criminal, not civil, case, is quite telling. In fact, nowhere in their briefing does Moving Defendant discuss, attempt to distinguish, or even cite to *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 (S.D. Ohio Oct. 7, 2019), a civil case in this very jurisdiction dealing with civil liability under the TVPRA for a defendant such as C3 Presents. In *M.A.*, the corporate defendants motions to dismiss were denied when they advanced essentially identical arguments to those of Moving Defendant.

11

The court in *M.A.* distinguished *Afyare* especially given its reliance on criminal, and not the more "salient" civil, concepts in the law. *M.A.*, 425 F. Supp. at 969.

As alleged in Plaintiffs FAC, Defendant C3 Presents knowingly received a financial benefit and additional intangible value in being associated with the Bassnectar brand by continuing to manage and promote Bassnectar and his brand—and otherwise participate in a partnership or business venture with him and the other Defendants—while Bassnectar and the Bassnectar Companies were engaged in the sex trafficking of Plaintiffs. Defendant C3 Presents profited from its partnership with Bassnectar and the Bassnectar Companies while those entities were engaged in a sex trafficking venture.

In *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 959, 965–66 (S.D. Ohio 2019), the court acknowledged that "collecting money through sponsorships, licensing, grants, [and] publicity" satisfied the "knowing benefit" element of the § 1595(a) standard. *Wyndham Hotels*, 425 F. Supp. at 966 (quoting *Gilbert v. United States Olympic Comm.*, 423 F. Supp. 3d 1112, 1138–1139 (D. Colo. 2019).[6] Further, in *M.A.* the court held that "[i]n the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the [other entity] such that it would appear that the trafficker and the [other entity] have established a pattern of conduct or could be said to have a tacit agreement." *Id.* at 970. The court in *M.A.* determined that the plaintiff made sufficient allegations to survive a Motion to Dismiss and that, in fact, a plaintiff need not allege knowledge of a specific or particular sex trafficking venture. *Id.* at 970 – 71 ("Having found that 'participation' under § 1595 does not require actual knowledge of participation in the sex trafficking itself, this Court must then examine whether there was 'participation in a venture' here. . . . Defendants need not have actual knowledge

---

[6] The *Wyndam Hotels* court also held that the Plaintiff's allegation that defendant Wyndam Hotels' rental of rooms to a human trafficker constituted a knowing benefit for purposes of § 1595(a). *Wyndam Hotels*, 425 F. Supp. at 966.

of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless.").

This is precisely what Plaintiffs have alleged here as it relates to Moving Defendant and Bassnectar and the Bassnectar Defendants. *See* Plaintiffs' FAC at ¶¶ 31, 65, 201 – 04, and 210 – 12. Similar results have obtained in other jurisdictions as well. *See A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 192 ("we are persuaded the clear language of section 1595 favors the approach taken by Judge Marbley [in *M.A.*] focusing on a hotel's possible civil liability best conforms to Congress's intent in amending the Act to include a civil remedy provision[.]")

C3 Presents benefitted from its participation in managing, promoting, recruiting, and profiting off the success of the Bassnectar brand which was a continuous business relationship. Therefore, by knowingly receiving a benefit, financial and otherwise, as a participant in a venture with Bassnectar and the remaining Defendants, Defendant C3 Presents' conduct, as alleged in Plaintiffs' FAC, satisfies the first two elements of civil liability under § 1595 of the TVPRA.

3. <u>Defendant C3 Presents Knew or Should Have Known of their Respective Participation in a Sex Trafficking Venture</u>

Moving Defendant misconstrues the legal standard of knowledge the Plaintiffs must allege in this case. The legal standard stated in *Noble v. Weinstein*[7] and cited by Defendant C3 Presents is not applicable to this case. The source of the appropriate legal standard in this case is 18 U.S.C. § 1595, as cited in the title of Count Two of the Plaintiffs' Amended Complaint and as outlined in *M.A.* and *A.B.* Defendant C3 Presents are liable for Plaintiffs' damages if they: (1) knowingly benefitted; (2) from participation in a venture; (3) that it knew *or should have known* engaged in sex trafficking. 18 U.S.C. § 1595(a) (emphasis added).

_____

[7] 335 F. Supp. 3d 504 (S.D.N.Y. 2018).

*Noble* is inapposite because the plaintiff in *Noble* did not allege that any defendant in that case "should have known" anything. *Noble* brought only perpetrator claims against the defendants in that case.[8] The plaintiff in *Noble* did not allege a single financial beneficiary claim under § 1595. As discussed above, perpetrator claims are separate and distinct from financial beneficiary claims. *See, e.g., Barrientos v. CoreCivic, Inc.*, 332 F. Supp. 3d 1305, 1312 (M.D. Ga. 2018) ("...Plaintiffs' Complaint arguably alleges a cause of action against CoreCivic as both a perpetrator and as a financial beneficiary."). Because the plaintiffs' claims in *Noble* alleged only that the defendants were the actual perpetrators of violations of § 1591, the plaintiff had to prove those violations against the defendants. To do so, § 1591, a criminal statute, explicitly requires a showing of at least "reckless disregard."

Section 1595 explicitly does not require a showing of "reckless disregard" and does not restrict civil suits only against defendants who have actually violated § 1591 themselves. "Reckless disregard" and "should have known" are not interchangeable levels of scienter. Reckless disregard is conscious indifference, while "should have known" is the well-known standard of knowledge, also referred to as constructive knowledge. *See Brewster v. La Quinta Inns, Inc.*, 142 F.3d 432 (6th Cir. 1998) (analyzing a hotel's duty of care under Louisiana negligence law, the Sixth Circuit explained the standard as "should have known (i.e., had constructive knowledge)"). Constructive knowledge is the "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019).

---

[8] The counts pled in *Noble* were specifically: (1) "Violation of 18 U.S.C. § 1591"; (2) Participation in a Venture in Violation of 18 U.S.C. § 1591"; (3) Participation in a Venture in Violation of 18 U.S.C. § 1591"; (4) Aiding and Abetting Violation of 18 U.S.C. § 1591"; (5) Aiding and Abetting Violation of 18 U.S.C. § 1591". See Pl. Ex. 3, Compl., *Noble v. Weinstein*, No. 1:17-cv-09260-RWS (Feb. 20, 2018).

A defendant's knowledge of the nature of the sex trafficking venture is required for a criminal conviction under § 1591. This *mens rea* standard is referenced explicitly in the definition of § 1591(e)(4): "The term 'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." All of the definitions in § 1591 are expressly limited to the criminal context at issue in § 1591 by subsection § 1591(e) which begins, "In this *section*..." (emphasis added).

Furthermore, while courts at times may "presume that the same term has the same meaning when it occurs here and there in a single statute," that is not an "irrebuttable" presumption, but instead "readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (quoting *Atlantic Cleaners and Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). The Supreme Court has unanimously agreed that it "understand[s] that '[m]ost words have different shades of meaning and consequently may be variously construed, not only when they occur in different statutes, but when used more than once in the same statute or even in the same section.'" *Id.* (quoting *Atlantic Cleaners and Dyers, Inc. v. United States*, 286 U.S. at 433). The Supreme Court further explained:

> The point is the same even when the terms share a common statutory definition, if it is general enough, as we recognized in *Robinson v. Shell Oil Co.*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). There the question was whether the term "employees" in § 704(a) of Title VII of the Civil Rights Act of 1964 covered former employees. Title VII expressly defined the term "employee," 42 U.S.C. § 2000e(f), but the definition was "consistent with either current or past employment," 519 U.S., at 342, 117 S.Ct. 843, and we held that ***"each section" of Title VII "must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute,"*** *id.*, at 343–344, 117 S.Ct. 843.

*Id.* (emphasis added). These principles are especially true when "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease

if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

The plain language of § 1595 irrefutably demonstrates that the definition of "participation in a venture" from § 1591(e)(4) cannot apply to "participation in a venture" as used in § 1595(a). If the definition from § 1591 did apply, civil liability would be limited only against a criminal perpetrator and most of § 1595(a)—everything in parentheses—would be rendered meaningless. That is because if a person knowingly supports or facilitates a violation of § 1591(a)(1) as the definition in § 1591(e)(4) provides, that person has criminally violated § 1591(a)(2) and is in fact a perpetrator. Thus, if the definition from § 1591 applied to § 1595, a civil cause of action would only be available against "the perpetrator" and the parenthetical in § 1595(a) would mean nothing. This interpretation cannot apply because courts must "avoid a reading which renders some words altogether redundant*." Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). For example,

> If "communication" included every written communication, it would render "notice, circular, advertisement, [and] letter" redundant, since each of these are forms of written communication as well. Congress with ease could have drafted § 2(10) to read: "The term 'prospectus' means any communication, written or by radio or television, that offers a security for sale or confirms the sale of a security." ***Congress did not write the statute that way, however, and we decline to say it included the words "notice, circular, advertisement, [and] letter" for no purpose.***

*Gustafson v. Alloyd Co.*, 513 U.S. 561, 574–75 (1995) (emphasis added). *See also United States v. Ballinger*, 395 F.3d 1218, 1236 (11th Cir.2005) ("statutes should be construed so that 'no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *United States v. Aldrich*, 566 F.3d 976, 978–79 (11th Cir. 2009)). The words "should have known" in § 1595(a) were not intended by Congress to be meaningless.

Defendant C3 Presents repeatedly elides the specific and clear differences between criminal liability and associated civil claims against perpetrators under § 1591 and civil liability of beneficiaries under § 1595. In order to state a claim, Plaintiffs must merely allege that Defendants should have known they were benefitting financially from a sex trafficking venture. Plaintiffs have so alleged.

Moving Defendant also argues Plaintiffs cannot show "some participation in the sex trafficking act itself[.]" *Noble v. Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018). As discussed herein, in order to state a financial beneficiary claim, Plaintiffs do not have to show that the Defendant C3 Presents participated in any sex trafficking act itself. Again, Defendant C3 Presents attempts to blur the lines between the civil and criminal statutes and blur the lines between very different cases.

The two cases from the Southern District of New York involving Harvey Weinstein (the "Weinstein Cases") are completely inapposite to the case at hand, particularly with regard to the standards of knowledge or participation in a sex trafficking venture required for civil liability in this case.[9] As discussed herein regarding *Noble*, the Weinstein Cases allege only perpetrator claims, which require alleging a direct violation of § 1591, criminal conduct. A direct violation of § 1591 requires knowledge or reckless disregard. A financial beneficiary claim under § 1595, however, requires only that the financial beneficiary "should have known" (or had constructive knowledge) the venture was violative of § 1591, i.e., that the venture involved unlawful sex trafficking. There are no claims in the Weinstein Cases that allege a defendant is civilly liable for the criminal conduct of another solely because the defendant benefitted financially from a venture the entity should have known was involved in sex trafficking.

_____

[9] *See Noble v. Weinstein*, No. 1:17-cv-09260-RWS (filed Feb. 20, 2018); *Canosa v. Ziff*, No. 1:18-cv-04115-PAE (filed Oct. 4, 2018).

Defendant C3 Presents also cites the Sixth Circuit soccer-team hypothetical from *United States v. Afyare* as a basis to attack the Plaintiffs' FAC. *Afyare* merely states analogously that under the criminal provisions of § 1591(a)(2), Congress did not intend to "target soccer players who turn a blind eye to the source of their financial sponsorship." *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016). However, under the constructive knowledge or "should have known" standard applicable to financial beneficiary claims under § 1595(a), Congress in fact did target those who turn a blind eye to the source of their income if that income derived from a sex trafficking venture via § 1595. At most, *Afyare* stands for the proposition that criminal liability will not follow sex trafficking money to all the potential persons or entities those proceeds may reach after the sex trafficking venture has been completed.

Moving Defendant also points to *H.G. v. Inter-Continental Hotels Corporation*, 489 F. Supp. 3d 697 (E.D. Mich. 2020) to support their claim that a participant in a sex trafficking venture must have knowledge of the specific sex trafficking at issue. *H.G.* involved trafficking claims against a hotel franchisor where the plaintiff failed to sufficiently allege control by the franchisor of its franchisee hotels. The plaintiff's claims in that matter were also largely time-barred as they arose prior to the 2008 amendment of the TVPRA. In its analysis of the TVPRA, however, the court fell into the same trap as the court in the Weinstein cases by incorrectly analyzing the *mens rea* element of the statute and essentially eviscerating the "should have known" standard. *See M.A.*, 425 F. Supp. at 971 ("Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless."); *See A.B.*, 455 F. Supp. 3d at 192 ("we are persuaded the clear language of section 1595 favors the approach taken by Judge Marbley [in *M.A.*] focusing on a hotel's possible civil liability best conforms to Congress's

intent in amending the Act to include a civil remedy provision[.]"). Instead the analysis in *M.A.*, and as adopted in *A.B.* should control here.

Defendant C3 Presents argues that Plaintiffs must allege that C3 Presents knew or should have known about a particular or specific sex-trafficking venture—abstract awareness of sex trafficking in general is insufficient. While the holding in *M.A.* runs counter to this claim, the reality is that Plaintiffs have alleged that Defendant C3 Presents knew or should have known about the sex trafficking *of Plaintiffs* and other similarly situated minor females who were recruited and groomed through Bassnectar's operation and which was supported and aided by Moving Defendant. Defendant C3 Presents erroneously alleges that *all* of Bassnectar's exploitative conduct was highly secretive. Plaintiffs have alleged that Bassnectar, Carlos Donohue, Chris Madrigal, "Bri," "Dom," John Does 1 – 10, and other employees, agents, or servants of Defendant Bassnectar Companies and C3 Presents all knowingly participated in a venture to traffic Plaintiffs and other underage girls for the purpose of having of sexual intercourse. *See* Ex. "A" ¶¶ 58–64, 68.

This venture was organized and operated in broad daylight at shows, concerts, and venues that C3 Presents managed and promoted by a person that was under the direct management, care, control, and supervision of Moving Defendant, considering that Moving Defendant managed the career of Bassnectar. This venture operated for *years* while Bassnectar was being managed by C3 Presents. In fact, C3 Presents managed Bassnectar and his brand during the *entirety* of the time period wherein Plaintiffs were trafficked. Plaintiffs were flown to concerts, given backstage passes, put up in hotels, and then paid for sex with Bassnectar with funds from the Defendants. Plaintiffs have sufficiently alleged facts which illustrate that Defendant C3 Presents, who benefitted financially from its partnership and participation in this business venture with Bassnectar and the Bassnectar Companies, knew or should have known that the *specific* sexual

exploitation and trafficking of Plaintiffs was occurring. Bassnectar made a concerted effort to keep his direct communications with Plaintiffs as private as possible, but Defendant C3 Presents' specious assertion that all of the conduct violative of the TVPRA alleged by Plaintiffs was highly secretive is belied by factual averments in Plaintiffs' FAC. Plaintiffs have pled specific and sufficient facts to demonstrate that trafficking of underage Plaintiffs for commercial sex acts was known or should have been known to C3 Presents and the remaining Defendants.

### C. The Complaint Does Not Rely on "Group Pleading"

In addition to their specific TVPRA arguments, Defendant C3 Presents contends generally that Plaintiffs have improperly "grouped" the Defendants in this case. Defendant C3 Presents ignores the special meaning of the term "group pleading," which is a term of art that applies in fraud cases within the framework of Rule 9(b) and the heightened pleading standard in cases alleging fraud. Plaintiffs do not allege fraud. Thus, Defendant C3 Presents' discussion of "group pleading" is an attempt to shoehorn inapplicable reasoning into their facial attack on Plaintiffs' FAC. *See, e.g., Gamrat v. Allard*, 320 F. Supp. 3d 927, 942 (discussing "group pleading" as a term of art in the context of fraud cases and the heightened pleadings standards imposed by Rule 9(b), even though the Plaintiff does not allege fraud in this matter); *United States ex rel. Takemoto v. Nationwide Mut. Ins. Co.*, 674 Fed. Appx. 92, 95 (2d Cir. 2017) (discussing "group pleading" as a term of art in fraud cases and noting that the statutory language at issue required individualized pleading, unlike some fraud statutes which do not).

Defendant C3 Presents' argument concerning the "very different roles" the Defendant companies played in Bassnectar's career is immaterial for the reasons stated above concerning C3 Presents' beneficiary liability under § 1595 of the TVPRA. Plaintiffs' well-pled FAC alleges specific and plausible facts illustrating that all Defendant businesses—Amorphous Music,

Bassnectar Touring, Red Light Management, Interactive Giving Fund, and C3 Presents—were engaged in a venture they knew or should've known was engaging in sex trafficking. The fact that Interactive Giving Fund had a different role with respect to the venture—as outlined in Plaintiffs' FAC—than C3 Presents does not negate the fact that C3 Presents had a role in the venture as well. Plaintiffs specifically name Defendant C3 Presents as the corporation that managed Bassnectar and produced large festivals where Bassnectar performed—festivals, concerts, and events Bassnectar also used to solicit, target, and sexually exploit Plaintiffs and other underage girls. *See* Ex. "A" ¶¶ 31, 54, 64–72, 201–204, 209–213. Plaintiffs have put Defendant C3 Presents on sufficient notice of the conduct for which it is liable.

### D. Venue is Proper in the Middle District of Tennessee

Defendant C3 Presents asserts that venue in the Middle District of Tennessee is improper pursuant to Fed. R. Civ. P. 12(b)(3). Defendant C3 Presents acknowledges that Plaintiff Ramsbottom "interacted" with the Defendants in Tennessee yet claims that Plaintiffs make no effort to detail such interaction or provide details for C3 Presents to assess whether the interaction and surrounding events occurred in the Middle District of Tennessee. This claim is belied by the factual allegations pled in Plaintiffs' FAC. *See* Ex. "A" ¶¶ 76–107. The interactions that C3 Presents allude to are, specifically: (1) Bassnectar soliciting, enticing, and coercing Plaintiff Ramsbottom to meet him at his show in Nashville;[10] (2) Bassnectar engaging in a commercial sext act with Plaintiff Ramsbottom, who was a minor at the time, by paying her $1,000 for sex at a hotel in Memphis;[11] and (3) Bassnectar engaging in commercial sex acts with Plaintiff Ramsbottom, while still a minor, in a Nashville hotel for four days.[12] The solicitation and sexual

---

[10] *See* Ex. "A" at ¶ 79.
[11] *Id*. at ¶¶ 83–87.
[12] *Id*. at ¶¶ 88–90.

abuse of underage Plaintiff Ramsbottom are substantial parts of the events or omissions giving rise to Plaintiffs' claims. Nashville is located in the Middle District of Tennessee. Simply because facts substantial to Plaintiffs Bowling, Houston, and Doe occurred in other venues does not make venue in the Middle District of Tennessee improper. "The Sith Circuit has held that [28 U.S.C. § 1391(b)(2)] does not require the court to determine where the most substantial events giving rise to the claim occurred; rather, venue is proper in 'any forum with a substantial connection to the plaintiff's claim.'" *See Am. Earth Sols., LLC v. Peacock,* No. 3:13-CV-1097, 2014 WL 1007285, at \*2 (M.D. Tenn. Mar 14, 2014) (quoting *First of Mich. Corp. v. Bramlet,* 141 F.3d 260, 263 (6th Cir. 1998)).

Furthermore, what is alleged in Plaintiffs' FAC is an ongoing joint venture in which the allegations of abuse and child pornography are not limited or isolated to any one Plaintiff. The trafficking and abuse at issue was systematic and akin to an ongoing tort, albeit involving different individual plaintiffs, that was committed over a course of time in a series of different jurisdictions.

Additionally, evidence in one Plaintiff's case would be relevant and admissible in all cases—necessitating that they are tried together in the same venue. "Where the same evidence is admissible against all defendants, a severance should not be granted." *United States v. Warner,* 971 F.2d 1189, 1196 (6th Cir. 1992) (quoting *United States v. Ciampaglia,* 628 F.2d 632, 643 (1st Cir. 1980)). Severance would not be required even if some evidence is admissible against some defendants and not others. *Warner,* 971 F.2d at 1196 (quoting *United States v. Hoffa,* 349 F.2d 20, 43 (6th Cir. 1965)). A substantial part of Plaintiff Ramsbottom's claims related to all defendants, including C3 Presents, occurred in the Middle District of Tennessee. Plaintiff Ramsbottom's claims are inextricably intertwined with that of Plaintiffs Bowling, Houston, and Doe and, therefore, must be tried together in the same venue.

Plaintiffs' FAC pleads that a substantial part of the events, which apply to all defendants and all claims, occurred in Nashville, Tennessee. Therefore, the pleaded facts properly establish venue.

### E. Alternative Relief

To the extent the Court has any reservations about any aspect of the Plaintiffs' First Amended Complaint and is inclined to grant some or all of the Movants' requested relief, Plaintiffs respectfully request that the Court grant any dismissals without prejudice and with leave to amend.

### III. <u>CONCLUSION</u>

The Plaintiffs' First Amended Complaint thoroughly and robustly states the factual bases for their claims and otherwise properly states their claim for relief pursuant to § 1595 of the TVPRA. To the extent the Court has any reservations about any aspect of the Plaintiffs' First Amended Complaint and is inclined to grant some or all of the Movants' requested relief, Plaintiffs respectfully request that the Court grant any dismissals without prejudice and with leave to amend. However, as the Plaintiffs have asserted throughout this Response, Defendant C3 Presents' requests for dismissal in unfounded and premature and contradicted by the face of the First Amended Complaint. Accordingly, their motion to dismiss is due to be denied in its entirety.

WHEREFORE, Plaintiffs move for an order denying C3 Presents, L.L.C.'s Motion to Dismiss Plaintiff's Amended Complaint.

Respectfully Submitted,

**MILLER LAW OFFICES**

By: <u>/s/ Phillip Miller</u>
Phillip Miller, #006873
*Attorney for the Plaintiff*
631 Woodland Street

Nashville, TN  37206
615-356-2000 phone
615-242-1739 fax
pmiller@seriousinjury.com

**LAFFEY, BUCCI & KENT, LLP**

Brian Kent*
M. Stewart Ryan*
Alexandria MacMaster*
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
(T): (215) 399-9255
(E): bkent@lbk-law.com
      sryan@lbk-law.com
      amacmaster@lbk-law.com

*admitted pro hac vice*

Dated: June 30, 2021