**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

---

| | |
|---|---|
| **RACHEL RAMSBOTTOM,** | **:** |
| **ALEXIS BOWLING,** | **:** |
| **JENNA HOUSTON,** | **:** |
| **JANE DOE #1** | **:** |
| **Plaintiffs,** | **:** |
| | **: CIVIL ACTION NO.** |
| | **:** |
| **v.** | **:** |
| | **: JURY TRIAL DEMANDED** |
| **LORIN ASHTON,** | **:** |
| **AMORPHOUS MUSIC, INC.,** | **:** |
| **BASSNECTAR TOURING, INC.,** | **:** |
| **REDLIGHT MANAGEMENT, INC.,** | **:** |
| **C3 PRESENTS, L.L.C,** | **:** |
| **INTERACTIVE GIVING FUND,** | **:** |
| **GNARLOS INDUSTRIES, LLC,** | **:** |
| **CARLOS DONOHUE; ABC** | **:** |
| **CORPORATIONS, ONE THROUGH** | **:** |
| **TEN (said Names Being Fictitious),** | **:** |
| **JOHN DOES, ONE THROUGH TEN** | **:** |
| **(said Names Being Fictitious)** | **:** |
| **Defendants.** | **:** |

---

## FIRST AMENDED COMPLAINT- CIVIL ACTION

Plaintiffs Rachel Ramsbottom, Alexis Bowling, Jenna Houston, and Jane Doe #1, by and through undersigned counsel, hereby states as follows in support of their Complaint against Defendants Lorin Ashton a/k/a Bassnectar ("Bassnectar"), Amorphous Music, Inc. ("Amorphous"), Bassnectar Touring, Inc. ("Bassnectar Touring"), Redlight Management, Inc. ("Redlight"), C3 Presents, L.L.C ("C3") Interactive Giving Fund ("Interactive"), Gnarlos Industries, LLC, ("Gnarlos Industries"), Carlos Donohue, ABC Corporations One Through Ten (said names being fictitious), and John Does One Through Ten (said names being fictitious), herein collectively referred to as "Defendants."

## INTRODUCTION

1. With the rapid rise of technological advances in the twenty-first century, a new genre of music was born. Electronic Dance Music, popularly known as EDM, captured a generation. As this new genre rose in popularity, so did the industry around it. Festivals and concerts became an immensely profitable venture as hundreds of thousands of youth flocked to these events around the country.

2. Lorin Ashton, popularly known by his stage name "Bassnectar," was regarded as one of the leading artists of the EDM scene, traveling from coast to coast performing shows and headlining large festivals. His dubstep-tinged electronica and strobe-light experience was showcased in large clubs like the 9:30 Club in Washington, D.C. and New York's Terminal 5.[1] Lorin Ashton was born on February 16, 1978.

3. Bassnectar's popularity became so great, in fact, that he began to host his own festivals including "Bass Center" and "Bass Island." Out of nine headlining shows reported to Billboard Boxscore in 2011, Bassnectar sold out eight of them and grossed $1.1 million dollars.[2]

4. Bassnectar's following was a cultural movement in itself. His fans, dubbed "Bass Heads" (not unlike the Grateful Dead's "Deadheads") would travel around the country making just enough money to get to the next show, some attending upwards of thirty-five (35) shows in a year. SF Weekly describes the Bassnectar culture as follows:

> "In a lot of ways, Bassnectar is a cult of personality. Ashton serves as a kind of tribal leader for his fans, a big brother with bass. He sees the project as a cultural and social concern, not merely a musical one, and speaks of his hardcore fans, known as Bass Heads, like a family . . . Bass Heads in turn show loyalty for Ashton and a communitarian spirit. It's a subculture of thousands across the country who are ready to show up anywhere he plays . . ."[3]

---

[1] Jason Lipshutz, *Let the Bass Build World Radio History* (2012), https://worldradiohistory.com/hd2/IDX-Business/Music/Billboard-Index/IDX/2012/2012-04-28-Billboard-Page-0036.pdf (last visited Feb 8, 2021).
[2] *Id.*
[3] Ian S. Port, *Bass Instincts: How Bassnectar Came to Rule American Dance Music* (2012), https://archives.sfweekly.com/sanfrancisco/bass-instincts-how-bassnectar-came-to-rule-american-dance-music/Content?oid=2187208&storyPage=2 (last visited Feb 5, 2021).

5.      Unlike many artists, whose success relies on their record sales, Bassnectar's clout was in his live performances. According to Bassnectar "[b]ecause our touring numbers were so monstrous last year, I just realized I could put out a CD and every noteworthy publication in the world could ignore it. But we're still going to have 3,000 kids show up on a Monday night in Kentucky with my logo tattooed on their fucking neck."[4]

6.      Self-described on Twitter as "a collaborate music project, not a person," Bassnectar utilized his platform to encourage adolescents and young people to become activists. He developed a charity for this purpose called the Interactive Giving Fund, formerly known as "BeInteractive." It partnered with organizations like Rock the Vote to get "Bass Heads" registered to vote and Conscious Alliance to organize fans to help work with local food shelters. On multiple occasions, Bassnectar also offered therapy scholarships through various organizations.

7.      A feature of the charity was its "amBASSadors" program—a carefully selected group of young people tasked with generating ideas and connecting with the "Bass Head" community. AmBASSadors were also found at shows where they would search for others "like them," even selecting fans for opportunities to get backstage and meet Bassnectar.

8.      As described by a former fan, Bassnectar was postured as an altruistic, activist organization originated by one man who provided a sense of belonging and righteousness to youth that may have felt like they never got that in their lives before. He gave them friends, fun and a purpose.[5] In many ways he was held out by himself and others to his followers—both adults and children—as God-like.

---

[4] *Id.*
[5] Alycia Grace, *Evidence Against Bassnectar [Interview] This is Perfect Harmony, LLC* (2020), https://thisisperfectharmony.com/2020/11/16/evidence-against-bassnectar-interview/ (last visited Feb 8, 2021).

9.      Yet, Bassnectar's purported noble actions and reputation of being in service to some greater good were nothing more than a veil to mask to his sinister desires and actions and a means to use his power and influence to groom and ultimately sexually victimize underage girls.

10.      Bassnectar solicited underage girls through various means, including, but not limited to, Twitter, the BeInteractive amBASSadors, and live shows, presenting himself as an advisor and peer in order to gain young girls trust, despite the fact that he was in his mid-thirties at the time. Bassnectar was able to conceal yet maintain consistent contact with these underage girls through secretive messaging apps which he required all communication to be funneled through so that he could groom them for eventual commercial sex acts, get them to send him sexually explicit photographs and further exploit them for his own gratification.

11.      After ingratiating himself into their lives, Bassnectar provided these underage girls tickets to his shows, exposing them to his thousands of young followers, "Bass Heads," and a culture premised on ideals such as community and collectivism.

12.      Bassnectar would also dictate how these underage girls were to behave, who the underage girls could hang out with and mandate that their contact with him be hidden from their parents and the public.

13.      After performances, Bassnectar would invite these underage girls to his hotel room and demand that the girls shower so that they were "clean." He would then have sex with them, requiring the sex to be unprotected, without a condom, and would provide large sums of cash and other items of value in exchange.

14.      Bassnectar would also require these underage girls to take sexually explicit photographs of themselves with their cell phones and send them to him in violation of child pornography statute 18 U.S. § 2252.

15.     This action for damages is brought by Plaintiffs who are minor victims of sex trafficking, child pornography, and other tortious acts and/or omissions who were groomed and ultimately exploited at the hands of Bassnectar.

16.     It was abundantly clear that Bassnectar was targeting and engaging in commercial sex acts with minors and utilizing his shows and organizations to accomplish the exploitation of young girls for his own sexual gratification. In fact, it was a running joke among those associated with Bassnectar that he would have to find a date at a high school dance.

17.     As such, remaining Defendants are companies that participated in a venture and benefitted economically from Bassnectar and his companies while he was trafficking the Plaintiffs and other underage girls. As a result of Bassnectar's trafficking of minor girls and solicitation and possession of child pornography, the remaining Defendants knew or, in the very least, should have known Bassnectar was trafficking minor girls for commercial sex and other illegal activity.

18.     As such, each of the Defendants, in violation of 18 U.S.C. § 1595, knowingly participated in or benefited from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a).

## PARTIES

19.     Plaintiff, Rachel Ramsbottom, is an adult female and a citizen of the state of Tennessee. Rachel was born on May 23, 1995.

20.     Plaintiff, Alexis Bowling, is an adult female and a citizen of the state of Kentucky. Alexis was born on August 20, 1996.

21.     Plaintiff, Jenna Houston, is an adult female and a citizen of the state of Pennsylvania. Jenna was born on May 27, 1995.

22.     Plaintiff, Jane Doe #1, is an adult female whose name and address is not contained in this Complaint so as to protect her privacy and identity as she incurred injuries and damages of

a sensitive nature as a result of the intentional and negligent acts and failures of Defendants outlined below. Information which would or could identify Jane Doe #1 is not contained herein. Plaintiff may be contacted through her counsel as outlined herein. Plaintiff is a citizen of Illinois.

23.     Plaintiff, Jane Doe #1, has sought leave of Court to proceed anonymously with the filing of her Motion for Leave to Proceed Anonymously and for a Protective Order Pursuant to Federal Rule of Civil Procedure 26(b). That motion was filed concurrently with the filing of this Complaint.

24.     Plaintiffs' claims are properly joined pursuant to Fed. R. Civ. Pro. 20 as they arise out of the same transaction, occurrence, or series of transactions or occurrences and involve common questions of law and/or fact, namely, the systematic grooming, trafficking and solicitation/possession of child pornography by Bassnectar and the knowledge and/or reckless indifference of same by the other Defendants.

25.     Defendant, Lorin Ashton (hereinafter "Bassnectar"), an individual, is an adult male and resident of California. Bassnectar was born on February 16, 1978.

26.     Defendant Amorphous Music Inc. (hereinafter "Amorphous"), a corporation, is incorporated in the state of California, and headquartered at 235 Park Avenue South, 9th Floor New York, New York 10003. Bassnectar is the founder, chairman, figurehead, chief executive, and icon of Amorphous Music Inc. Amorphous had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

27.     Defendant Bassnectar Touring, Inc. (hereinafter "Bassnectar Touring"), a corporation, is incorporated in the state of Delaware, and maintains an office in New York at 235 Park Avenue South, 9th Floor New York, New York 10003. Bassnectar is the founder, chairman, figurehead, chief executive, and icon of Bassnectar Touring Inc. Bassnectar utilized Bassnectar

Touring to target, recruit and ultimately victimize young girls, like Plaintiffs, for sexual exploitation. Bassnectar Touring had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

28.     Defendant Interactive Giving Fund (formerly known as "BeInteractive" and hereinafter referred to as "IGF"), is a California Corporation with headquarters located at 5800 Bristol Parkway, Culver City, CA 90230. Bassnectar is the founder and former chairman, figurehead, chief executive, and icon of IGF. Bassnectar utilized IGF to target, recruit and ultimately victimize young girls, like Plaintiffs, for sexual exploitation. IGF had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

29.     Amorphous, Bassnectar Touring and IGF are referred to collectively herein as "the Bassnectar Companies."

30.     Defendant Red Light Management, L.L.C. (hereinafter "Red Light"), a corporation, is incorporated in the state of Oregon and is headquartered at 455 2nd St. SE Suite 500, Charlottesville, VA 22902. Red Light Management participated in a venture with Bassnectar in which it managed, promoted, recruited and profited from its' venture with Bassnectar. Red Light knew, or should have known, Bassnectar was engaging in the trafficking of and unlawful conduct with minors. Red Light had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

31.     Defendant C3 Presents, L.L.C. (hereinafter C3), a corporation, is incorporated in the state of Texas and is headquarter at 1645 E 6TH St Ste 150 Austin , TX, 78702-3386. C3, at all relevant times, managed Bassnectar and produced large festivals where Bassnectar performed,

including Electric Daisy Carnival, Camp Bisco, and Lalapalooza. Bassnectar utilized these festivals, concerts and events to target young girls, like Plaintiffs, for sexual exploitation. C3 participated in managing, promoting, recruiting, and profiting from its venture with Bassnectar. C3 knew, or should have known, Bassnectar was engaging in the trafficking of minors. C3 had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

32.     Defendant Gnarlos Industries, L.L.C. (hereinafter Gnarlos Industries), a corporation, is incorporated in the state of Oregon and is headquartered at 3337 NE 79th Ave., Portland, OR, 97213. Gnarlos Industries, L.L.C., at all relevant times, participated in a venture with Bassnectar in which it managed, promoted, recruited and profited from its' venture with Bassnectar. Carlos Donohue is the founder, chairman, figurehead, and chief executive of Gnarlos Industries. Gnarlos Industries knew, or should have known, Bassnectar was engaging in the trafficking of and unlawful conduct with minors. Gnarlos Industries had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

33.     Defendant, Carlos Donohue, an individual, is an adult male and resident of Oregon. Carlos Donohue is the founder, chairman, figurehead, and chief executive of Gnarlos Industries. Carlos Donohue utilized Gnarlos Industries to arrange for and transport young girls, including Plaintiffs, to engage in commercial sex acts with Bassnectar. Carlos Donohue had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.

34.     Defendants named in the above caption as John Does, One through Ten (said names being fictitious, and hereinafter referred to as "John Does"), were, at all relevant times, individuals who were involved in a venture with Defendant Bassnectar, Amorphous and/or Bassnectar Touring

who benefitted economically from said venture and knew, or should have known, that Bassnectar, Amorphous and/or Bassnectar Touring were trafficking minor girls. The identification of these individuals is not known by the Plaintiffs at this time in the absence of discovery. Plaintiffs reserve the right to substitute the name(s) for those Defendants designated as John Does when and if such information becomes available.

35. Defendants ABC Corporations, One through Ten (said names being fictitious, and hereinafter referred to as "ABC") are incorporated associations, corporations, or other jural entities that were involved in a venture with Bassnectar, Amorphous and/or Bassnectar Touring who benefitted economically from said venture and knew, or should have known, that Bassnectar, Amorphous and/or Bassnectar Touring were trafficking minor girls. The identification of these entities are not known by the Plaintiffs at this time in the absence of discovery. Plaintiffs reserve the right to substitute the name(s) for those entities designated as ABC Corporations when and if such information becomes available.

36. At all relevant times, all Defendants in this action were acting by and through themselves in their individual capacities, and/or additionally by and through their actual and/or ostensible agents, servants and/or employees, which included entities and/or individuals over whom they had control or the right to control.

**JURISDICTION**

37. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 in that Plaintiffs and Defendants are citizens of different states and the amount in controversy is in excess of $75,000.

38. This Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1595, which provides the district courts of the United States jurisdiction over violations of 18 U.S.C. § 1591.

39. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 in that all claims are so related within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

40. This Court is "an appropriate district court of the United States" in accordance with 18 U.S.C. §1595.

41. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

**FACTS COMMON TO ALL PLAINTIFFS**

42. Like many of their peers in high school, Plaintiffs had an interest in electronic dance music ("EDM") and were fans of "Bassnectar."

43. Plaintiffs followed @Bassnectar on Twitter.

44. Bassnectar maintained control of the @Bassnectar Twitter account and used it to interact with fans.

45. Through the Bassnectar twitter account, Bassnectar found Plaintiffs and contacted them through direct messages, providing his personal number and email to maintain communication.

46. Bassnectar maintained consistent communication with Plaintiffs through text, email, and secretive communication apps.

47. In an effort to groom Plaintiffs, Bassnectar asked about personal details of Plaintiffs' lives and provided advice, including encouraging them to watch "American Beauty," a movie about an older man having a relationship with a young girl. Bassnectar referenced American Beauty at his shows too. He used the visual of the scene with the actress laying in rose petals and had rose petals fall from the sky at one of his New Year's Eve shows.

48. Through these communications, Bassnectar had personal knowledge that all Plaintiffs were minors.

49. Nevertheless, Bassnectar supplied tickets and travel arrangements for Plaintiffs to attend his performances.

50. Plaintiffs were subsequently invited to his hotel room where Bassnectar had sex with them which Bassnectar mandated be without the use of a condom.

51. In exchange for the sexual encounters, Bassnectar gave Plaintiffs cash—in amounts ranging from three hundred ($300) to one thousand six hundred ($1,600) dollars.

52. In exchange for the sexual encounters, Bassnectar also paid for and provided transportation, event tickets and other goods and services of monetary value. On some occasions, these exchanges were arranged by employees of Bassnectar and/or other Defendants.

53. Bassnectar maintained tight control over Plaintiffs, requiring them to follow certain rules including:

    a.    Keeping the relationship secret; this included avoiding being seen in public together;

    b.    Not allowing Plaintiffs to leave hotel rooms or answer the phone in Bassnectar's hotel room;

    c.    Demanding that any sexual intercourse be unprotected (without the use of a condom);

    d.    Demanding that the Plaintiffs shower before Bassnectar had unprotected sex with them so that they were "clean;"

    e.    Requiring Plaintiffs to take sexually explicit photographs of themselves and send them to Bassnectar; and

f. Plaintiffs were not allowed to have sex with anyone else, but Bassnectar could have sex with other girls and women.

54. At the heart of this action is Bassnectar's use of the Bassnectar Companies to facilitate and enable the sex trafficking of minor girls in the United States.

55. The Bassnectar Companies fund and support Bassnectar's illegal sex trafficking venture, and Bassnectar uses the Bassnectar Companies' brand, resources, and promotional events to recruit, lure, entice, and/or groom his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts.

56. Defendant IGF used their AmBASSador employees to fund, facilitate and support Bassnectar's illegal sex trafficking.

57. As a part of the admissions process, IGF would screen and vet the applicants on social media by following the applicant on their various social media platforms. Generally, an applicant would not be considered or accepted unless and until they allowed IGF to follow them on social media. Upon information and belief, part of the consideration of an applicant's acceptance in the AmBASSador program was an applicant's appearance including the applicant's appearance on social media. Many of the chosen AmBASSadors were young teenage girls that were Bassnectar's "type." Several young girls and women who were accepted in the program would be referred to as "cute" or subject to other comments on their appearance.

58. Chris Madrigal was employed as the Bassnectar Coordinator for the AmBASSador program run by Defendant IGF. He was promoted to AmBASSador coordinator in 2014. His responsibilities included coordinating times and tasks for AmBASSador volunteers who worked before and during Bassnectar shows. As a part of the work, AmBASSadors would hand out water to concert attendees to ensure those at concerts were comfortable and healthy.

59.     As a reward for their service, Defendant IGF, working in conjunction with all other Defendants, arranged for the young female AmbASSAdors to pose for photos with Bassnectar. IGF and Bassnectar did not allow the AmBASSadors to take the photos themselves, but rather had staff take the photos for Bassnectar. These photos were made available for Bassnectar to view personally.

60.     IGF, along with all other Defendants, created an environment giving Bassnectar free reign to pick and choose young girls as he pleased. Not only were young girls admitted in the AmBASSador program, but young girls were brought to him for photo opportunities so he could view each young fan.

61.     On several occasions, Madrigal, as an employee of IGF, would stand by the water stations and bathroom areas at Bassnectar's concerts looking for young underage girls that were Bassnectar's "type." Madrigal would target the young girls, approach them and offer them free backstage tickets to meet Bassnectar. Madrigal approached these young girls, introduced himself as a member of Bassnectar's staff, handed them backstage passes, and led them to the backstage area. Each time Madrigal would hand out backstage passes to the young girls, the young girls were excited to have the chance to meet their icon, Bassnectar. Madrigal was seen doing this by other AmBASSadors on numerous occasions prior to 2017.

62.     Madrigal recruited young females, many of whom were minors, and presented them to Bassnectar for his choosing.

63.     Other employees of Bassnectar's companies also recruited young females at Bassnectar concerts. Bassnectar would give several passes for "meet and greets" and backstage passes to his employees to bring him young girls and women. "Bri" and "Dom" were two employees that handed out passes to young girls for Bassnectar at his shows. Many of the young

girls who appeared underage stood in the line to get backstage in disbelief that they were hand-picked to meet one of their idols, Bassnectar.

64.     Defendants Amorphous Music, Inc., Bassnectar Touring, Inc, Red Light Management, Inc., C3 Presents LLC, and Interactive Giving Fund (hereinafter referred to as "Bassnectar Companies") also facilitated Bassnectar's illegal acts in other ways. While it was best practice for crew members to check the identification of artists' guests, this was not done by the Bassnectar crew. At least one of the employees hired by the Bassnectar Companies would even place hotel room keys in hiding places for Bassnectar's "girls" on a regular basis. When questioned by anyone about Bassnectar's requests, the employee would willfully ignore any concern, stating "it's none of my business," and/or "I'm just doing my job."

65.     The Bassnectar Companies each had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior against underage girls. In turn, the Bassnectar Companies knowingly benefit from their participation in Bassnectar's venture by the continued promotion of the Bassnectar brand.

66.     Bassnectar, using the Bassnectar Companies' resources, engaged in a pattern and practice of recruiting, luring, enticing, obtaining, and grooming underaged girls, and causing them through force, fraud or coercion, or knowing that the victim was below the age of eighteen, to engage in commercial sex acts through, among other means, providing cash payments and other commercially lucrative benefits such as transportation and concert/event tickets.

67.     The Bassnectar Companies have actual knowledge of Bassnectar's unlawful commercial sex acts through him, as he is the founder of the Bassnectar Companies and intimately involved in their day-to-day operations.

68.     Further, the Bassnectar Companies knowingly aided and abetted, facilitated, and participated in Bassnectar's illegal sex trafficking venture by being integrally involved in the

recruitment of underaged victims and the logistical steps necessary for Bassnectar to recruit, lure, entice, obtain, and groom underaged victims.

69. Bassnectar intentionally used the Bassnectar Companies' resources to recruit, lure, and entice children to cause them to engage in commercial sex acts and other degrading acts, for which he always provided Bassnectar Companies' resources as value.

70. Further, the Bassnectar Companies knowingly financed Bassnectar's commercial sex acts.

71. Bassnectar's conduct, as outlined above, violates the Trafficking Victims Protection Act (hereinafter "TVPA") and Trafficking Victims Protection Reauthorization Act (hereinafter "TVPRA"), which outlaw using means of interstate or foreign commerce to recruit, entice, obtain, or lure a person and force or coerce that person, or knowing that the person had not attained the age of eighteen years, to engage in commercial sex acts. The Bassnectar Companies are guilty of aiding and abetting Bassnectar's violations of the TVPA and TVPRA by knowingly facilitating and enabling his illegal conduct.

72. The Bassnectar Companies also directly violated the TVPA because they knowingly benefitted from participation in Ashton's venture with knowledge, or in reckless disregard of the fact, that Bassnectar used means of force, threats of force, fraud, and coercion to force children and women into engaging in commercial sex acts.

73. In June 2020, an Instagram account was created titled "@evidenceagainstbassnectar"[6] where dozens of young and underage women detailed the ways in which they were victimized by Bassnectar.

---

[6] https://linktr.ee/evidenceagainstbassnectar

74. Terrified of his illegal conduct being exposed, Bassnectar contacted Plaintiffs, telling them they were special and that he would always love them, going so far as to offer money in an attempt to coerce and manipulate Plaintiffs into staying silent.

75. The Bassnectar Companies, Red Light Management, Inc, and C3 Presents, LLC also took steps to silence other women who could expose their transgressions. The Defendants used their legal counsel to contact several women in an attempt to persuade them to remain quiet about Bassnectar's sexual misconduct after the #MeToo movement was under way in 2016 and again in 2020 after Bassnectar's illegal conduct was exposed.

**PLAINTIFF RACHEL RAMSBOTTOM**

76. Plaintiff, Rachel Ramsbottom (hereinafter referred to as Rachel), became a fan of Bassnectar in high school and followed the @Bassnectar Twitter account.

77. Rachel was born on May 23, 1995.

78. In September 2012, after tweeting about a Bassnectar show cancellation, Rachel was contacted by Bassnectar through a private message on Twitter. Rachel was seventeen at the time. Bassnectar was thirty-four years old.

79. Bassnectar informed Rachel that he would be playing a show in Nashville, in her home state of Tennessee. The first Bassnectar show Rachel went to was his New Year's Eve show in Nashville in 2012. Bassnectar knew Rachel was underage at the time but had wanted to see Rachel the next day regardless. Rachel did not meet with him because she was with her brother at the time.

80. However, Bassnectar provided his phone number and email address and maintained communication with Rachel every day or every other day from the end of September 2012 until May 2013.

81.     During this time, Bassnectar was aware that Rachel was a minor and in high school. Bassnectar would read Rachel's school assignments and even asked her to write one for him. Bassnectar said the paper he wanted Rachel to write him would take about 4-5 hours.

82.     Bassnectar manipulated Rachel and gained the trust of Rachel by presenting himself as a friend and a mentor, discussing school and offering his advice. Yet, his communications had sexual undertones, grooming Rachel for what would later become Bassnectar sexually abusing and exploiting Rachel while she was still a child under the age of eighteen. Examples include, but are not limited to:

        a.     Asking her what she would want to do if they met;

        b.     Telling her that every guy wants to have sex with her;

        c.     Directing Rachel to break up with her high school boyfriend at the time, which she did;

        d.     Telling Rachel her last name "blows [him] away" and was "really sexy;"

        e.     Asking about her social life; and

        f.     Having Rachel engage in phone sex with him.

83.     In May 2013, Bassnectar was in Memphis performing at the Beale Street Music Festival.

84.     On or about May 3, 2013 Rachel met Bassnectar at the Marriott Hotel in Memphis.

85.     Instead of meeting in the lobby as originally planned, Bassnectar directed Rachel to meet him in the elevator. When she did, Bassnectar did not say a word to Rachel.

86.     Instead, Bassnectar took Rachel to his hotel room and had sex with her. Bassnectar refused to wear a condom and never asked if Rachel was on birth control. Rachel was seventeen years old at the time.

87.     Bassnectar provided Rachel with one thousand ($1,000) dollars in mixed bills after he had sex with her.

88.     Approximately several weeks later, Bassnectar wanted to celebrate Rachel's birthday in Nashville and invited Rachel to stay with him at the Lowe's hotel.

89.     Bassnectar kept Rachel in the hotel room for approximately four (4) days.

90.     During this time, Bassnectar required Rachel to hide when room service arrived and became angry when Rachel answered the phone.

91.     In addition to the sexual abuse described herein, Bassnectar was very controlling of Rachel including, but not limited to:

    a.      Advising Rachel of the friends she should have;

    b.      Telling Rachel she could not pursue modeling;

    c.      Directing her choice of major in college; and

    d.      Pressuring Rachel to change her last name as no one would ever take her seriously.

92.     Further, Rachel was required to follow Bassnectar's rule: she was not allowed to have sex with anyone else, but he could have sex with whomever he wanted and unprotected sex with Rachel whenever he wanted.

93.     On numerous occasions, when Rachel was a minor, Bassnectar solicited Rachel to take and send sexually explicit photographs of herself while naked. Rachel complied. As such, Bassnectar engaged in the manufacture and possession of child pornography on numerous occasions.

94.     November of 2013 was the last time Bassnectar and Rachel saw each other in person.

95.     After the "MeToo" movement began in 2016, Bassnectar reached out to Rachel, checking in with her often and telling her "you know I love you."

96.     Rachel finally began talking about what transpired with Bassnectar during therapy sessions in 2019. It was only after beginning therapy that Rachel was able to connect the injuries and damages complained of in this complaint to what Bassnectar had done to her, as described herein.

97.     In 2019, shortly after Rachel had started therapy as a result of what Bassnectar did to her, she decided to tell Bassnectar for the first time that she was suffering as a result of what he did to her when she was a minor. Bassnectar attempted to justify his behavior, again using manipulation tactics. Bassnectar offered to pay for Rachel's therapy or fly out for a therapy session with Rachel.

98.     After being publicly exposed in June 2020, Bassnectar began incessantly reaching out to Rachel; when she blocked his number, he continued to attempt to initiate contact via the messaging app "WhatsApp." Bassnectar also emailed Rachel before his last attempt to contact her on "Whatsapp."

99.     Eventually, Rachel agreed to have a phone conversation with him.

100.    Bassnectar and Rachel spoke on June 3, 2020. During the phone conversation, Rachel confronted Bassnectar about the fact that she was taken advantage of, trafficked and that what happened between them was statutory rape.

101.    In response, Bassnectar admitted his abuse of Rachel was "so inappropriate" and that what he did was "completely wrong."

102.    Bassnectar admitted that he engaged with multiple women who were "too young," and acknowledged in his own words that there was an imbalance of power dynamic due to his age, the fan/celebrity dynamic, his male privilege, and his celebrity privilege.

103.     During the call, Bassnectar confessed that he abused his power, stating that "you weren't complicit," going so far as to apologize to Rachel for "exploiting you and taking advantage of you when you were so impressionable."

104.     Ironically, Bassnectar repeatedly stated that he wanted to "take accountability" and "make an example of myself" yet blamed Rachel for his inability to do so: "I could be doing so much more if it wasn't for one person who could push a button and put me in fucking jail."

105.     Importantly, Bassnectar admitted his conduct was illegal and referenced his risk of going to jail numerous times throughout the conversation:

           a.      "If you think it's worth me living forever in a Tennessee jail to be raped or beat to death…"

           b.      "Do you think I deserve to be in jail in Tennessee?"

           c.      "The one thing that gets in the way is if I have to go to a Tennessee jail for life."

           d.      "Do you understand me taking accountability over the phone with you right now . . . is colored by the fact that me talking to you can result in a Tennessee jail that is not a six-month sentence."

           e.      "There is only one person who has the potential to take me from being really sorry . . . to being raped in a Tennessee jail."

106.     During the phone conversation, Bassnectar repeatedly offered Rachel money and other benefits in an attempt to coerce her into remaining silent.

107.     Rachel has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked.

**PLAINTIFF ALEXIS BOWLING**

108.    Plaintiff Alexis Bowling (hereinafter referred to as "Alexis") was a fan of Bassnectar in high school and tweeted to Bassnectar on or around her 17th birthday in the Summer of 2013.

109.    Alexis was born on August 20, 1996.

110.    Bassnectar, who was thirty-five years old at the time, contacted Alexis through a direct message wishing her happy birthday. Throughout her senior year, Bassnectar, through the @Bassnectar twitter account, would reply to her tweets.

111.    Around April 2014, Bassnectar provided Alexis with his personal email and contacted her via email offering her tickets to his Las Vegas show. Bassnectar informed Alexis that his manager, Defendant, Carlos Donohue, would be getting her tickets and backstage passes for the show. Upon information and belief, Donohue, the founder, chairman, figurehead, and chief executive of Gnarlos Industries, did in fact arrange to provide tickets for Alexis, who at that time was under the age of 18. Donohue, the founder, chairman, figurehead, and chief executive of Gnarlos Industries, knew, or should have known, Bassnectar was engaging in the trafficking of and unlawful conduct with minors.

112.    Alexis drove to Las Vegas but was not permitted in the venue because she was under the age of 18.

113.    Alexis reached out to Bassnectar to see if there was anything he could do, but he could not help her. Instead, Bassnectar directed her and arranged for her to meet him near his hotel.

114.    Bassnectar met Alexis near his hotel where he took her into the bushes and hid for hours, kissing and touching Alexis.

115.    Afterwards, Bassnectar paid Alexis $300 in cash and instructed her to download the Wickr messaging app so they could stay in touch.

116.    On or around July 1, 2014, Bassnectar flew to Kentucky to visit Alexis. She picked him up from the airport and took him to the Lexington Griffin Gate Marriott where he stayed for four days. During this visit, Ashton had sex with Alexis. Alexis was seventeen years old. Bassnectar was thirty-six years old.

117.    Bassnectar paid Alexis $1600 after he had sex with her.

118.    Approximately two weeks later, Bassnectar again visited Alexis and stayed at the Hyatt Hotel in Cincinnati for three or four days. During this visit, Bassnectar had sex with Alexis.

119.    On approximately August 1, 2014, Bassnectar again visited Alexis and stayed at a hotel in Covington, Kentucky. He again stayed for three or four days. During each visit, Bassnectar had sex with Alexis multiple times.

120.    On numerous occasions, Bassnectar solicited Alexis to take and send sexually explicit photographs of herself while naked. Alexis complied. Bassnectar solicited Alexis to send sexually explicit photographs of herself while naked while Alexis was a minor.

121.    Each time Bassnectar coerced Alexis, a minor, to take nude, sexually explicit photos of herself and send them to him he engaged in the manufacture and possession of child pornography.

122.    Following the death of her Father, Bassnectar told Alexis that he could offer guidance and advice to Alexis like a father and do all the things a father would do for her.

123.    Bassnectar dictated and controlled every aspect of Alexis's life, telling her what she could or could not do, who she could hang out with, what she could wear, etc.

124.    Bassnectar required that Alexis not tell anyone about Bassnectar's contact with her, physical or otherwise. Bassnectar also ensured and required that he not be seen in public with Alexis and vice versa.

125.    Bassnectar lied to Alexis telling her that the reason she couldn't tell anyone about their contact or be seen in public with her is because he had never dated a younger girl, he didn't want to be judged and that no one would understand their love.

126.    Between 2014-2016, Bassnectar paid for and flew Alexis all over the country to see him while he was on tour. On most of these visits Bassnectar would make Alexis stay in his hotel room the entire time. Bassnectar would have sex with Alexis during most of these visits. This occurred in approximately ten (10) different states. On each of these visits that they had sex, Bassnectar either paid Alexis cash or provided her with concert tickets without charging her.

127.    In December 2015, Bassnectar had Alexis fly to California to visit him at his home in Oakland. Upon arrival, Bassnectar directed Alexis to take an Uber to a mini-mart near his house. This store was located at the base of his neighborhood and Bassnectar picked her up there.

128.    The majority of the visit was spent in Bassnectar's home. Bassnectar had sex with Alexis during this visit.  Afterwards, Bassnectar gave Alexis tickets to his show in Virginia.

129.    Alexis studied interior design and Bassnectar informed Alexis that he could get her a job with the prestigious Deborah Berke design firm.

130.    Alexis applied for the job and was scheduled for a telephone interview. Bassnectar was present for the telephone interview as Alexis was at his house in California at the time.

131.    During the telephone interview, Alexis was asked how she knew about the San Francisco position given that she had a Kentucky address. At that point, Bassnectar took the phone and hung up.

132.    In October 2016, Bassnectar had Alexis fly out to see Bassnectar at his home for the last time.

133.     On June 13, 2020 Bassnectar contacted Alexis and told her about allegations of a music teacher of his in high school having sexual contact with a minor. However, in an attempt to

manipulate Alexis, Bassnectar told Alexis that what happened between them was nothing like that. He told Alexis how special she was to him and that he would "always love her" in an attempt to maintain Alexis's loyalty and prevent her from speaking out against his unlawful conduct.

134. Moreover, following the posting of "@evidenceagainstbassnectar on Instagram, the head of Bassnectar's charitable organization contacted Alexis in an attempt to further manipulate and silence Alexis from speaking out about what Bassnectar did to her as a minor.

135. Alexis has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked.

**PLAINTIFF JENNA HOUSTON**

136. Plaintiff, Jenna Houston (hereinafter referred to as "Jenna"), was a fan of Bassnectar in high school and followed the @Bassnectar account on Twitter.

137. Jenna was born on May 27, 1995.

138. After tweeting Bassnectar lyrics on twitter, Jenna was contacted by Defendant Bassnectar through private messages on twitter. Jenna was sixteen years old at the time.

139. Bassnectar then sent Jenna his phone number and Jenna and Bassnectar began text messaging. She was sixteen years old.

140. In April of 2012, a few months after first contacting Jenna, Bassnectar came to Jenna's home state of Pennsylvania and had her meet him at the Ritz Carlton hotel in Philadelphia, PA. Bassnectar instructed Jenna to meet him in his hotel room.

141. Jenna, who was sixteen at the time, went to Bassnectar's hotel room and met Bassnectar. Almost as soon as she walked into the room, Bassnectar started having sex with Jenna. Bassnectar did not use a condom. Bassnectar was thirty-four years old.

142. Bassnectar provided Jenna with cash after they had sex.

143. For approximately the next three years, Bassnectar took advantage of Jenna's

impressionable age and successfully groomed her so he could sexually abuse her. Bassnectar manipulated and coerced Jenna into traveling and flying all over the country to have sex with him whenever he desired. Bassnectar paid for Jenna's flights to see him. Bassnectar booked Jenna's flights using his own United Airlines account number.

144.     During this time, Bassnectar knew that Jenna was a minor. Bassnectar knew her age as a result of booking her numerous flights across the country so that he could sexually abuse her. Further, there were several times when Bassnectar and Jenna were together that Bassnectar saw her identification which displayed her date of birth.

145.     Bassnectar had sex with Jenna in several states on multiple occasions after arranging her travel. In particular, Bassnectar had sex with Jenna in Pennsylvania, New York, California, Colorado, Louisiana and other states. Jenna was a minor when they had sex. Bassnectar was in his mid-thirties.

146.   When Bassnectar decided to have sex with Jenna, he would not speak to her, but would just immediately begin to undress her and have intercourse. Afterwards, Bassnectar would make her shower. He never used a condom.

147.   Additionally, Bassnectar would furnish alcohol to the young teenager. While Bassnectar and Jenna would be in hotel rooms, he would give her Bogle wine to drink and would watch her get drunk.

148.     During this time period, Defendant Bassnectar insisted that Jenna keep any contact between them a secret. He forbade her from telling anyone about them, including her parents and friends.

149.     Bassnectar would not allow them to be seen in public together. On rare occasions, the two would go hiking around Berkeley or San Francisco. On one occasion, they went to a field

to play soccer together. While they were playing soccer, some bystanders looked at them suspiciously, and Bassnectar made them run in the other direction to avoid being seen.

150.    Every few months, Bassnectar would contact Jenna "to make sure she was keeping quiet." He repeatedly drilled it into Jenna never to tell anyone about them while she was underage.

151.    During this time period, Bassnectar would not see Jenna while she was menstruating, many times even planning her flights around her menstrual cycle to avoid it.

152.    Throughout this time period, Bassnectar demanded that Jenna not date other people, but informed her that he would still be dating other girls.

153.    After Bassnectar had sex with Jenna, he would give her cash.  On some occasions, after the two would have sex and Jenna would leave, Jenna would find cash that Bassnectar put in her luggage. On at least one occasion, Bassnectar sent Jenna a magazine with cash inside of it to her home.

154.    Aside from cash, Bassnectar would also pay for Jenna's travel, food, show tickets and other expenses during the time he was having sex with her.

155.    On numerous occasions while Jenna was a minor, Bassnectar solicited Jenna to take and send sexually explicit photographs and videos of herself while naked. Jenna complied. As such, Bassnectar engaged in the manufacture and possession of child pornography on numerous occasions.

156.    Specifically, Bassnectar would badger Jenna to send photos of herself fully nude and videos of herself touching her genitals. Jenna sent him the photos and videos that he requested. Bassnectar solicited, received and possessed these sexually explicit photos and videos of Jenna prior to her eighteenth birthday.

157.    When Jenna went to college and became the age of majority, Bassnectar told her he wanted to end things with her.

158. After the account @evidenceagainstBassnectar was started in 2020 exposing Bassnectar of sexual misconduct with underage girls and women, Bassnectar began contacting Jenna again to make sure she was "staying quiet." Bassnectar asked Jenna to speak with his lawyers on the topic. Jenna even heard from Bassnectar's apparent lawyer who tried to "get her on his side."

159. Even after Bassnectar was exposed for his sexual misconduct with young girls and women, Bassnectar and the Bassnectar Companies still attempted to use money to silence his victims, including Jenna.

160. Jenna has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked. For years since the abuse, Jenna has seen several therapists after suffering severe mental stress and anguish related to Bassnectar's abusive and coercive behavior towards Jenna beginning when she was a minor. Jenna continues to suffer due to the trauma and continues to receive treatment.

**PLAINTIFF JANE DOE #1**

161. Plaintiff, Jane Doe #1, was a fan of Defendant Bassnectar and followed his account, @Bassnectar, on twitter.

162. In the Summer of 2012, when Jane Doe #1 was seventeen years old, she tweeted @Bassnectar saying how much she loved his music. Bassnectar then followed her twitter account and privately messaged her on twitter. Bassnectar asked Jane Doe #1 if the photo associated with her account was her. When Jane Doe #1 responded yes, Bassnectar asked her for her phone number. Jane Doe #1 gave him her phone number and a minute later, he called.

163. Immediately, Bassnectar told Jane Doe #1 that he wanted to start a friendship with her, that it needed to be built on trust and that she needed to keep this completely confidential. As a young impressionable fan, Jane Doe #1 agreed.

164.    Bassnectar immediately made plans to see Jane Doe #1 a week later in Chicago when he was on tour with the Bassnectar Companies. Implying that he would be with other people, Bassnectar asked Jane Doe #1 to meet him at the Congress Hotel in Chicago. Jane Doe #1 agreed and went to his hotel room as directed.

165.    When Jane Doe #1 got to the hotel room, Bassnectar was alone. Immediately Bassnectar forced himself on her. He threw her body against the wall. Jane Doe #1 then said she had a boyfriend and Bassnectar continued to force himself on her and said, "it's not like it's going to last anyway."

166.    As Bassnectar continued, Jane Doe #1 was physically shaking and upset that he would not acquiesce to her demands to stop. Bassnectar then put Jane Doe #1 on his lap and began stroking her hair and her shoulders and rubbed his hands all over her body. Seeing that Jane Doe #1 was upset, Bassnectar continued touching her and started kissing her in an effort to console her. Jane Doe #1 was seventeen at the time of the assault. Bassnectar was thirty-four years old.

167.    Eventually Bassnectar stopped and Jane Doe #1 left extremely distraught, upset and angry.

168.    In exchange for what happened, Bassnectar spoke with his tour manager, Carlos Donohue, to arrange transportation for Jane Doe #1 to take her to his show. Bassnectar paid for the cab ride.

169.    After this encounter, Bassnectar insisted they continue talking and eventually was able to manipulate his way back into Jane Doe #1's life. The two began communicating more often. Bassnectar portrayed himself as a confidante to get back into her good graces.

170.    Bassnectar had Jane Doe #1 download the application, Wickr, which would delete any messages sent and alert the other party if any screenshots were taken. It was on this application that Bassnectar began soliciting child pornography from Jane Doe #1.

171.     While Jane Doe #1 was still under the age of eighteen, Bassnectar began sending her sexually explicit messages and requested nude photos of Jane Doe #1. Jane Doe #1 complied and sent Bassnectar nude photos of herself while a minor.

172.     Bassnectar's requests for sexually explicit photos would be extremely specific. Bassnectar would ask for specific angles, tell her how to pose and would make her simulate sex acts in these photos. Bassnectar also had Jane Doe #1 send her videos of herself nude simulating sex acts. Bassnectar informed Jane Doe #1 that he would masturbate to her in these photos and videos.

173.     Approximately two months after being groped by Bassnectar in Chicago and after he manipulated his way back into her life, Bassnectar made plans to have Jane Doe #1 see him in Bloomington, Illinois when he was touring with the Bassnectar Companies.

174.     Bassnectar had Jane Doe #1 come to his hotel room alone. As soon as she walked into the room and without speaking to Jane Doe #1, Bassnectar began having sex with Jane Doe #1. He did not use a condom. He made Jane Doe #1 shower right after. Jane Doe #1 was seventeen years old. Bassnectar was thirty-four years old.

175.     Bassnectar continued to see Jane Doe #1 and continued to have sex with her. Each time, he would not use a condom and would have her shower. He forbade Jane Doe #1 from having sex with anyone else but informed her that he would continue to have sex with other girls.

176.     Bassnectar spoke with his tour manager, Carlos Donohue, about arranging transportation and paying for transportation to engage in commercial sex acts with Jane Doe #1. Donahue assisted and had cabs take Jane Doe #1 to and from seeing Bassnectar.

177.     When Jane Doe #1 was underage, Bassnectar would help Jane Doe #1 come up with lies to tell her parents about where she would be when she went to see him.

178.    Thereafter, Bassnectar started paying Jane Doe #1 in cash after they had sex. Bassnectar would also pay for her flights to travel to him. While he would have her book the flight herself so he could not be linked to her, he would hand her cash when they had sex. One time after having sex, he handed her $800 in cash.

179.    Bassnectar told Jane Doe #1 that she had signed a "verbal non-disclosure agreement" that prohibited her from telling anyone about the sexual nature of their interactions.

180.    Bassnectar continued to have contact with Jane Doe #1 over the next several years. He continued to have sex with her until 2018.

181.    As Bassnectar was aware, Jane Doe #1 struggled with her mental health. Her parents became very protective of Jane Doe #1 while she was in high school and were understandably concerned about Jane Doe #1's well-being. This became problematic for Bassnectar. In an attempt to find a way to have her parents back off, Bassnectar helped Jane Doe #1 craft a letter to her therapist about how she "feels trapped by her parents." Even as Jane Doe #1 continued to deteriorate, Bassnectar selfishly prioritized his sexual desires over Jane Doe #1's mental health. Jane Doe #1 was seventeen years old and still in high school when Bassnectar assisted Jane Doe #1 with this letter. To disguise his true intentions, Bassnectar would also send messages to her that purported to be loving and sexual in nature while also giving advice as to how she could trick her therapist and parents into giving her more freedom.

182.    When Jane Doe #1 was nineteen, she found herself in an abusive relationship with another person who was verbally, physically, and sexually abusive towards her. She ultimately was forced to get a restraining order against this person.

183.    As Jane Doe #1 continued to struggle with her mental health, Bassnectar disguised his care and concern for her and even recommended that she continue to see a therapist (with the caveat that she not disclose her interactions with him to the therapist). Bassnectar watched as Jane

Doe #1 stayed in the abusive relationship with her boyfriend for another three years. He learned that Jane Doe #1 attempted suicide and became addicted to prescription pills but continued to restrict and control her ability to open up about her other toxic relationship with Bassnectar.

184.     While Jane Doe #1 continued to turn to Bassnectar in those dark times, she heard that Bassnectar would have relations with other young girls. Jane Doe #1 learned about friends of hers who had also had sex with him, all of which added to the trauma she was already struggling with.

185.     In July of 2020, when news of Bassnectar's sexual misconduct with young girls went public, in an attempt to keep Jane Doe #1 silent as it related to their relationship, Bassnectar contacted Jane Doe #1. Bassnectar both called and emailed Jane Doe #1 to reestablish contact and make sure she would keep her mouth shut about his misconduct.

186.     Jane Doe #1 has suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked. For years since the abuse, Jane Doe #1 has seen several therapists and even required going to an inpatient treatment facility after suffering severe mental stress and anguish related to Bassnectar's abusive and coercive behavior towards Jane Doe #1 beginning when she was a minor. Jane Doe #1 continues to suffer due to the trauma and continues to receive treatment.

## CAUSES OF ACTION

### COUNT I:
### CONDUCT IN VIOLATION OF THE TRAFFICKING VICTIM PROTECTION REAUTHORIZATION ACT, 18 U.S.C. § 1591(a)
### (All Plaintiffs v. Defendant Lorin Ashton a/k/a Bassnectar)

187.     Plaintiffs incorporate each forgoing allegation herein.

188.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person

for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."

189.    Pursuant to 18 U.S.C. §1591(a), all who knowingly provide or obtain commercial sex that was provided or obtained through force, fraud, and coercion are guilty of sex trafficking. This includes, at a minimum, *both* the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work *and* those who obtain, solicit, or patronize forced commercial sex work.

190.    Pursuant to 18 U.S.C. §1591(a), anyone under the age of 18 engaging in the act of commercial sex is considered to be a victim of human trafficking.

191.    Bassnectar, with the help of the Defendants and their resources, used his fame and popularity through the Bassnectar brand, to recruit, solicit, and coerce underage girls into commercial sex acts.

192.    Rachel Ramsbottom is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

193.    Alexis Bowling is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

194.    Jenna Houston is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

195.    Jane Doe #1 is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

196.    The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of Plaintiffs' injuries and damages.

197.    Plaintiffs have suffered substantial physical and psychological injuries as a result of being trafficked and sexually exploited by Defendants in violation of 18 U.S.C. §1591(a).

**COUNT II:**
**BENEFITING FROM A SEX TRAFFICKING VENTURE IN VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT, 18 U.S.C. §§ 1591 AND 1595**
**(All Plaintiffs and the All Defendants)**

198. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

199. Under 18 U.S.C. §1591 liability arises for entities who: (1) knowingly benefitted financially or by receiving anything of value (2) from participation in a venture (3) it knew or should have known was engaged in sex trafficking.

200. Pursuant to 18 U.S.C. §1591(a), anyone under the age of 18 engaging in the act of commercial sex is considered to be a victim of human trafficking.

201. Defendants' acts, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendants had a statutory obligation not to participate in or benefit from a venture that they knew, or should have known, was engaged in violations of 18 U.S.C. §1591(a). At all relevant times, Defendants breached this duty by participating in, and facilitating, the harboring and provision of Plaintiffs for the purpose of commercial sex induced by fraud and coercion by their acts, omissions, and commissions.

202. Defendants knew, or were in reckless disregard of the fact, that it was Bassnectar's pattern and practice to use the channels and instrumentalities of interstate and foreign commerce, as well as Defendants' resources to entice or recruit young and underage female fans into commercial sex acts.

203. Defendants knowingly benefited from, and received value for, their participation in their venture with Bassnectar and, with the Defendants knowledge, or in reckless disregard of the fact, Bassnectar utilized his fame and influence through the Bassnectar brand, to solicit and coerce Plaintiffs, who were under the age of eighteen, to engage in commercial sex acts.

204. Defendants have financially benefitted as a result of these acts, omissions, and/or commissions by their participation in managing, promoting, recruiting, and profiting off the success of the Bassnectar brand.

205. Rachel Ramsbottom is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

206. Alexis Bowling is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

207. Jenna Houston is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

208. Jane Doe #1 is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

209. Defendants' conduct was in, or affected, interstate and/or foreign commerce. Defendants knowingly benefited from participation in what they knew or should have known was a sex trafficking venture, in violation of 18 U.S.C. §§ 1591(a)(2) and 1595(a).

210. Defendants knowingly benefited from, and/or received something of value for their participation in the venture, in which Defendants knew, should have known, or were in reckless disregard of the fact that the Plaintiffs were engaged in commercial sexual acts while under the age of eighteen.

211. Defendants' employees and agents had actual knowledge or should have known that they were facilitating and participating in a scheme to profit from a venture involved in commercial sex acts with minor children.

212. Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, Defendants had a statutory obligation not to benefit in any way from a venture they knew, or should have known, to engage

in violations of 18 U.S.C. §1591(a). At all relevant times, Defendants breached this duty by causing a person under the age of 18 to engage in a commercial sex act.

213. Defendants' conduct has caused Plaintiffs serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**COUNT III:**
**RECEIPT AND POSSESSION OF CHILD PORNOGRAPHY, 18 U.S.C. § 2252 and 2252A**
**(All Plaintiffs Against Defendant Lorin Ashton a/k/a Bassnectar)**

214. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs as if fully incorporated herein.

215. The Defendant committed multiple violations of 18 U.S.C. § 2252.

216. Plaintiffs were minors and victims of violations of Sections 1591, 2252, and 2252A and suffered personal injury as a result of such violations and are eligible to sue and recover damages and other forms of relief under 18 U.S.C. § 2255.

217. Defendant knowingly solicited, manufactured, received and possessed child pornography depicting Plaintiffs.

218. As a proximate result of Defendant's violation of 18 U.S.C. § 2252A, Plaintiffs suffered serious harm, including physical, psychological, financial, and reputational harm.

219. Defendant's conduct was malicious, oppressive, or in reckless disregard of Plaintiffs' rights. They are entitled to compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

**COUNT IV:**
**NEGLIGENCE *PER SE* UNDER STATE LAW**
**(Plaintiff Rachel Ramsbottom Against Defendants Lorin Ashton, Amorphous Music, Inc., Bassnectar Touring, Inc., Interactive Giving Fund, ABC Corporations One Through Ten (said names being fictitious), and John Does One Through Ten (said names being fictitious))**

220. Plaintiff Rachel Ramsbottom realleges and incorporates by reference all prior and subsequent paragraphs as if fully incorporated herein.

221. Pursuant to Tennessee state law, T.C.A. § 39-13-506(C), Aggravated Statutory Rape is the unlawful sexual penetration of a victim by the Defendant, or of the Defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the Defendant is at least ten (10) years older than the victim.

222. Defendant Bassnectar's acts, outlined above, constitute a violation of T. C. A. § 39-13-506(C). Specifically, Defendant Bassnectar committed Aggravated Statutory Rape by sexually penetrating Rachel Ramsbottom when she was less than eighteen (18) years of age and Defendant Bassnectar was at least ten (10) years older than Rachel Ramsbottom in the state of Tennessee. Defendant Bassnectar engaged in this illegal conduct on numerous occasions.

223. Pursuant to Tennessee state law, T.C.A. § 39-13-532, Statutory Rape by an Authority Figure is the unlawful sexual penetration of a victim by the Defendant, or of the Defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the Defendant is at least four (4) years older than the victim, and the defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration.

224. Defendant Bassnectar's acts, outlined above, constitute a violation of T. C. A. § 39-13-532. Specifically, Defendant Bassnectar committed Statutory Rape by an Authority Figure by sexually penetrating Rachel Ramsbottom when she was less than eighteen (18) years of age, Defendant Bassnectar was at least four (4) years older than Rachel Ramsbottom in the state of Tennessee, and Defendant Bassnectar was in a position of trust or power by virtue of Bassnectar's

professional and/or occupational status and used the position of trust or power to accomplish the sexual penetration. Defendant Bassnectar engaged in this illegal conduct on numerous occasions.

225. Bassnectar, with the help of the Defendants and their resources, used his fame and popularity through the Bassnectar brand, to recruit, solicit, and coerce minors, including all Plaintiffs and Rachel Ramsbottom for purpose of having unlawful sexual intercourse with Bassnectar.

226. All Defendants knew, had knowledge, should have known, or had reasonable suspicion of harmful acts being committed by Bassnectar on Rachel Ramsbottom and/or other minor girls and negligently, recklessly and/or intentionally permitted Bassnectar to violate Tennessee criminal statute prohibiting T. C. A. § 39-13-506(C) Aggravated Statutory Rape.

227. All Defendants knew, had knowledge, should have known, or had reasonable suspicion of harmful acts being committed by Bassnectar on Rachel Ramsbottom and/or other minor girls and negligently, recklessly and/or intentionally permitted Bassnectar to violate Tennessee criminal statute prohibiting T. C. A. § 39-13-532 Statutory Rape by an Authority Figure.

228. Such failure on part of Defendants was reckless, intentional, knowing, grossly negligent, deliberately and recklessly indifferent, outrageous, malicious and/or was a reckless and conscious disregard for the safety of Plaintiff Rachel Ramsbottom.

229. Defendants' violations constitute negligence *per se* under Tennessee law.

230. Pursuant to 28 U.S.C.A. § 1367, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

231. Defendants' violations of negligence *per se* under Tennessee law are so related to all other claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

232. Defendants' violations of negligence *per se* under Tennessee law arise from a common nucleus of operative facts as outlined herein such that they should be tried in one judicial proceeding.

233. Defendants' negligent, reckless and/or intentional acts allowed Bassnectar to continually sexually abuse Plaintiff Rachel Ramsbottom, causing continuing harm to Plaintiff Rachel Ramsbottom and the injuries and damages described above.

234. The actions, omissions, and/or commissions by Defendants alleged in this pleading were the but-for and proximate cause of Plaintiff Rachel Ramsbottom' injuries and damages described above.

235. Defendants' conduct has caused Plaintiff Rachel Ramsbottom serious harm including, without limitation, physical, psychological, financial, and reputational harm.

**WHEREFORE,** in consideration of the above claims, Plaintiffs Rachel Ramsbottom, Alexis Bowling, Jenna Houston and Jane Doe #1 request that a jury be selected to hear this case and render a verdict for the Plaintiffs, and against the Defendants, and that the jury selected award damages to the Plaintiffs in an amount which will effectively prevent other similarly caused acts and adequately reflects the enormity of the Defendants' wrongs and injuries to the Plaintiffs due to the Defendants' faulty conduct, including but not limited to:

      a. All available compensatory damages for the described losses with respect to each cause of action;

      b. Past and future medical expenses, as well as the costs associated with past and future life care;

      c. Past and future lost wages and loss of earning capacity;

d. Past and future emotional distress;

e. Consequential and/or special damages;

f. All available non-economic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g. Punitive damages with respect to each cause of action;

h. Reasonable and recoverable attorney's fees;

i. Costs of this action; and

j. Pre-judgement and all other interest recoverable.

Further, Plaintiffs request that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

/s/ Philip Miller
Phillip Miller, #006873
*Attorney for the Plaintiff*
631 Woodland Street
Nashville, TN 37206
615-356-2000 phone
615-242-1739 fax
pmiller@seriousinjury.com

Brian Kent*
M. Stewart Ryan*
Alexandria MacMaster**
LAFFEY, BUCCI & KENT, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
(T): (215) 399-9255
(E): bkent@lbk-law.com
sryan@lbk-law.com
amacmaster@lbk-law.com

* *appearing pro hac vice*
***pro hac vice application pending*

Date: May 7, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May 2021, I electronically filed the foregoing First Amended Complaint with the Clerk of Court using CM/ECF system, which will send notification of such filing to the following:

Russell B. Morgan
Jason C. Palmer
Rachel Sodée
BRADLEY ARANT
BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, Tennessee 37203
*Attorneys for Defendant C3 Presents, L.L.C.*

Grace A. Fox
Robert A. Peal
Mark W. Lenihan
SIMS FUNK, PLC
3322 West End Avenue
Suite 200
Nashville, TN 37203
(615) 292-9335
Fax: (615) 649-8565
Email: gfox@simsfunk.com

Kimberly S. Hodde
HODDE & ASSOCIATES
40 Music Square East
Nashville, TN 37203
(615) 242-4200
Fax: (615) 242-8115
Email: kim.hodde@hoddelaw.com

Mitchell Schuster
Stacey M. Ashby
MEISTER, SEELIG & FEIN, LLP
125 Park Avenue, 7th Floor
New York, NY 10017

*Attorneys for Defendants Lorin Ashton, Amorphous Music Inc., and Bassnectar Touring, Inc.*

Bennett James Wills
Brian T. Boyd
LAW OFFICE OF BRIAN T. BOYD
214 Overlook Cir.
Suite 275
Brentwood, TN 37027
(615) 861-1936
Fax: (615) 523-2595
Email: bennett@boydlegal.com

*Attorneys for Defendant Interactive Giving Fund*

*/s/ Phillip Miller*

Phillip Miller, Esquire