## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **RACHEL RAMSBOTTOM et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 3:21-cv-00272** |
| ) | **Judge Aleta A. Trauger** |
| **LORIN ASHTON et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Before the court are five separate Motions to Dismiss filed by the six defendants in this case who have been properly identified and served[1]: Lorin Ashton (also known by the stage name "Bassnectar"),[2] Amorphous Music, Inc. ("Amorphous"), Bassnectar Touring, Inc. ("BTI"), Red Light Management, Inc. ("Red Light"),[3] C3 Presents, L.L.C. ("C3"), and Carlos Donohue. Four of the motions seek the dismissal of all of the claims asserted against the moving defendant(s) (Doc. Nos. 50, 63, 70, and 103) in the Amended Complaint (Doc. No. 23); the motion filed by Ashton (Doc. No. 67) seeks dismissal of only one of the causes of action asserted against Ashton in the Amended Complaint.

For the reasons set forth herein, the court will grant all of the motions except for Ashton's

---

[1] The Amended Complaint also purports to state claims against "ABC Corporations One Through Ten (said names being fictitious), and John Does One Through Ten (said names being fictitious)." (Doc. No. 23, at 1.)

[2] Ashton is referred to herein as "Ashton," except in direct quotations (where the plaintiffs refer to him exclusively as "Bassnectar") or when the context makes it clear that the reference is to his stage persona.

[3] This defendant is identified as "Redlight Management, Inc." in the case caption but as "Red Light Management, Inc." in the body of the pleading and in the defendants' filings.

motion for partial dismissal.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The facts set forth herein are derived from the operative pleading (Doc. No. 23) and are accepted as true for purposes of ruling on the Motions to Dismiss.

### A.      The Parties

Plaintiff Rachel Ramsbottom is domiciled in Tennessee and was born on May 23, 1995. Plaintiff Alexis Bowling is domiciled in Kentucky; she was born on August 20, 1996. Plaintiff Jenna Houston is a resident and citizen of Pennsylvania and was born on May 27, 1995.

Lorin Ashton, also known as Bassnectar, was born on February 16, 1978 and is domiciled in California. He is a musician who became a leading artist on the Electronic Dance Music scene, traveling from coast to coast, performing live at large clubs, headlining large music festivals, and later hosting his own music festivals. He was enormously popular among teenagers, had a large following of devoted and loyal fans, and became a cult of personality. He developed several charities and encouraged adolescents and young people to become activists. While holding himself out to be an altruistic activist, he was allegedly also sexually abusing and manipulating underage girls on the side.

Amorphous is a corporation incorporated in the state of California, with its principal place of business in New York City. BTI is a corporation incorporated in the state of Delaware, with its principal place of business in New York City. Ashton is the founder, chairman, and chief executive officer of both Amorphous and BTI and has had a continuing business relationship with both entities at all times relevant to this lawsuit. The Amended Complaint refers to Amorphous and BTI collectively as the "Bassnectar Companies," so the court does as well.[4]

---

[4] The Amended Complaint, confusingly, initially defines the term "Bassnectar Companies" to include only those companies that Ashton allegedly formed and managed (*see* Doc. No. 23 ¶

Defendant Red Light is a corporation incorporated in Oregon with its principal place of business in Charlottesville, Virginia. It participated in a "venture" with Ashton that it managed and promoted, for which it recruited and from which it profited. (Doc. No. 23 ¶ 30.) Similarly, C3, a corporation incorporated in Texas and headquartered in Austin, Texas, "managed" Ashton, produced large festivals at which Ashton performed, and participated in "managing, promoting, recruiting, and profiting from its venture with [Ashton]." (*Id.* ¶ 31.)

Defendant Carlos Donohue is an adult resident of Oregon and the founder and chairman of Gnarlos Industries, which was originally named as a defendant but against whom all claims have been voluntarily dismissed. He is also alleged to have been Ashton's "manager" (*id.* ¶¶ 111) or "tour manager" (*id.* ¶¶ 168, 176).

### B.    Ashton's Relationships with the Plaintiffs

Ramsbottom, Bowling, and Houston all had "an interest" in Electronic Dance Music and were fans of "Bassnectar," following him on Twitter. Ashton maintained control of the "@Bassnectar" Twitter account and used the platform to interact with his fans. Through the Bassnectar Twitter account, Ashton found the plaintiffs while they were still teenagers, contacted them through direct messages, and provided them his personal cellphone number and email address in order to maintain communication with them. He also communicated with them through "secretive communication apps." (*Id.* ¶ 46.) Through these communications, Ashton had actual knowledge that all three plaintiffs were minors at the time he first contacted them. He nonetheless engaged in a sexual relationship with each while they were underage, provided them plane tickets

---

29) but then expands the term to include the other entity defendants, Red Light and C3, in whose formation and management Ashton is not alleged to have played any role (*id.* ¶ 64). The court employs the term only to refer to Amorphous and BTI collectively unless quoting directly from the Amended Complaint. At times it is unclear whether allegations in the Amended Complaint are directed only against Amorphous and BTI or also against the other entity defendants as well.

and made travel arrangements for them to attend his performances, and gave them cash—in amounts ranging from $300 to $1,600—in exchange for the sexual encounters. All three plaintiffs allege that they suffer "physical and psychological injuries and emotional distress as a result of being sexually abused, exploited, and trafficked." (Doc. No. 23 ¶¶ 107, 135, 160.)

1.      *Rachel Ramsbottom*

Specifically regarding Ramsbottom, the plaintiffs allege that she became a fan of Ashton's while she was in high school and followed the @Bassnectar Twitter account. In September 2012, when she was seventeen years old and he was thirty-four years old, Ashton contacted Ramsbottom directly through a private message on Twitter. Ashton informed Ramsbottom that he would be playing a show in Nashville. Ramsbottom attended Ashton's New Year's Eve show in Nashville on December 31, 2012—her first Bassnectar show. Although he knew that she was underage, Ashton wanted to meet with her the next day. However, Ramsbottom was with her brother and, as a result, was unable to meet with Ashton.

After his Nashville show, Ashton gave Ramsbottom his private telephone number and email address, and he communicated with her on a near-daily basis from the end of September 2012 through May 2013. Ashton knew Ramsbottom was in high school at the time. He sometimes read her school assignments; he manipulated her and gained her trust by presenting himself as a friend and mentor, discussing school and offering advice. His communications also had sexual overtones, however, as he was allegedly "grooming [Ramsbottom] for . . . sexually abusing and exploiting [her] while she was still . . . under the age of eighteen." (*Id.* ¶ 82.) For example, they engaged in phone sex, and Ashton directed Ramsbottom to break up with her boyfriend, which she did. Ashton also directed Ramsbottom on numerous occasions, while she was still a minor, to take sexually explicit photographs of herself and send them to him, which she did.

In May 2013, Ashton was performing at the Beale Street Music Festival in Memphis,

Tennessee. On or around May 3, 2013, approximately three weeks before Ramsbottom's eighteenth birthday, Ramsbottom met with Ashton in his hotel room in Memphis and had sex with him. Afterward, Ashton gave Ramsbottom $1,000 in mixed bills. "Approximately several weeks later," Ashton invited Ramsbottom to stay with him at his hotel room in Nashville to celebrate her birthday, which she did. He "kept [Ramsbottom] in the hotel room for approximately four days." (*Id.* ¶ 89.)[5]

The last time Ramsbottom and Ashton saw each other in person was in November 2013, when Ramsbottom was no longer a minor. Throughout their long-distance relationship (the duration of which is not specified in the Amended Complaint), Ashton was very "controlling," pressuring Ramsbottom to change her last name, directing her choice of college major, and advising her of what kind of friends she should have. In addition, she was not allowed to have sex with anyone other than him, though he could have sex with whomever he wanted.

Not until Ramsbottom began therapy in 2019 and "finally began talking about" her relationship with Ashton was she "able to connect the injuries and damages complained of in this complaint to what [Ashton] had done to her." (*Id.* ¶ 96.)

### 2. Alexis Bowling

Bowling was a Bassnectar fan and a follower of the @Bassnectar Twitter account while in high school. She sent a "tweet" to Ashton around her seventeenth birthday, during the summer of 2013. Ashton, who was thirty-five years old at the time, sent Bowling a direct message through Twitter to wish her a happy birthday. Throughout her senior year in high school, Ashton would reply to her "tweets." (*Id.* ¶¶ 108–10.)

---

[5] The Amended Complaint does not supply the date of this encounter. Ramsbottom's eighteenth birthday was on May 23. The Amended Complaint also does not actually state that Ashton had sex with Ramsbottom on that occasion, but it implies that he did.

In April 2014, Ashton provided Bowling his personal email address and contacted her through email, offering her tickets to his Las Vegas show. He informed her that his manager, Carlos Donohue, would be getting her tickets and backstage passes for the show. The Amended Complaint alleges "upon information and belief" that Donohue actually procured tickets and backstage passes for Bowling, who was under eighteen at the time. Bowling drove to the venue (apparently from her home in Kentucky) but was denied entry, because she was under eighteen.

Bowling reached out to Ashton, but he could not help her get into the show. Instead, he directed her to meet him near his hotel. She went where he told her to go, and he "took her into the bushes," where they "hid for hours, kissing and touching." (*Id.* ¶ 114.) Afterwards, he paid her $300 in cash and directed her to download the Wickr messaging app so that they could stay in touch.

On or around July 1, 2014, less than two months before her eighteenth birthday, Ashton flew to Kentucky to visit Bowling. She picked him up from the airport and drove him to a hotel in Lexington, Kentucky, where he stayed for four days. During this visit, Ashton had sex with Bowling. After he had sex with her, he paid her $1,600. They met at a hotel in Cincinnati approximately two weeks later and had sex multiple times during this visit as well. Around August 1, 2014, while Bowling was still seventeen, they met at a hotel in Covington, Kentucky. On this visit, as on the others, Ashton stayed three or four days and had sex with Bowling on multiple occasions. In addition, on "numerous occasions" while Bowling was still a minor, Ashton directed her to take and send to him sexually explicit photographs of herself while naked, which she did. (*Id.* ¶ 120.)

Ashton was very controlling with Bowling, dictating what she could do, what she could

wear, and whom she could "hang out with." (*Id.* ¶ 123.) He also required her not to tell anyone about his relationship with her and ensured that they were never seen in public together. Between 2014 and 2016 (in other words, both before and after Bowling turned eighteen), Ashton paid for airline tickets for Bowling to fly all over the country to see him while he was on tour, and, on most of these occasions, she would stay in his hotel room and they would have sex. On each visit during which they had sex, Ashton either paid Bowling cash or provided her with free concert tickets. The last time Bowling saw Ashton was in October 2016, when he flew her out to see him at his home in California.

### 3.    *Jenna Houston*

Houston, too, was a Bassnectar fan and followed the @Bassnectar Twitter account while she was a high school student. She was contacted by Ashton through a private message on Twitter when she was sixteen years old. Ashton sent her his telephone number and they began exchanging text messages in early 2012.

In April 2012, a few months after they began texting, Ashton came to Houston's home state, Pennsylvania. At Ashton's direction, Houston met him at a hotel in Philadelphia, where they had sex. Houston was still sixteen years old; Ashton was thirty-four years old. Ashton knew that Houston was a minor. Ashton gave her cash after they had sex.

For the next three years, all while knowing she was a minor for most of that time frame, Ashton "manipulated and coerced [Houston] into flying all over the country to have sex with him whenever he desired." (*Id.* ¶ 143. He booked her flights using his own United Airlines account number and paid for all of her travel expenses and concert tickets. Each time she traveled to meet with him to have sex, he paid her cash. Sometimes she would find cash that he put in her luggage, and once he sent her a magazine that had cash tucked inside it. He required that she keep their relationship a secret and did not allow them to be seen in public together.

On numerous occasions, Ashton solicited Houston to take sexually explicit photographs and videos of herself and send them to him, while she was still a minor. Houston complied.

After Houston turned eighteen and went to college, Ashton told her he wanted to "end things with her." (*Id.* ¶ 157.)

## C.    Allegations Against the Entity Defendants

The Amended Complaint alleges very generally that Ashton's "continuous business relationship" with the Bassnectar Companies, Red Light, C3, and Donohue "enabled" him to "engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed." (*Id.* ¶¶ 26, 27, 30, 31, 33.) The plaintiffs assert that Ashton's "use of the Bassnectar Companies to facilitate and enable the sex trafficking of minor girls in the United States" is "[a]t the heart of this action." (*Id.* ¶ 54.) They allege, very broadly, that the Bassnectar Companies "fund and support [Ashton's] illegal sex trafficking venture, and [Ashton] uses the Bassnectar Companies' brand, resources, and promotional events to recruit, lure, entice, and/or groom his victims and force or coerce them, [while] knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts" with him. (*Id.* ¶ 55.)

The Amended Complaint asserts that employees of the Bassnectar Companies would "recruit young females at Bassnectar concerts," give them free backstage passes with opportunities to meet Ashton, and "place hotel room keys in hiding places for Bassnectar's 'girls' on a regular basis." (*Id.* ¶¶ 63, 64.) Although it was "best practice" for crew members to check artists' guests' identification, the Bassnectar crew did not do that. (*Id.* ¶ 64.) Employees willfully turned a blind eye to Ashton's "requests," stating that they were just doing their jobs. (*Id.*)

The Amended Complaint states that the entity defendants all had "continuous business relationships" with Ashton that enabled him to "engage in predatory behavior against underage

girls" and, in turn, the entities "knowingly benefit[ted] from their participation in Bassnectar's venture by the continued promotion of the Bassnectar brand." (*Id.* ¶ 65.) Because Ashton was the founder of the Bassnectar Companies and was "intimately involved in their day-to-day operations," the Bassnectar Companies purportedly had "actual knowledge of [Ashton's] unlawful commercial sex acts through him" and "aided and abetted, facilitated, and participated in [Ashton's] illegal sex trafficking by being integrally involved in the recruitment of underage victims and the logistical steps necessary for [Ashton] to recruit, lure, entice, obtain, and groom underage victims." (*Id.* ¶ 68.) Ashton used the Bassnectar Companies' resources in engaging in that behavior, and the Bassnectar Companies "knowingly financed" his "commercial sex acts." (*Id.* ¶ 70.) The plaintiffs allege that the Bassnectar Companies "knowingly benefitted from participation in Ashton's venture with knowledge, or in reckless disregard of the fact, that [Ashton] used means of force, threats of force, fraud, and coercion to force children and women to engage in commercial sex acts." (*Id.* ¶ 72.)

The plaintiffs also allege that, when an Instagram account titled "@evidenceagainstbassnectar" was created in June 2020, where "dozens of young and underage women detailed the ways in which they were victimized by [Ashton]," Ashton took steps to "coerce and manipulate Plaintiffs into staying silent." (*Id.* ¶ 74.) In addition, the Bassnectar Companies and Red Light and C3 "took steps to silence other women who could expose their transgressions." (*Id.* ¶ 75.)

### D.    Relevant Procedural History

The initial Complaint, asserting claims on behalf of Ramsbottom and Bowling, was filed on April 5, 2021. The Amended Complaint, joining plaintiff Jenna Houston, was filed shortly

thereafter, on May 7, 2021.[6] Based on the factual allegations summarized above, the Amended Complaint states four claims or causes of action. The plaintiffs collectively assert claims against Ashton alone for violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1591 (Doc. No. 23, Count I) and for receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A (*id.*, Count III). The second "count," asserted against all defendants by all three plaintiffs, is for benefitting from a sex trafficking venture in violation of the TVPRA, 18 U.S.C. §§ 1591 and 1595 (*id.*, Count II). The Amended Complaint separately sets forth a claim on behalf of Ramsbottom alone against Ashton, Amorphous, and BTI for negligence *per se* under Tennessee state law (*id.*, Count IV).

On June 1, 2021, C3 filed its Motion to Dismiss under Rules 12(b)(3) and 12(b)(6), arguing that the claim against it should be dismissed based on improper venue, and, alternatively, because the Amended Complaint fails to allege facts to support a claim against it under the TVPRA. (Doc. No. 50.) The other defendants followed suit in short order. Red Light's motion argues that the claim against it should be dismissed under Rule 12(b)(6), for failure to state a claim for which relief may be granted. (Doc. No. 63.) Amorphous and BTI jointly move to dismiss the claims against them under Rule 12(b)(2), for lack of personal jurisdiction or, alternatively, under Rule 12(b)(3) or 12(b)(6), for improper venue or failure to state a claim for which relief may be granted. (Doc. No. 70.) Carlos Donohue likewise argues that the claim against him should be dismissed for lack of personal jurisdiction, improper venue, and failure to state a claim for which relief may be granted.

Unlike the other defendants, Ashton does not seek dismissal of all claims asserted against

---

[6] The Amended Complaint also added Jane Doe #1 as a plaintiff. However, Jane Doe #1 voluntarily dismissed her claims after the court denied her request for leave to pursue her claims pseudonymously.

him individually. He seeks dismissal only of the negligence *per se* claim, arguing both that the Amended Complaint fails to adequately plead facts to support the claim and that it is barred by the applicable statute of limitations.

The plaintiffs have filed a Response in Opposition to each motion (Doc. Nos. 60, 85, 87, 88, 107), and the defendants have filed Replies (Doc. Nos. 66, 98, 99, 100, 108.)

## II.    DISCUSSION

### A.    C3's Motion to Dismiss

C3's Motion to Dismiss (Doc. No. 50) cites Rules 12(b)(6) and 12(b)(3). Finding C3's Rule 12(b)(6) argument to be dispositive, the court does not reach its argument that venue is improper.

#### 1.    Rule 12(b)(6) Standard

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare

recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

> 2.    *Allegations in the Amended Complaint Against C3*

The allegations in the Amended Complaint that pertain to C3—in their entirety—are as follows:

> 16.    It was abundantly clear that Bassnectar was targeting and engaging in commercial sex acts with minors and utilizing his shows and organizations to accomplish the exploitation of young girls for his own sexual gratification. . . .
>
> 17.    As such, remaining Defendants are companies that participated in a venture and benefitted economically from Bassnectar and his companies while he was trafficking the Plaintiffs and other underage girls. As a result of Bassnectar trafficking of minor girls and solicitation and possession of child pornography, the remaining Defendants knew or, in the very least, should have known Bassnectar was trafficking minor girls for commercial sex and other illegal activity.
>
> . . . .
>
> 31.    Defendant [C3] . . . , at all relevant times, managed Bassnectar and produced large festivals where Bassnectar performed . . . . Bassnectar utilized these festivals . . . to target young girls, like Plaintiffs, for sexual exploitation. C3 participated in managing, promoting, recruiting, and profiting from its venture with Bassnectar. C3 knew, or should have known, that Bassnectar was engaged in the trafficking of minors. C3 had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed.
>
> . . . .
>
> 54.    At the heart of this action is Bassnectar's use of the Bassnectar Companies to facilitate and enable the sex trafficking of minor girls in the United States.

55. The Bassnectar Companies fund and support Bassnectar's illegal sex trafficking venture, and Bassnectar uses the Bassnectar Companies' brand, resources, and promotional events to recruit, lure, entice, and/or groom his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts.[7]

. . . .

64. Defendants Amorphous Music, Inc., Bassnectar Touring, Inc, Red Light Management, Inc., [and] C3 Presents LLC . . . (hereinafter referred to as "Bassnectar Companies") also facilitated Bassnectar's illegal acts in other ways. While it was best practice for crew members to check the identification of artists' guests, this was not done by the Bassnectar crew. At least one of the employees hired by the Bassnectar Companies would even place hotel room keys in hiding places for Bassnectar's "girls" on a regular basis. When questioned by anyone about Bassnectar's requests, the employee would willfully ignore any concern, stating "it's none of my business," and/or "I'm just doing my job."

65. The Bassnectar Companies each had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior against underage girls. In turn, the Bassnectar Companies knowingly benefit from their participation in Bassnectar's venture by the continued promotion of the Bassnectar brand.

66. Bassnectar, using the Bassnectar Companies' resources, engaged in a pattern and practice of recruiting, luring, enticing, obtaining, and grooming underaged girls, and causing them through force, fraud or coercion, or knowing that the victim was below the age of eighteen, to engage in commercial sex acts through, among other means, providing cash payments and other commercially lucrative benefits such as transportation and concert/event tickets.

. . . .

68. Further, the Bassnectar Companies knowingly aided and abetted, facilitated, and participated in Bassnectar's illegal sex trafficking venture by being integrally involved in the recruitment of underaged victims and the logistical steps necessary for Bassnectar to recruit, lure, entice, obtain, and groom underaged victims.

69. Bassnectar intentionally used the Bassnectar Companies' resources to recruit, lure, and entice children to cause them to engage in commercial sex acts and other degrading acts, for which he always provided Bassnectar Companies' resources as value.

---

[7] It is unclear whether the usage of the term "Bassnectar Companies" in paragraphs 54 and 55 is intended to include C3.

70.     Further, the Bassnectar Companies knowingly financed Bassnectar's commercial sex acts.

71.     Bassnectar's conduct, as outlined above, violates the Trafficking Victims Protection Act (hereinafter "TVPA") and Trafficking Victims Protection Reauthorization Act (hereinafter "TVPRA") . . . . The Bassnectar Companies are guilty of aiding and abetting Bassnectar's violations of the TVPA and TVPRA by knowingly facilitating and enabling his illegal conduct.

72.     The Bassnectar Companies also directly violated the [TVPRA[8]] because they knowingly benefitted from participation in Ashton's venture with knowledge, or in reckless disregard of the fact, that Bassnectar used means of force, threats of force, fraud, and coercion to force children and women into engaging in commercial sex acts.

. . . .

75.     The Bassnectar Companies, Red Light Management, Inc, and C3 Presents, LLC also took steps to silence other women who could expose their transgressions. The Defendants used their legal counsel to contact several women in an attempt to persuade them to remain quiet about Bassnectar's sexual misconduct after the #MeToo movement was under way in 2016 and again in 2020 after Bassnectar's illegal conduct was exposed.

(Doc. No. 23, *passim*.)

The question posed by the defendant's motion is whether these allegations are sufficient to state a claim against it under 18 U.S.C. § 1595(a).

> 3.     The TVPRA

Congress initially passed the Trafficking Victims Protection Act of 2000 "[t]o combat trafficking in persons, especially into the sex trade, slavery, and involuntary servitude, to reauthorize certain Federal programs to prevent violence against women, and for other purposes." Victims of Trafficking and Violence Protection Act of 2000, PL 106–386 (Division A), Oct. 28, 2000, 114 Stat 1464. The legislation created criminal offenses for forced labor and sex trafficking.

---

[8] The Amended Complaint actually states that the Bassnectar Companies violated the TVPA, but Count I asserts a violation of the TVPRA, which, as discussed below, created a civil cause of action for victims of sex trafficking.

As specifically relevant here, 18 U.S.C. § 1591 made it a federal crime to engage in the sex trafficking of children or in sex trafficking (of adults or children) by force, fraud or coercion. *Id.* The statute has been amended several times in the intervening years, including in 2018, but, during the years when Ashton was involved with the plaintiffs, it stated:

> (a) Whoever knowingly–
>
>> (1) in or affecting interstate or foreign commerce, . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>>
>> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591 (Effective Dec. 23, 2008 to May 28, 2015). In other words, the statute makes it a crime both to actively engage in sex trafficking and to knowingly benefit from participation in a venture that the defendant either knows is engaged in sex trafficking or acts in reckless disregard of that fact. *United States v. Afyare*, 632 F. App'x 272, 286–87 (6th Cir. 2016).

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003, PL 108–193, Dec. 19, 2003, 117 Stat 2875. One of the stated purposes of the 2003 amendments was to remove "unintended obstacles" faced by victims of trafficking "in the process of securing needed assistance." *Id.* Foremost among the 2003 amendments was the creation of a civil cause of action by victims of trafficking against their traffickers:

> (a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the *perpetrator* in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees. . . .

18 U.S.C. § 1595 (2003) (emphasis added).[9] That is, the 2003 version of the TVPRA provided a civil remedy against the trafficker only.

In 2008, Congress expanded victims' remedies with the passage of the William Wilberforce Trafficking Victims Protection Reauthorization Act, which extended civil liability to those who facilitate trafficking ventures. Congress amended section 1595 by striking the words "of section 1589, 1590, or 1591"; inserting "(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)" after "perpetrator"; and by adding a ten-year statute of limitations. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, Dec. 23, 2008, 122 Stat 5044. As amended in 2008 (and in its current version), section 1595(a) states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees.

18 U.S.C. § 1595(a) (2008).

Thus, in the 2008 amendment, Congress provided the victims of sex trafficking a civil cause of action, not only against perpetrators, but also against those who benefitted—financially or otherwise—from the sex trafficking of the victims. Section 1595 "opened the door for liability against facilitators who did not directly traffic the victim, but benefitted from what the facilitator should have known was a trafficking venture." Gallant Fish, *No Rest for the Wicked: Civil Liability*

---

[9] Section 1589 imposes criminal liability for forced labor, and section 1590 makes it a crime to engage in trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

*Against Hotels in Cases of Sex Trafficking*, 23 Buff. Hum. Rts. L. Rev. 119, 138 (2011).

    4.   *Whether the Plaintiffs State a Claim Against C3 Under § 1595(a)*

   As suggested above, to state a claim under a § 1595(a) beneficiary theory, the plaintiffs must allege facts—beyond mere conclusions—allowing the court to plausibly infer that the defendant (1) "knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture (3) that it "knew or should have known has engaged in" sex trafficking under 1591. *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 188 (E.D. Pa. 2020) (quoting 18 U.S.C. § 1595(a)). "The phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence." *Id.* (citing *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019)). To withstand a motion to dismiss, the plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S.at 678–79.

   In support of its Motion to Dismiss, C3 argues that the claim against it must be dismissed because: (1) the plaintiffs fail to allege facts showing that C3 knowingly participated in a "sex-trafficking venture," as opposed to merely participating in Bassnectar's music-related business; (2) even assuming that the plaintiffs have "sufficiently alleged that C3 Presents was engaged in a sex-trafficking venture with Bassnectar—which they have not—Plaintiffs nonetheless fail to demonstrate that C3 Presents committed specific acts that furthered the sex-trafficking aspect of the venture" (Doc. No. 51, at 8); (3) the plaintiffs fail to allege that C3 "knew or should have known" that Ashton was engaged in a sex-trafficking venture; and (4) the plaintiffs fail to allege facts showing that C3 "knowingly benefitted" from a "sex-trafficking venture" (*id.* at 13).

   As an initial matter, the court finds unwarranted the defendant's reliance on the Sixth Circuit's discussion of the elements of an offense under § 1591 in *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016), and on an opinion from the Southern District of New York, *Noble v.*

*Weinstein*, 335 F. Supp. 3d 504, 524 (S.D.N.Y. 2018), which did the same, in particular by adopting the definition of "participation in a venture" ("knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)") contained in the criminal statute, at 18 U.S.C. § 1591(e)(4), for purposes of a claim under § 1595. This court, without belaboring the point, is persuaded by those cases, decided since *Noble*, that have concluded that applying the definition of "participation in a venture" from § 1591 to a beneficiary-liability claim under § 1595 improperly requires a sex trafficking victim pursuing such a claim to first prove a violation of § 1591 in order to succeed. As the United States District Court for the Eastern District of Pennsylvania explained, rejecting an argument similar to that made by the defendant here:

> The court in *Noble* . . . applied the "participation in a venture" element from the criminal offense defined by Congress in section 1591(a)(2). The court in *Noble* did not address the "knew or should have known" language in the civil remedies defined in section 1595. [T]he court in *Noble* essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of section 1591(a)(2). . . .
>
> We disagree with the reasoning in *Noble* . . . We do not read the language of section 1595 to impose such a burden . . . The definition of "participation in a venture" [in § 1591] by its terms applies only to the criminal offense in section 1591(a). This requires "knowing" or "reckless disregard" of a sex trafficking venture. If we imputed this standard into section 1595—which does not define "participation in a venture"—we would ignore its "knew or should have known" language.

*A.B.*, 455 F. Supp. 3d at 188 (footnote omitted).[10]

---

[10] In *Noble*, it appears that the *plaintiffs* alleged that the defendants violated § 1591 directly, and they brought suit under § 1595 based on the defendants' direct violations of § 1591, as perpetrators. In assessing their claims, the court did not actually consider the standards set forth in § 1595 and instead considered only whether the plaintiffs could prove a violation of § 1591:

> To adequately allege "participation in a venture in violation of 18 U.S.C. § 1591(a)(2)," Plaintiff must plead facts suggesting that Robert (i) "knowingly benefitted, (ii) from participation in a commercial sex trafficking venture, (iii) while knowing (or in reckless disregard of the fact) that means of force, fraud or coercion would be used to cause the trafficked person to engage in a commercial sex act."

*Noble*, 335 F. Supp. 3d at 523–24 (quoting *Afyare*, 632 F. App'x at 283).

However, regardless of the standard that applies to the other elements of the claim, the court agrees with C3 that the Amended Complaint does not remotely allege actual facts from which it could reasonably be inferred that C3 knew or should have known that Ashton was engaged in a sex-trafficking venture. As set forth above, the facts directed toward C3 are wholly conclusory. The Amended Complaint essentially recites the elements of a claim but provides no specifics.

As just one example, the plaintiffs allege that, "[a]s a result of [Ashton's] trafficking of minor girls and solicitation and possession of child pornography, the remaining Defendants knew or, in the very least, should have known [Ashton] was trafficking minor girls for commercial sex and other illegal activity." (Doc. No. 23 ¶ 17.) This purely tautological statement proves nothing, and the remaining allegations in the Amended Complaint suffer from the same flaw. The pleading asserts that C3 and the other entities were "integrally involved in the recruitment of underage victims" (*id.* ¶ 68) and "knowingly financed Bassnectar's commercial sex acts" (*id.* ¶ 70), but it does not contain a single concrete factual allegation directed at C3 or any C3 employee, nor does it identify any specific action by Ashton (or anyone else) that was witnessed by C3 or a C3 employee that should have clued C3 into the fact that Ashton was "trafficking" underage girls or soliciting pornography from underage girls, under the "should have known" standard. The mere fact that Ashton was allegedly involved in sex trafficking and that C3 was engaged in a venture with Ashton from which it clearly benefitted—managing Ashton's music career and promoting large music festivals—is not sufficient to give rise to liability against C3 under § 1595. In addition, notably, C3 is not alleged to have had any involvement in, or knowledge of, Ashton's relationships with the three named plaintiffs. The Amended Complaint explains in great detail the steps *Ashton* took to direct-message each of the plaintiffs directly through Twitter to initiate the relationships, to maintain the relationships through purely private channels of communication, and to ensure that

the relationships remained secret.

Regarding the assertion that C3 and the other defendants took steps in 2016 and 2020 to "persuade" Ashton's victims (other than the plaintiffs) to "remain quiet about [his] sexual misconduct" (Doc. No. 23 ¶ 75), this allegation, even if accepted as true, does not allege facts showing C3's particular involvement, has nothing to do with the claims brought by the particular plaintiffs here, and does nothing to establish C3's knowledge (or negligent disregard) of Ashton's sexual misconduct while it was taking place from 2012 through 2014, as the plaintiffs allege.

The plaintiffs' Response in Opposition to C3's Motion to Dismiss argues that Count Two of the Amended Complaint "unequivocally states a beneficiary theory of liability against the Moving Defendant pursuant to § 1595 of the TVPRA, not a perpetrator theory of liability pursuant to § 1591." (Doc. No. 60-2, at 5.) To establish liability under this theory, the plaintiffs must only show that C3 knowingly benefitted from participating in a venture that it knew or should have known was engaged in sex trafficking. (*Id.*) As discussed above, the plaintiffs have accurately stated the elements of the claim. However, the plaintiffs have not pointed to any actual facts that support their assertion that C3 "should have known" that Ashton was engaged in sex trafficking at all, much less sex trafficking that involved the specific plaintiffs.

In sum, the Amended Complaint contains no nonconclusory allegations that implicate C3. In particular, the plaintiffs fail to allege facts that, if true, would establish that C3 knew or should have known that Ashton was engaged in a sex-trafficking venture. Its Motion to Dismiss will be granted on that basis, and the court does not reach C3's venue argument. The dismissal will be without prejudice, but the court denies the plaintiffs' alternative request that they be permitted to amend their pleading again. To amend their complaint, the plaintiffs will be required to file a motion to amend, accompanied by a proposed amended pleading, the merits of which the court

will consider in due course, assuming such a motion is filed.

**B.      Red Light's Motion to Dismiss**

Red Light, like C3, moves for dismissal of the § 1595(a) claim against it under Rule 12(b)(6), incorporating by reference the arguments made in C3's motion. (*See* Doc. No. 64, at 3.)

The allegations in the Amended Complaint that implicate Red Light, either directly or indirectly, are essentially identical to those recited above that reference C3 or the "Bassnectar Companies" generally. As with the allegations against C3, the court finds that the Amended Complaint does not allege facts from which it could reasonably be inferred that Red Light knew or should have known that Ashton was engaged in a sex-trafficking venture. Its Motion to Dismiss will also be granted on the basis that the Amended Complaint fails to state a colorable claim against Red Light for violation of the TVPRA. The claim against Red Light will be dismissed without prejudice, but the court, again, denies the plaintiffs' request that, at this point, they be granted leave to amend again.

**C.      Amorphous's and BTI's Joint Motion to Dismiss**

Amorphous and BTI (collectively, the "Bassnectar Companies") jointly move to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim for which relief may be granted. "As with every case, we begin with any jurisdictional issues." *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 566 (6th Cir. 2001). As set forth below, the court finds that the Amended Complaint fails to allege facts sufficient to establish a *prima facie* basis for the exercise of personal jurisdiction by this court over Amorphous or BTI. Their motion will be granted for that reason.

*1.      Personal Jurisdiction*

The Bassnectar Companies move to dismiss under Rule 12(b)(2), arguing that the legal (and factual) standards for the exercise of general jurisdiction are not met and that the exercise of specific jurisdiction over them in the state of Tennessee would violate the Fourteenth

Amendment's Due Process Clause, because they lack the requisite minimum contacts with the state, and the plaintiffs' causes of action do not arise from any alleged actions by the Bassnectar Companies in Tennessee. In response, the plaintiffs argue that, because they have brought "federal statutory claims under 18 U.S.C. §§ 1591, 2252, and 2252A," with respect to which another statute, 18 U.S.C. § 2255, provides for nationwide service of process, personal jurisdiction is governed by the Fifth Amendment's Due Process Clause. Under that standard, the question is only whether the defendants have sufficient minimum contacts *with the United States*, rather than specifically with Tennessee. (Doc. No. 87-1, at 3 (citing *Kammona v. Onteco Corp.*, 587 F. App'x 575, 579 (11th Cir. 2014)).) They contend that, because "it is clear that all Defendants have sufficient minimum contacts with the United States," the court has "personal jurisdiction over Defendants to adjudicate Plaintiffs' claims under 18 U.S.C. § 1591 and 18 U.S.C. § 2252/2252A." (*Id.* at 5.)

In the alternative, the plaintiffs contend that "jurisdiction over corporations, which can act through their agents . . . , may be established by the actions or conduct of their agents in any particular forum." (Doc. No. 87, at 3.) They also contend that "a principal may be held vicariously liable for the negligence of [its] agent, where the agent is acting within the actual or apparent scope of the agency" and that, consequently, "[e]ach and every act of abuse undertaken by Bassnectar, including those acts that took place in this judicial district[,] are also the acts of [the Bassnectar Companies]," for the purposes of establishing specific jurisdiction over them in this State, consistent with the Fourteenth Amendment's Due Process Clause. Third, the plaintiffs contend that the Amended Complaint adequately alleges a claim under the TVPRA based on allegations that the Bassnectar Companies "received a knowing benefit from their participation in a venture that they knew or should have known was engaged in sex trafficking," that "numerous instances of abuse . . . occurred within the state of Tennessee," and, therefore, that they are subject to specific

jurisdiction in this state based on their own conduct. (*Id.* at 6.) And finally, the plaintiffs assert that, while they believe the allegations in the Amended Complaint are sufficient to establish personal jurisdiction over the Bassnectar Companies, if the court disagrees, the plaintiffs should be permitted to conduct jurisdictional discovery.

In their Reply, the Bassnectar Companies assert that (1) the nationwide service of process provision in 18 U.S.C. § 2255, by its terms, does not apply to the plaintiffs' claims against them or establish jurisdiction over them; (2) the plaintiffs are confused and are conflating the concepts of the principal-agency relationship and the alter-ego theory of liability but have not pleaded facts in the Amended Complaint to support either theory or otherwise to establish personal jurisdiction over them; and (3) the plaintiffs have no basis for seeking jurisdiction-related discovery.

a)      *18 U.S.C. § 2255 Does Not Apply*

Section 2255 states, in relevant part: "Any person who, while a minor, was a victim of a violation of section . . . 1591, . . . 2252, [or] 2252A . . . of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court[.]" 18 U.S.C. § 2255(a). In addition, the statute provides for service of process on the defendant in an action brought under § 2255 "in any district in which the defendant . . . is an inhabitant [or] may be found." *Id.* § 2255(c)(2).

Numerous courts, including the Sixth Circuit, have concluded that identical language for service of process in any district in which the defendant either "is an inhabitant" or "may be found" "authorizes nationwide service of process" and, thus, also provides "the statutory basis for personal jurisdiction." *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210 (10th Cir. 2000) (finding that identical language in 29 U.S.C. § 1132(e)(2) unquestionably authorizes nationwide service of process in ERISA cases); *see also deSoto*, 245 F.3d at 567 ("reaffirm[ing] . . . that Congress has the power to confer nationwide personal jurisdiction" and that "it conferred such

jurisdiction under § 1132(e)(2)"). In addition, the Sixth Circuit has made it clear that, when there is a federal statutory grant for nationwide service of process, a "national contacts test" applies to the question of whether the district courts of the United States may exercise personal jurisdiction over the defendant. *DeSoto*, 245 F.3d at 566–67; *see id.* at 567 ("Because of the national service of process provision, the district court's exercise of jurisdiction was . . . nationwide, and therefore, the minimum contacts analysis, as a limitation on state extra-territorial power, [was] simply inapposite. Instead, in such cases we would apply a minimum contacts with the United States analysis." (internal quotation marks and citation omitted)); *Flake v. Schrader-Bridgeport Int'l, Inc.*, 538 F. App'x 604, 617 (6th Cir. 2013) ("Because . . . the bankruptcy rules provide for nationwide service of process, the relevant forum for this jurisdictional analysis is the entire United States. Accordingly, the question is this: does Tomkins have 'continuous and systematic' contacts sufficient to render it 'essentially at home' in the United States?" (citing *deSoto*, 245 F.3d at 567–68; other internal citations omitted)).[11]

In other words, it is clear that, if § 2255 did apply to the plaintiffs' claims over the Bassnectar Companies, then they would be subject to personal jurisdiction in this court, because there is no dispute that they are "at home" in the United States. However, the Bassnectar Companies argue that, while, the statute authorizes a "victim of a violation of section . . . 1591" to sue "in any appropriate United States District Court," the claims against the Bassnectar Companies

---

[11] The defendants' alternative argument that "service of process is not the same as conferring personal jurisdiction" and that, even under § 2255, the "Plaintiffs must still show that Defendants had sufficient contacts with Tennessee for this Court to have jurisdiction" (Doc. No. 100, at 10), appears simply to be incorrect under the law of the Sixth Circuit. Likewise, their argument that the Amended Complaint does not allege § 2255 as a basis for jurisdiction is beside the point, as the question before the court is simply whether the plaintiffs' factual allegations "make a *prima facie* showing of personal jurisdiction." *N.M. ex rel. Balderas v. Tiny Lab Prods.*, 448 F. Supp. 3d 1263, 1269 (D.N.M. 2020) (citation omitted).

are premised upon § 1595, a statutory provision that "is noticeably absent from the list of applicable sections" set forth in § 2255(a)." (Doc. No. 100, at 10.) Thus, they argue, § 2255(a) does not apply, and the "Plaintiffs still must show Defendants have sufficient minimum contacts with Tennessee." (*Id.*)

The question posed appears to be one of first impression. At least one district court within the Sixth Circuit has recognized that § 2255 provides for nationwide service of process and, consequently, may operate as a statutory basis for nationwide personal jurisdiction in the federal district courts. *See C.T. v. Red Roof Inns, Inc.*, No. 2:19-CV-5384, 2021 WL 2942483, at *7 (S.D. Ohio July 1, 2021) (stating, in dicta, that § 2255 "confers nationwide service of process for minors bringing TVPRA suits" and that "Congress thus has the power to confer nationwide personal jurisdiction when it includes a nationwide service of process provision in a statute" (citing *deSoto*, 245 F.3d at 567)), *appeal dismissed*, No. 21-3635, 2021 WL 4739619 (6th Cir. Aug. 4, 2021). In *C.T.*, however, § 2255 did not apply, because the plaintiff was an *adult* trafficking victim. *See id.* at *9 ("This section's application, as it may pertain to suits under the TVPRA, is limited by its very terms to trafficking victims who were under 18 at the time of their injuries."). No other court has considered whether it applies to child victims of sex trafficking bringing suit under § 1595 against defendants who are not themselves alleged to have violated § 1591 but, instead, to have "knowingly benefit[ted], financially or by receiving anything of value[,] from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

The court finds the plain language of the statute itself to be dispositive of the question. As quoted above, § 2255(c) authorizes nationwide service of process on a defendant sued under subsection (a) of the statute. Subsection (a) provides that a person who was a minor at the time of

being a "victim of a violation" of § 1591, 2252, or 2252A, among other provisions, and "who suffers personal injury *as a result of such violation*," may bring suit "in any appropriate United States District Court." 18 U.S.C. § 2255(a) (emphasis added). Although the statute does not include the words "against the perpetrator" after the words "may sue," the court finds that the statute only makes sense if it is interpreted to include that limitation, insofar as it requires a personal injury arising from the violation of § 1591 (or § 2252 or § 2252A) and thus implies that the suit may be brought *against the perpetrator* to remedy the personal injury arising from the direct violation of § 1591. Section 1595 authorizes civil lawsuits against perpetrators of sex trafficking in violation of § 1591. However, as discussed above, it also authorizes suits against those who benefit from participation in a venture that they "knew or should have known" was engaged in sex trafficking— a negligence standard of liability that does not require the knowing beneficiary actually to have committed a crime in violation of § 1591. And, notwithstanding allegations in the Amended Complaint suggesting to the contrary, the plaintiffs expressly disclaim any intention to bring suit against the Bassnectar Companies under a "perpetrator" theory of liability. They state: "Count Two of the FAC explicitly and unequivocally states a beneficiary theory of liability against Moving Defendants pursuant to § 1595 of the TVPRA, not a perpetrator theory of liability pursuant to § 1591." (Doc. No. 87, at 12.) The court finds, therefore, that § 2255 does not apply and, consequently, cannot serve to extend nationwide service of process to defendants sued under § 1595 who are not also (plausibly) alleged to have violated § 1591.

The plaintiffs' assertion that they have brought suit against Ashton himself under § 1591 (Count I) and under §§ 2252 and 2252A for receipt and possession of child pornography (Count III) is utterly beside the point. Even though they appear to be arguing that personal jurisdiction over the Bassnectar Companies exists based on some type of agency theory, as discussed below,

they have not named the Bassnectar Companies as defendants in either Count I or Count III. Thus, jurisdiction over the Bassnectar Companies cannot be premised upon § 2255(a).

b)    *Ordinary Personal Jurisdiction Principals*

In the absence of a federal statutory basis for the exercise of personal jurisdiction, a plaintiff responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction bears the burden of proving that the court's exercise of personal jurisdiction in the forum state is proper. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). Where the court does not conduct an evidentiary hearing on the question of personal jurisdiction, the plaintiff's burden is "relatively slight." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017). "To defeat dismissal in this context, [the plaintiff] need make only a *prima facie* showing that personal jurisdiction exists." *Id.* To determine whether the plaintiff has made such a showing, the court considers the pleadings and any affidavits submitted by the parties in the light most favorable to the plaintiff. Any conflicts between facts contained in the parties' affidavits must be resolved in the plaintiff's favor. *Neogen Corp.*, 282 F.3d at 887. Dismissal under Rule 12(b)(2) is appropriate only if the specific facts alleged by plaintiff, taken as a whole, fail to state a *prima facie* case for personal jurisdiction. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 478 (6th Cir. 2003).

A defendant may be subject to either general jurisdiction or specific jurisdiction. General jurisdiction means that a court can hear any and all claims against a defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014). A court has general jurisdiction over a corporate defendant when the corporation has constant and pervasive, continuous and systematic affiliations with the forum state. *See id.*; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). The plaintiffs do not assert personal jurisdiction based on general jurisdiction; the question is whether the court may exercise specific jurisdiction.

When a federal court's subject-matter jurisdiction is based on a federal question, the court's exercise of personal jurisdiction must both be authorized by the forum state's long-arm statute and be in accordance with the Due Process Clause of the Fourteenth Amendment. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)). However, because Tennessee's long-arm statute is coextensive with the limits of federal due process, "the two inquiries merge," and the court must only determine whether the exercise of personal jurisdiction is consistent with due process. *Intera Corp. v. Henderson*, 428 F.3d 605, 616 (6th Cir. 2005); *First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 384 (Tenn. 2015), *cert. denied sub nom. Fitch Ratings, Inc. v. First Cmty. Bank, N.A.*, 136 S. Ct. 2511 (2016); Tenn. Code Ann. § 20-2-223(a).

Specific jurisdiction deals with a defendant's contacts with the forum state relating to the claims at issue. When determining whether a district court's exercise of personal jurisdiction would offend due process, "[t]he relevant inquiry is whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court recently described the parameters of specific jurisdiction, as follows:

> Specific jurisdiction . . . covers defendants less intimately connected with a State, but only as to a narrower class of claims. The contacts needed for this kind of jurisdiction often go by the name "purposeful availment." The defendant, we have said, must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State. The contacts must be the defendant's own choice and not random, isolated, or fortuitous. They must show that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there. Yet even then—because the defendant is not "at home"—the forum State may exercise jurisdiction in only certain cases. The plaintiff's claims, we have often

stated, must arise out of or relate to the defendant's contacts with the forum. Or put just a bit differently, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.

*Ford Motor Co. v. Mont. Eighth Judicial District Court*, 141 S. Ct. 1017, 1024–25 (2021) (internal quotation marks and citations omitted).[12] In *Ford Motor Company*, the Court found that the exercise of specific jurisdiction was appropriate, specifically rejecting Ford's argument that its contacts with the forum state must "give rise" to the plaintiff's claims. The Court emphasized that a defendant's contacts with the forum state need only "relate to" the plaintiff's claims. *Id.* at 1026.

### c) The Bassnectar Companies' Contacts with Tennessee

Amorphous and BTI argue that the allegations in the Amended Complaint do not show that these defendants took any overt action to avail themselves of the privilege of acting in Tennessee, that there is no causal nexus—or nexus of any kind—between the plaintiffs' claims against them and their contacts with Tennessee as there are no such contacts, and that it would be unreasonable to exercise personal jurisdiction over Amorphous and BTI in this forum.

The allegations in the Amended Complaint regarding these defendants' contacts with Tennessee are essentially the same as those concerning C3 and Red Light, with some minor variations, specifically including:

- "Bassnectar is the founder, chairman, figurehead, chief executive, and icon of [Amorphous and BTI]. [Amorphous and BTI] had a continuous business relationship with Bassnectar

---

[12] The Sixth Circuit has articulated a similar test to "guide" the determination of whether specific jurisdiction exists:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed." (Doc. No. 23 ¶¶ 26, 27.)

- "At all relevant times, all Defendants in this action were acting by and through themselves in their individual capacities, and/or additionally by and through their actual and/or ostensible agents, servants and/or employees, which included entities and/or individuals over whom they had control or the right to control." (*Id.* ¶ 36.)

None of the very general allegations directed against the Bassnectar Companies suggests that these defendants availed themselves of the privilege of acting or causing a consequence in the state of Tennessee, that the plaintiffs' causes of action against the Bassnectar Companies "relate to" their contacts in Tennessee, or that there is any connection between the Bassnectar Companies and the state of Tennessee that would make the exercise of jurisdiction over them reasonable.

The only connection between the plaintiffs' claims and Tennessee alleged in the Amended Complaint arises from Ashton's conducting a sexual relationship with Rachel Ramsbottom, who lived in Tennessee and was a minor at the time. Specifically, the Amended Complaint alleges that Ashton contacted Ramsbottom, when she was presumably in Tennessee, in September 2012 by way of a Twitter private message to inform her that he was playing a show in Nashville on New Year's Eve of 2012. (*Id.* ¶¶ 78–79.) Ramsbottom went to that show but did not meet Ashton at that time. However, they remained in contact via telephone, email, and text messaging from September 2012 until May 2013. During that time, Ashton allegedly solicited and received sexually explicitly photographs from Ramsbottom while she was underage. (*Id.* ¶ 93.) They finally met and spent several days together at a hotel room in Memphis in May 2013. "Approximately several weeks later," Ramsbottom spent several days with Ashton at the Lowe's hotel in Nashville to celebrate her eighteenth birthday. (*Id.* ¶ 88.)

While the Amended Complaint clearly alleges that *Ashton* engaged in tortious and illegal activity within the state, the Amended Complaint does not indicate that any employee of Amorphous or BTI facilitated Ashton's initial contact with Ramsbottom, was aware of his

continued contacts with her or his solicitation of child pornography from this state, was aware or had any reason to be aware of Ramsbottom's presence in Ashton's hotel room in Memphis or in Nashville, or facilitated any of her travel arrangements. Moreover, after May 2013, Ramsbottom was no longer a minor. (*See id.* ¶ 19.)

Under the test articulated in *Ford Motor Company*, the plaintiffs must establish that the Bassnectar Companies "purposefully availed themselves of the privilege of acting in Tennessee or causing a consequence in Tennessee." *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 478 (6th Cir. 2003). "The 'purposeful availment' requirement is satisfied when the defendant's contacts with the forum state 'proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State, and when the defendant's conduct and connection with the forum are such that he 'should reasonably anticipate being haled into court there.'" *Id.* (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996)). "The emphasis in the purposeful availment inquiry is whether the defendant has engaged in 'some overt actions connecting the defendant with the forum state.'" *Id.* at 478–79 (quoting *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1274 (6th Cir. 1998)).

The Amended Complaint contains no allegations affirmatively showing that the Bassnectar Companies engaged in any overt action connecting them with the state of Tennessee. The Amended Complaint alleges that Ashton was the "founder, chairman, figurehead, chief executive, and icon" of both Bassnectar Companies, but it does not actually describe what business Amorphous or BTI was engaged in. It alleges in that each of the Bassnectar Companies "had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed" (Doc. No. 23 ¶¶ 26, 27) and that "Bassnectar uses the Bassnectar Companies' brand, resources, and promotional

events to recruit, lure, entice, and/or groom his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts" (*id.* ¶ 55).

Despite the conclusory nature of these allegations and giving the plaintiffs every benefit of the doubt, it might conceivably be inferred that the Bassnectar Companies were involved in the staging and/or promotion of Ashton's music concerts and musical venture generally and, because Ashton, as Bassnectar, performed in Tennessee on several occasions, that the Bassnectar Companies availed themselves of the privilege of acting in Tennessee. Even so, the allegations in the Amended Complaint do not suggest that the claims against the Bassnectar Companies arise from or are related to these defendants' activities in the state. These defendants are simply not alleged to have played any role whatsoever in Ashton's relationship with Ramsbottom.

As a result, the court concludes both that (1) the plaintiffs' claims do not "arise out of or relate to" the Bassnectar Companies' contacts with Tennessee, as there is no "affiliation between the forum and the underlying controversy," *Ford Motor Co.*, 141 S. Ct. at 1025; and (2) the exercise of specific jurisdiction over the Bassnectar Companies would not "comport with traditional notions of fair play and substantial justice." *Theunissen*, 935 F.2d at 1459. The court finds, based on the allegations in the Amended Complaint, that the court lacks specific jurisdiction over these defendants.

### d)    *Agency/Vicarious Liability and Alter Ego Liability*

The plaintiffs seek to avoid this conclusion by invoking the principals of agency/vicarious liability and alter ego liability and by insisting, separately, that the Amended Complaint states a colorable TVPRA claim against the Bassnectar Companies. Regarding these arguments, the court notes, first, that the question of whether the Amended Complaint states a colorable claim against the Bassnectar Companies under the TVPRA is a completely separate inquiry. To reach it, the

court must first conclude that it may appropriately exercise jurisdiction over the defendants.

As for agency and alter ego liability, the court understands the plaintiffs to be arguing both that (1) the Bassnectar Companies may be vicariously liable for the actions of Ashton, who acted as their agent; and (2) Ashton so controlled and dominated the Bassnectar Companies that they functioned as his alter egos and may be liable for his conduct based on some type of veil-piercing theory of liability. The plaintiffs make no effort to explain how these theories dovetail with the specific jurisdiction analysis, but the Sixth Circuit has "endorsed the use of the alter-ego theory to exercise personal jurisdiction." *Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008); *see also Flynn v. Greg Anthony Constr. Co.*, 95 F. App'x 726, 734–38 (6th Cir. 2003) (applying the alter-ego theory for personal jurisdiction outside the parent-subsidiary context); *Sanders v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. 2:20-CV-02001, 2020 WL 5651675, at *7 (W.D. Tenn. Sept. 22, 2020) ("It is compatible with due process for a court to exercise personal jurisdiction over an entity that would not ordinarily be subject to personal jurisdiction when the entity is substantively legally related to another entity that is subject to personal jurisdiction." (citing 4A Charles A. Wright et al., Fed. Practice & Procedure § 1069.4 (4th ed. 2020))).

Federal common law applies when a court assesses alter-ego liability under a federal statutory scheme. *See Flynn*, 95 F. App'x at 732 (applying federal common law to alter-ego analysis in an ERISA case). To avoid dismissal, the plaintiffs must make a *prima facie* showing of personal jurisdiction, which requires them to "allege sufficient facts for considering [the Bassnectar Companies] the alter egos of [Ashton]." *Id.* at 735. The factual scenario at issue here presents an unusual framework for liability, as veil-piercing or alter-ego liability usually entails holding individuals—owners and officers of corporations—or parent corporations liable for the

wrong-doing of the business entities they control. In that context, the Sixth Circuit has articulated the factors relevant to piercing a corporate veil, for purposes of alter ego liability, as follows:

> Generally, a corporation is considered an entity separate and distinct from its owners or shareholders. Regarding a corporation as a legal entity with the capacity to contract, sue, and be sued is a legal fiction designed to provide incentives for business investments. However, the corporate fiction should be disregarded in the interest of public convenience, fairness and equity. This disregard for the corporate form is appropriate when a corporation is merely the alter ego of its owners, such that the corporation no longer has a separate personality apart from its owners. Therefore, when a corporation exists solely for the purpose of serving as an alter ego for its owners, the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.

*Id.* at 733–34 (internal quotation marks and citations omitted).

In *Flynn*, the court adopted the "two-prong test" articulated by the D.C. Circuit for determining whether alter ego liability is established: "The first prong asks whether there is 'such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist,' and the second prong asks if an inequitable result will follow 'if the acts are treated as those of the corporation alone.'" *Id.* at 734 (quoting *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982)).

The court finds that the plaintiffs have not alleged sufficient facts in the Amended Complaint to establish a *prima facie* basis for the exercise of personal jurisdiction over the Bassnectar Companies based on alter ego liability. For one thing, the plaintiffs here are not attempting to pierce a *corporate* veil in order to make an individual (or corporate parent) liable for the acts of a corporation he (or it) controls. *See, e.g.*, *Flynn*, 95 F. App'x at 729 (explaining that the plaintiff brought suit against an employer for failure to meet its obligations under collective bargaining agreements and against two other companies and two individuals as derivatively liable for the first defendant's obligations). Instead, the reverse situation is presented: the plaintiffs seek

to hold the corporations liable for the wrongdoing of an individual who supposedly controls the companies. Aside from that anomaly, while the plaintiffs allege that Ashton is the founder and chief executive of the Bassnectar Companies, they do not allege a disregard of corporate formalities; they do not plausibly allege that Ashton was in any sense acting through the Bassnectar Companies in pursuing his relationships with the plaintiffs; nor do they claim that Ashton's control over the Bassnectar Companies caused their injuries. And finally, the Amended Complaint contains no allegations suggesting that an inequitable result would follow if the Bassnectar Companies are not held liable for Ashton's wrongdoing. *See Carell, 681* F. Supp.2d at 890 (mere allegations of dominion and control will not support an alter-ego theory of liability); *accord Flynn*, 95 F. App'x at 734 (finding that the plaintiffs failed to "establish[] a *prima facie* showing of personal jurisdiction" as to two individual defendants, based on "sparse" statements in an affidavit that the individuals "failed to maintain separate identities from the [c]ompanies . . . , failed to follow corporate formalities[, and] failed to maintain arms-length relationships among the different entities, by commingling work and intertwining office space, equipment and staff"). The court finds that the plaintiffs have failed to make a *prima facie* showing of personal jurisdiction over the Bassnectar Companies based on alter ego liability.

Likewise, to the extent the plaintiffs seek to hold the Bassnectar Companies liable based on an agency or *respondeat superior* liability, federal courts recognize vicarious liability under federal statutory schemes based on "federal common law principles of agency." *In re Jt. Pet. Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6574 (2013) ("[A] seller . . . may be held vicariously liable under federal common law principles of agency for violations of [the Telephone Consumer Privacy Act] that are committed by third-party telemarketers."); *Imhoff Invest., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 635 (6th Cir. 2015) ("The *DISH Network* decision . . . found that the seller may

be vicariously liable for such violations under federal common law agency principles."); *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 584 (S.D. Ohio 2016). And, "[b]ecause a seller may be liable . . . for the actions of its agent, a seller also may be subject to personal jurisdiction in a given forum state based on the actions of its agent." *Johansen*, 218 F. Supp. 3d at 584 (collecting cases). Such vicarious liability does not "require a 'formal' agency relationship"; it may also be based on "principals of apparent authority and ratification." *Id.* (citations omitted).

In this case, the plaintiffs do not allege facts suggesting that Ashton was the "agent" of the Bassnectar Companies or acting within the scope of any apparent authority when he entered into inappropriate and illegal sexual relationships with the three named plaintiffs. Nor do they allege (or even argue that they allege) facts that would substantiate a ratification theory. *See id.* (defining ratification as "'the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.' A person may ratify an act of another by 'manifesting assent that the act shall affect the person's legal relations' or by 'conduct that justifies a reasonable assumption that the person so consents.'" (quoting Restatement (Third) of Agency § 4.01(1) & (2) (2006))).

In sum, the plaintiffs' reliance on alter-ego liability and agency liability is unavailing, as they have failed to allege sufficient facts to establish a *prima facie* basis for the exercise of personal jurisdiction based on these theories. The court, therefore, will grant the Bassnectar Companies' Motion to Dismiss based on lack of personal jurisdiction.

### 2. *Failure to State a Claim*

Even if § 2255 applied or if the plaintiffs' bare allegations of agency liability justified the exercise of jurisdiction, those same allegations are insufficient to actually state a claim against the Bassnectar Companies based on agency (or alter-ego) liability. Moreover, the allegations in the Amended Complaint do not allege sufficient facts to state a claim against the Bassnectar

Companies under the TVPRA. The allegations in the Amended Complaint against these defendants are basically the same as those asserted against the other defendants. As already stated, the plaintiffs allege that:

- "It was abundantly clear that Bassnectar was targeting and engaging in commercial sex acts with minors and utilizing his shows and organizations to accomplish the exploitation of young girls for his own sexual gratification. In fact, it was a running joke among those associated with Bassnectar that he would have to find a date at a high school dance." (Doc. No. 23 ¶ 16).

- "As such, remaining Defendants are companies that participated in a venture and benefitted economically from Bassnectar and his companies while he was trafficking the Plaintiffs and other underage girls. As a result of Bassnectar's trafficking of minor girls and solicitation and possession of child pornography, the remaining Defendants knew or, in the very least, should have known Bassnectar was trafficking minor girls for commercial sex and other illegal activity." (*Id.* ¶ 17.)

- "Bassnectar is the founder, chairman, figurehead, chief executive, and icon of [Amorphous and BTI]. [Amorphous and BTI] had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed." (*Id.* ¶¶ 26, 27.)

- "At all relevant times, all Defendants in this action were acting by and through themselves in their individual capacities, and/or additionally by and through their actual and/or ostensible agents, servants and/or employees, which included entities and/or individuals over whom they had control or the right to control." (*Id.* ¶ 36.)

- "At the heart of this action is Bassnectar's use of the Bassnectar Companies to facilitate and enable the sex trafficking of minor girls in the United States." (*Id.* ¶ 54.)

- "The Bassnectar Companies fund and support Bassnectar's illegal sex trafficking venture, and Bassnectar uses the Bassnectar Companies' brand, resources, and promotional events to recruit, lure, entice, and/or groom his victims and force or coerce them, or knowing that the victim has not attained the age of eighteen years, into engaging in commercial sex acts." (*Id.* ¶ 55.)

- Other employees of Bassnectar's companies also recruited young females at Bassnectar concerts. Bassnectar would give several passes for "meet and greets" and backstage passes to his employees to bring him young girls and women. 'Bri' and 'Dom' were two employees that handed out passes to young girls for Bassnectar at his shows. Many of the young girls who appeared underage stood in the line to get backstage in disbelief that they were handpicked to meet one of their idols, Bassnectar." (*Id.* ¶ 63.)

- [The Bassnectar Companies] also facilitated Bassnectar's illegal acts in other ways. While it was best practice for crew members to check the identification of artists' guests, this was

not done by the Bassnectar crew. At least one of the employees hired by the Bassnectar Companies would even place hotel room keys in hiding places for Bassnectar's "girls" on a regular basis. When questioned by anyone about Bassnectar's requests, the employee would willfully ignore any concern, stating "it's none of my business," and/or "I'm just doing my job." (*Id.* ¶ 64.)

- "The Bassnectar Companies each had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior against underage girls. In turn, the Bassnectar Companies knowingly benefit from their participation in Bassnectar's venture by the continued promotion of the Bassnectar brand." (*Id.* ¶ 65.)

- "Bassnectar, using the Bassnectar Companies' resources, engaged in a pattern and practice of recruiting, luring, enticing, obtaining, and grooming underaged girls, and causing them through force, fraud or coercion, or knowing that the victim was below the age of eighteen, to engage in commercial sex acts through, among other means, providing cash payments and other commercially lucrative benefits such as transportation and concert/event tickets." (*Id.* ¶ 66.)

- "The Bassnectar Companies have actual knowledge of Bassnectar's unlawful commercial sex acts through him, as he is the founder of the Bassnectar Companies and intimately involved in their day-to-day operations." (*Id.* ¶ 67.)

- "Further, the Bassnectar Companies knowingly aided and abetted, facilitated, and participated in Bassnectar's illegal sex trafficking venture by being integrally involved in the recruitment of underaged victims and the logistical steps necessary for Bassnectar to recruit, lure, entice, obtain, and groom underaged victims." (*Id.* ¶ 68.)

- "Bassnectar intentionally used the Bassnectar Companies' resources to recruit, lure, and entice children to cause them to engage in commercial sex acts and other degrading acts, for which he always provided Bassnectar Companies' resources as value." (*Id.* ¶ 69.)

- "Further, the Bassnectar Companies knowingly financed Bassnectar's commercial sex acts." (*Id.* ¶ 70.)

- "The Bassnectar Companies also directly violated the TVPA because they knowingly benefitted from participation in Ashton's venture with knowledge, or in reckless disregard of the fact, that Bassnectar used means of force, threats of force, fraud, and coercion to force children and women into engaging in commercial sex acts." (*Id.* ¶ 72.)

- "The Bassnectar Companies . . . took steps to silence other women who could expose their transgressions. The Defendants used their legal counsel to contact several women in an attempt to persuade them to remain quiet about Bassnectar's sexual misconduct after the #MeToo movement was under way in 2016 and again in 2020 after Bassnectar's illegal conduct was exposed." (*Id.* ¶ 75.)

As set forth above, to state a claim under the TVPRA based on a beneficiary theory of

liability, the plaintiff must allege actual facts that allow the court to plausibly infer that the defendant (1) "knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture (3) that it "knew or should have known has engaged in" sex trafficking under § 1591. *A.B.*, 455 F. Supp. 3d at 188 (quoting 18 U.S.C. § 1595(a)). Further, a plaintiff may satisfy these elements  either by showing that "the defendant's own acts, omissions, and state of mind establish each element" or, alternatively by "imput[ing] to the defendant the acts, omissions, and state of mind of an agent of the defendant." *H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697, 704 (E.D. Mich. 2020) (citations omitted). "The former is referred to as 'direct liability' and the latter as 'indirect liability.'" *Id.*

The Amended Complaint contains no specific allegations directed toward the Bassnectar Companies in the paragraphs that detail Ashton's interactions with the named plaintiffs. The court finds that these wholly conclusory allegations—which have nothing to do with Ashton's interactions with the actual plaintiffs—amount to no more than the "legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action" that the Supreme Court has held are not enough to permit the court to "draw the reasonable inference that [either] defendant is liable for the misconduct alleged" based on its own acts or omissions. *Iqbal*, 556 U.S. at 678–79. Moreover, as set forth above, the plaintiffs also do not allege facts sufficient to establish an agency relationship between Ashton and the Bassnectar Companies for purposes of establishing indirect liability.

Thus, even if the court were to find that the exercise of personal jurisdiction over these defendants was appropriate, the claims against them would nonetheless be subject to dismissal for failure to state a claim for which relief may be granted. The plaintiffs' request that they be permitted to conduct jurisdictional discovery, therefore, will be denied as futile and unnecessary.

**D.     Carlos Donohue's Motion to Dismiss**

In support of his Motion to Dismiss (Doc. No. 103), defendant Carlos Donohue, like the Bassnectar Companies, invokes Rules 12(b)(2), 12(b)(3), and 12(b)(6). The court finds that it lacks personal jurisdiction over this defendant, too, and will grant his Motion to Dismiss on that basis.

*1.     Factual Allegations Against Donohue*

Carlos Donohue is an adult resident of Oregon and is the "founder, chairman, figurehead, and chief executive" of Gnarlos Industries. (Doc. No. 23 ¶¶ 32, 33.) Gnarlos was originally named as a defendant, but the plaintiffs voluntarily dismissed their claims against it. (Doc. No. 101.) Donohue allegedly "utilized Gnarlos Industries to arrange for and transport young girls, including Plaintiffs, to engage in commercial sex acts with Bassnectar" and "had a continuous business relationship with Bassnectar that enabled Bassnectar to engage in predatory behavior toward underage girls during the times that each Plaintiff was harmed." (Doc. No. 23 ¶ 33.)

In April 2014, Ashton informed plaintiff Alexis Bowling (who lived in Kentucky) that Donohue, his "manager," would be getting her tickets and backstage passes to the Bassnectar show in Las Vegas, Nevada. (*Id.* ¶ 111.) Donohue did in fact "arrange to provide tickets" for Bowling, who, at the time, was under age eighteen. (*Id.*) The Amended Complaint does not allege that Donohue ever saw, communicated with, or spoke to Bowling. It does not allege a basis for Donohue's knowledge of Bowling's age. Moreover, when Bowling arrived in Las Vegas, she was denied admittance to the concert venue and was unable to use her ticket or her backstage pass because she was underage. The plaintiffs do not allege that Donohue—or Ashton—pulled strings to allow her admittance despite her being underage. Instead, the Amended Complaint states that Ashton directed Bowling to meet him near his hotel since she was unable to get into the music venue. (*Id.* ¶¶ 112–13.)

The other allegations in the Amended Complaint concerning Donohue relate to the claims made on behalf of former plaintiff Jane Doe #1, a citizen and resident of Illinois, who has voluntarily dismissed her claims. These include allegations that Ashton spoke with Donohue to arrange transportation for Jane Doe #1 to take her to his show (*id.* ¶ 168) and to arrange transportation to see Ashton (*id.* ¶ 176). Again, the Amended Complaint does not allege that Donohue ever saw, communicated with, or spoke to Jane Doe #1, nor does it allege a basis for Donohue's knowledge of Jane Doe #1's age. More to the point, for purposes of the exercise of personal jurisdiction, the Amended Complaint does not allege that any of these actions took place in Tennessee.

### 2. *Lack of Specific Jurisdiction*

As already discussed, in order for a court to exercise specific jurisdiction, "the suit must aris[e] out of or relat[e] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (citation and internal quotation marks omitted).[13] Even if the court assumes based on the sparse allegations in the Amended Complaint that Donohue was Ashton's "manager" and functioned as his agent, the Amended Complaint does not contain any allegations remotely suggesting that Donohue engaged in any suit-related conduct, or even any non-suit-related conduct, in Tennessee. Although, as Ashton's manager, it might reasonably be inferred that Donohue directed some activities toward the state in connection with Bassnectar's performances in Tennessee, Donohue is not alleged to have had any involvement in the relationship between Ashton and Ramsbottom. There is no indication that Donohue knew about Ashton's meetings with Ramsbottom or facilitated them in

_____

[13] The plaintiffs do not argue that personal jurisdiction extends to Donohue through the operation of § 2255.

any way. The actions of Donohue in this state as alleged in the Amended Complaint do not arise from or relate to the claim against him and are not substantial enough to justify the exercise of this court's jurisdiction over him in this case.

In their Response in Opposition to Donohue's motion, the plaintiffs attempt to premise personal jurisdiction over Donohue upon the same agency theory that they raise in responding to the Bassnectar Companies' motion. (*See* Doc. No. 107-2, at 5 ("Each and every act of abuse undertaken by Bassnectar, including those acts that took place in this judicial district, are also the acts of Defendant Donohue for the purposes of the [Amended Complaint]. . . . It is well settled that in Tennessee, a principal may be held vicariously liable for the negligence of his or her agent, where the agent is acting within the actual or apparent scope of the agency. " (citing *Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008)).) But the Amended Complaint does not contain *any* allegations suggesting that Ashton functioned as *Donohue's* agent, such that Aston's actions can be imputed to Donohue. Rather, the plaintiffs allege that Donohue, as Ashton's manager, was *Ashton's* agent. If Donohue functioned as Ashton's agent, then Donohue's own acts, besides giving rise to personal liability, might theoretically also be imputed to Ashton. *See, e.g.*, *Johansen*, 218 F. Supp. 3d at 584 (noting that a principal may be liable for the actions of its agent and, as such, subject to personal jurisdiction in the forum state based on the agent's actions in that state). The plaintiffs appear to be attempting to superimpose a theory of criminal conspiracy on this civil liability action to make Donohue liable for Ashton's independently undertaken wrongdoing. Agency does not work that way.

The plaintiffs assert that the exercise of jurisdiction over Donohue is reasonable, because they have "specifically alleged that Donohue was a fundamental cog in Bassnectar's trafficking machine and that Donohue knowingly participated in the venture that helped Bassnectar select,

groom and abuse underaged children." (Doc. No. 107-2, at 5.) However, the Amended Complaint does not contain any actual facts that support that conclusory assertion. The only non-conclusory allegations in the Amended Complaint concerning Donohue relate to his having arranged for a ticket for Bowling for a show in Las Vegas (which she was unable to use) and arranging transportation for Jane Doe #1 on several occasions (but not in Tennessee). These acts, undertaken elsewhere, are not sufficient to establish personal jurisdiction over Donohue in Tennessee.

The court will grant Donohue's motion based on the lack of personal jurisdiction. The plaintiffs' request that they be permitted to conduct jurisdictional discovery will be denied as futile and unnecessary.

### E. Ashton's Motion

As set forth above, Count IV of the Amended Complaint, asserted on behalf of Ramsbottom only against Ashton, Amorphous, and BTI, asserts a claim for negligence *per se* under Tennessee law. The court has already concluded that personal jurisdiction over Amorphous and BTI is lacking, so the court considers this claim only insofar as it is asserted against Ashton individually.

Tennessee, of course, recognizes a cause of action for negligence, the elements of which are: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the applicable standard of care; (3) the plaintiff suffered an injury; (4) the defendant's conduct was a cause in fact of the injury; and (5) the defendant's conduct was a proximate cause of the injury. *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). The common-law standard to which individuals "must conform to avoid being negligent is the familiar 'reasonable person under similar circumstances' standard." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003) (citation omitted).

But the common law "is not the only source of legal duties or standards of conduct in

negligence cases." *Id.* The state's General Assembly may "create a legal duty and then provide a civil cause of action for its breach." *id.* at 589. In addition, "the General Assembly may enact a penal statute that does not explicitly provide a civil remedy, and the courts may then derive a civil legal duty from the penal statute." *Id.* The doctrine associated with the latter process is "negligence *per se*." *Id.*[14]

> As the Tennessee Court of Appeals has explained:
>
> The negligence *per se* doctrine does not create a new cause of action. Rather, it is a form of ordinary negligence that enables the courts to use a penal statute to define a reasonably prudent person's standard of care. Negligence *per se* arises when a legislative body pronounces in a penal statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct.

*Id.* (internal citations omitted; emphasis added). The doctrine does not "automatically create[] a private negligence action for the violation of every statute." *Id.* at 590. Rather, "[t]o trigger the doctrine, the statute must establish a specific standard of conduct." *Id.* Thus, the effect of "declaring conduct negligent *per se* is to render the conduct negligent as a matter of law." *Id.* As a result, "a person whose conduct is negligent *per se* cannot escape liability by attempting to prove that he or she acted reasonably under the circumstances," though the plaintiff asserting negligence *per se* must still establish the other elements of a negligence claim, including causation and damages. *Id.*

In this case, Rachel Ramsbottom's negligence *per se* claim is premised upon Ashton's violation of Tenn. Code Ann. § 39-13-506(c), which criminalizes "aggravated statutory rape," and § 39-13-532(a), which criminalizes "statutory rape by an authority figure." Aggravated statutory rape is defined as the unlawful penetration of a victim by the defendant, or of the defendant by the

---

[14] Tennessee courts recognize that "courts may also infer new private rights of action from a penal statute." *Rains*, 124 S.W.3d at 589 n.5 (citations omitted).

victim, when the victim is at least thirteen but less than eighteen years old and the defendant is at least ten years older than the victim. Statutory rape by an authority figure is defined as the unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim, when the victim is at least thirteen but less than eighteen years old; the defendant is at least four years older than the victim; and the defendant, at the time of the offense, had either parental or custodial authority over the victim or was "in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration." Tenn. Code Ann. § 39-13-532(a). The Amended Complaint asserts that Ashton's violation of these statutes constitutes negligence *per se* and caused Ramsbottom serious physical, psychological, financial, and reputational harm. (Doc. No. 23 ¶ 235.)

Ashton argues that this claim should be dismissed because: (1) the claim is barred by the statute of limitations; and (2) as a matter of law, Ramsbottom has not pleaded sufficient facts to show a violation of either of the two statutes at issue in her negligence *per se* claim. (Doc. No. 67.) As discussed below, the court finds that Ashton is not entitled to dismissal of this claim, at least at this juncture.

### 1. Statute of Limitations

#### a) Legal Standards

Under Rule 8(c), the argument that a claim is barred by the applicable statute of limitations is an affirmative defense, and a plaintiff "generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citations omitted). For this reason, a motion under Rule 12(b)(6)—which considers only the allegations in the Amended Complaint—is the appropriate vehicle for dismissing a claim on statute of limitations grounds only when the allegations in the complaint "affirmatively show that the claim is time-

barred" and that dismissing the claim under Rule 12(b)(6) is appropriate. *Id.* (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." (internal quotation marks and citations omitted))).

"A defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing v. Cath. Bishop*, 363 S.W.3d 436, 456 (Tenn. 2012). These "elements are inter-related and, therefore, should not be considered in isolation." *Id.*

The Tennessee Supreme Court recognizes the length of the limitations period as "perhaps the most straightforward" of these elements, as it is generally defined by statute. *Id.* at 457. The choice of which statute applies is "made by considering the 'gravamen of the complaint.'" *Id.* (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006)). The phrase "gravamen of the complaint" "refers to the 'substantial point,' the 'real purpose,' or the 'object' of the complaint." *Id.* (quoting *Est. of French v. Stratford House*, 333 S.W.3d 546, 557 (Tenn. 2011)). Determining the "gravamen of the complaint" is a question of law. *Id.*

"The concept of accrual relates to the date on which the applicable statute of limitations begins to run." *Id.* (citations omitted). "[A] cause of action accrues and the statute of limitations commences to run when the [plaintiff] discovers, or in the exercise of reasonable care and diligence . . . , should have discovered the resulting injury." *Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn. 1974). "The application of this so-called 'discovery rule' results in personal injury actions being filed more than one year after the injury occurs in instances in which [the] plaintiff does not discover and reasonably could not be expected to discover that an injury was sustained during the

year." *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995) (citing *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990)). The discovery rule, however, is not intended to allow a plaintiff to delay filing suit until she discovers all the facts affecting the merits of her claim. *Redwing*, 363 S.W.3d at 459. "[T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages[.]" *Id.* (citing *B & B Enters. of Wilson Cty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010); *Weber v. Mose*s, 938 S.W.2d 387, 393 (Tenn. 1996)). "The statute of limitations is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry." *Wyatt*, 910 S.W.2d at 854 (internal quotation omitted). "[O]nce the plaintiff has information sufficient to alert a reasonable person of the need to investigate the injury," the statute of limitations begins to run. *Woodruff by & through Cockrell v. Walker*, 542 S.W.3d 486, 495 (Tenn. Ct. App. 2017) (citing *Sherrill v. Souder*, 325 S.W.3d 584, 593 n.7 (Tenn. 2010)).

Tennessee courts and the General Assembly have also recognized various other tolling doctrines that suspend or extend the running of the limitations period. *Id.* The only tolling period alleged to be relevant here is the statute tolling the statute of limitation for minors until they reach the age of majority. Tenn. Code Ann. § 28-1-106.

*b)*     *Which Statute of Limitations Applies*

In this case, the Amended Complaint alleges that Ashton committed "aggravated statutory rape" and "statutory rape by an authority figure" by having sex with Ramsbottom in May 2013, shortly before her eighteenth birthday, thus giving rise to her negligence *per se* claim. (Doc. No. 23 ¶¶ 221, 222.) Ramsbottom "finally began talking" about what happened to her in therapy sessions some time in 2019. (*Id.* ¶ 96.) Only after beginning therapy did Ramsbottom "connect the injuries and damages complained of" in the Amended Complaint to "what Bassnectar had done to

her." (*Id.*) She alleges that she "suffered substantial physical and psychological injuries and emotional distress as a result of being sexually abused, exploited and trafficked." (*Id.* ¶ 107.)

Ashton argues that the statute of limitations governing Ramsbottom's negligence *per se* claim is the Tennessee statute that applies generally to personal injury torts, Tenn. Code Ann. § 28-3-104(a)(1)(A), which provides that claims for "injuries to the person" must be brought within one year of accrual. (*See* Doc. No. 68, at 5.) He also asserts that, under Tennessee law, a cause of action based on alleged sexual abuse accrues when the victim of the alleged abuse has constructive notice of the abuse—that is, when she knows she was abused and knows the identity of the abuser. (*Id.* (citing *Redwing*, 363 S.W.3d at 457).) He acknowledges that, because Ramsbottom was a minor at the time of the events giving rise to a cause of action, the statute of limitations was tolled until she reached the age of majority. (*Id.* (citing Tenn. Code Ann. § 28-1-106(a)).) Thus, Ashton asserts that Ramsbottom's claim accrued at the time of the alleged statutory rape in early May 2013, was tolled for a few weeks until she turned eighteen, and began to run as of her eighteenth birthday on May 23, 2013. Consequently, he argues that the limitations period expired on May 23, 2014, almost seven years before Ramsbottom filed the original Complaint in April 2021. Alternatively, Ashton contends that, even if a more generous discovery rule applies and Ramsbottom did not "discover" her injury—and her claim did not accrue—until she began therapy some time in 2019, the one-year limitations period expired at some point in 2020, still well before she filed suit on April 5, 2021.

For her part, Ramsbottom argues that her claim is subject to the three-year statute of limitations pertaining to "child sexual abuse that occurred before July 1, 2019 but was not discovered at the time of abuse," found at Tenn. Code Ann. § 28-3-116(b)(1), and that she did not "fully appreciate[] the injury from the abuse [until] she began uncovering same during therapy" in

2019, within the three-year limitations period. Alternatively, she asserts that the question of whether a plaintiff has "exercised reasonable diligence to discover [her] claims . . . is a question of fact" that should not be resolved on a motion to dismiss. (Doc. No. 88-1, at 11 (quoting *Redwing*, 363 S.W.3d at 466).) In his Reply, Ashton argues that Count IV of the Amended Complaint is not based on "child sexual abuse" as the term is defined for purposes of § 28-3-116(b)(1); rather, it is based on negligence *per se*, to which Tenn. Code Ann. § 28-3-104(a)(1)(A) applies.

In relevant part, Tenn. Code Ann. § 28-3-116 states:

(a) As used in this section, unless the context otherwise requires:

(1) "Child sexual abuse" means any act set out in § 37-1-602(a)(3), that occurred when the victim was a minor;

. . . .

(4) "Minor" means a person under eighteen (18) years of age.

(b) Notwithstanding § 28-3-104, a civil action for an injury or illness based on child sexual abuse that occurred when the injured person was a minor must be brought:

(1) For child sexual abuse that occurred before July 1, 2019, but was not discovered at the time of the abuse, within three (3) years from the time of discovery of the abuse by the injured person . . . .

*Id.* § 28-3-116(a)–(b)(1).

For purposes of this statute, "child sexual abuse" is defined in Tenn. Code Ann. § 37-1-602(a)(3). Subsection (B) of that provision defines "child sexual abuse" to mean the "unlawful sexual abuse, molestation, fondling or carnal knowledge of a child under thirteen (13) years of age that on or after November 1, 1989" constituted one of the criminal offenses listed in the statute, including the offenses of aggravated rape under Tenn. Code Ann. § 39-13-502; aggravated sexual battery under § 39-13-504; aggravated sexual exploitation of a minor under § 39-17-1004, and so forth. Arguably, a person who was a minor under the age of eighteen, but older than twelve, at the time she was a victim of any of the offenses enumerated in subsection (B) would be able to bring

a civil suit for damages arising from the offense within three years of her "discovery" of the abuse, based on § 28-3-116(b)(1). But statutory rape in any form, in violation of any part of Tenn. Code Ann. § 39-13-506 or § 39-13-532, is not among the enumerated offenses defined as child sexual abuse under § 37-1-602(a)(3)(B).[15]

In addition, however, Section 39-1-602(a)(3)(C) also incorporates a very broad, catch-all provision, further encompassing within the definition of "child sexual abuse" the "penetration, however slight, of the vagina or anal opening of one (1) person by the penis of another person," any oral-genital contact of "one (1) person" by "another person," and any "intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of either the child or the perpetrator," subject to exceptions for "normal caretaker responsibilities" and "[a]cts intended for a valid medical purpose." Tenn. Code Ann. § 39-1-602(a)(3)(C)(i)–(iv). Subsection (C) does not contain an age limitation. However, subsection (D) provides that the term "child sexual abuse," for purposes of the child abuse reporting, investigation, and treatment provisions of Tenn. Code Ann. §§ 37-1-603 through -615, "also means the commission of any act specified in subdivisions (a)(3)(A)–(C) against a child thirteen (13) years of age through seventeen (17) years of age if such act is committed against the child by a parent, guardian, relative, person residing in the child's home, or other person responsible for the care and custody of the child," *id.* § 37-1-602(a)(3)(D), such as "the child's legal guardian, legal custodian, or foster parent; an employee of a public or private child care agency, public or private school; or any other person legally responsible for the child's welfare in a residential setting," *id.* § 37-1-602(a)(8)). In other words, Subsection (D) strongly implies that

---

[15] Section 37-1-602(a)(3)(A) includes a list of statutory offenses (all since repealed) for abuse of a child under age thirteen committed prior to November 1, 1989.

the General Assembly intended for the activities identified in Subsection (C) to qualify as "child sexual abuse" only if the victim is under the age of thirteen as well, unless the perpetrator is the child's parent or legal guardian—at least for purposes of the provisions identified in Tenn. Code Ann. § 37-1-602(a).[16]

Thus, although part (C) does not specifically require that the victim of the identified sexual acts be under the age of thirteen, Tennessee courts construing the provision have concluded, based on context and the ordinary rules of statutory interpretation, that "Subsection C implicitly include[s] the requirement that the victim of abuse must be under the age of thirteen," at least for purposes of the reporting provision in Tenn. Code Ann. § 37-1-605 and the confidentiality provision in § 37-1-612. *See Jarvis v. Hamilton Cty. Dep't of Educ.*, No. 1:17-cv-00172, 2019 WL 1368618, at *15 (E.D. Tenn. Mar. 26, 2019) (holding that the sexual assault of a juvenile older than twelve was not "child sexual abuse" under § 37-1-602(a)(1)(C), for purposes of the reporting requirements of §§ 37-1-605 and -615); *see also Green v. Metro. Gov't*, No. M2001-01561-COA-R3-CV, 2002 WL 1751436, at *4 (Tenn. Ct. App. July 30, 2002) (concluding that the "non-disclosure provisions of Tenn. Code Ann. § 37-1-612 relating to child sexual abuse" did not pertain to the offense of statutory rape of a minor between the ages of thirteen and seventeen).

No Tennessee case has yet construed the definition of child sexual abuse contained (by reference) in Tenn. Code Ann. § 28-3-116(a). Ashton argues that, to incorporate § 602(a)(3)(C) wholesale into § 28-3-116(a), with no age limitation, is unwarranted, as it would lead to patently absurd results, "ignore Subsection (C)'s place in the statutory scheme," and "produce a result

---

[16] This clause of the statute states that the definitions contained in it pertain to "this part," meaning Tenn. Code Ann. §§ 37-1-601 through -616, and §§ 8-7-109, 37-1-152, 37-1-403, 37-1-406, 37-1-413 and 49-7-117, "unless the context otherwise requires." Tenn. Code Ann. § 37-1-602(a).

demonstrably at odds with the intentions of its drafters." (Doc. No. 99, at 4.) The court is not fully persuaded. Section 28-3-116(a) expressly incorporates within its definition of child sexual abuse "any act set out in § 37-1-602(a)(3), that occurred when the victim was a minor," and it defines "minor" as "a person under eighteen (18) years of age." Thus, as noted above, it seems clear that the perpetration of the sexual offenses identified in § 37-1-602(a)(3)(B), including such crimes as aggravated rape and aggravated sexual battery, would—for purposes of § 28-3-116(a) even if not for purposes of § 37-1-602(a)(3)(B) itself—qualify as child sexual abuse, so long as the victim is under age eighteen. This conclusion suggests that the perpetration of more minor sexual offenses, including those identified in Subsection (C), likewise need not be limited to younger victims in order to qualify as "child sexual abuse" for purposes of a statute of limitations for offenses premised upon civil liability for "child sexual abuse," as opposed to the definition of the term for purposes of unrelated reporting and other administrative requirements.

Ashton insists that construing the statute thus would lead to "absurd" results by "expand[ing] the statute of limitation to include any sexual act involving a minor, including consensual sex between two seventeen-year-olds." (Doc. No. 99, at 7.) However, while it is unclear how consensual sex between seventeen-year-old minors would give rise to a civil cause of action, it would not necessarily be absurd to apply the statute to create a three-year limitations period for a cause of action based on *nonconsensual* sex between a seventeen-year-old victim and a seventeen-year-old perpetrator. And it is not necessarily absurd to construe the definition of "child abuse" broadly in the context of a civil claim premised upon statutory rape.

The court finds, in short, that the three-year limitations period in § 28-3-116(b)(1) applies to Ramsbottom's negligence *per se* claim, the gravamen of which is the statutory rape of a minor under age eighteen. Ramsbottom alleges that she did not "discover" her injuries arising from her

sexual abuse, for purposes of accrual, until 2019, within three years of the date her lawsuit was filed in 2021. The court therefore finds, at this juncture, that the defendant is not entitled to dismissal of the claim on statute of limitations grounds.

### 2. Failure to State a Claim

Ashton also argues that the Amended Complaint fails to "plead sufficient facts to show a violation of either Tenn. Code Ann. §§ 39-13-506(C) or 39-13-532, which dooms [Ramsbottom's] Count IV as a matter of law." (Doc. No. 68, at 7.) This argument is based on the assertion that Ramsbottom has not pleaded that Ashton was charged or convicted of a violation of either statute. Ashton argues that "the lack of a charge or a conviction may be a dispositive basis to dismiss a negligence per se claim." (*Id.* (citing *Ware v. Tow Pro Custom Towing & Hauling, Inc.*, No. 3:04-0528, 2007 WL 108885, at *7 (M.D. Tenn. Jan. 12, 2007) (Knowles, M.J.), *aff'd on other grounds*, 289 F. App'x 852 (6th Cir. 2008), *abrogated in part by Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013)).)

In *Ware*, Magistrate Judge Knowles, sitting by designation, held that the plaintiffs failed to present any facts supporting their claim that the defendant had violated the statute (prohibiting extortion) upon which the negligence *per se* claim was premised. *Ware*, 2007 WL 108885, at *7. He then went on to state, in *dicta*, that the defendant "correctly argued" that the defendant had never been charged with or convicted of the crime of extortion, as a result of which the plaintiffs "cannot establish the threshold element necessary to a claim of negligence *per se*, *i.e.*, that Defendant violated a statute or ordinance." *Id.* (citing *Bennett v. Putnam Cty.*, 47 S.W.3d 438, 443 (Tenn. Ct. App. 2000)). The cited case, however, does not stand for that proposition, and this court is unable to locate any Tennessee opinion holding that a negligence *per se* claim premised upon the violation of a criminal statute automatically fails unless the plaintiff pleads and proves that the defendant was actually convicted of violating the underlying statute. Rather, the law is clear that a

plaintiff must simply prove, in the civil action, a violation of the underlying statute. *See, e.g.*, *Rains v. Bend of the River*, 124 S.W.3d 580, 592 (Tenn. Ct. App. 2003) (accepting, for purposes of reviewing the trial court's denial of summary judgment that "the sale of handgun ammunition to an eighteen year old purchaser in violation of 18 U.S.C. § 922(b)(1) is negligence *per se*," where the factual recitation does not indicate that the defendant was ever charged with violating the statute, and reversing the denial of summary judgment based on the absence of a showing of proximate causation); *Bennett*, 47 S.W.3d at 441, 445 (noting that the trial court found the defendant paramedics "guilty of negligence" based on their violation of Tenn. Code Ann. § 55-8-158 and reversing the finding of liability for negligence and negligence *per se* based on the absence of evidence of proximate cause of the plaintiff's injuries, as required for both).

This court, therefore, is not persuaded by *Ware* and finds that the fact that Ashton was not charged or convicted of statutory rape or statutory rape by an authority figure is not dispositive of the negligence *per se* claim. The defendant is not entitled to dismissal of the claim based on this argument.

Second, Ashton contends that the plaintiff's negligence *per se* claim fails, insofar as it is premised upon an alleged violation of § 39-13-532(a), because the plaintiff does not allege facts that, if true, would establish that he meets the statutory definition of "authority figure." Ramsbottom argues that the term is defined more broadly by the Tennessee courts than Ashton suggests and that she has alleged facts sufficient to establish Ashton's status as an "authority figure."

Tennessee courts have clarified that the defendant must either occupy a position of trust *or* exercise supervisory or disciplinary power over the victim. The plaintiff is "not required to prove both." *State v. McGrowder*, No. M2013-01184-CCA-R3CD, 2014 WL 4723100, at *1 (Tenn.

Crim. App. Sept. 23, 2014). The term "position of trust" has been defined broadly by the Tennessee Supreme Court, which has explained that a "court must look to 'the nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.' A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." *State v. Gutierrez*, 5 S.W.3d 641, 645 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). Notably,

> [t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

*Kissinger*, 922 S.W.2d at 488.

Where the adult perpetrator and child victim are members of the same household, a position of trust is generally presumed. In addition, however, "a personal relationship between the Defendant and victim where the Defendant acts as the victim's friend, paying for food and other items, [may be] a sufficient basis for finding a private trust." *State v. King*, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *6 (Tenn. Ct. Crim. App. Nov. 13, 2002) (citing *State v. McKnight*, 900 S.W.2d 36, 55 (Tenn. Ct. Crim. App. 1994)); *but see State v. Stepp*, No. E2005-02178-CCA-R3-CD, 2006 WL 3102353, at *5 (Tenn. Crim. App. Nov. 2, 2006) (where the evidence showed that "a friendship existed between the Appellant and the victim" and that the victim visited the appellant regularly and "on occasion . . . helped [him] put up groceries," holding that the mere existence of friendship did not establish a "private trust" for purposes of the sentencing enhancement).

In other words, it is clear that the question of whether a defendant occupies a "position of trust" is an intensely fact-specific inquiry, the resolution of which depends on the circumstances presented in a particular case. Here, the Amended Complaint alleges that Ashton knew that

Ramsbottom was in high school at the time he began contacting her, that he maintained continuous communication with her for months, during which he occasionally read her school assignments, and that he generally "manipulated" Ramsbottom to gain her trust by "presenting himself as a friend and mentor, discussing school and offering advice." (Doc. No. 23 ¶¶ 81, 82.) By virtue of his relationship with her, he acted in a "very controlling" manner, advising her of what friends she could have, directing her choice of college major, and imposing "rules" on her, such as the rule that she could not have sex with anyone but him, but he could have sex with anyone he wanted and unprotected sex with her whenever he wanted. (*Id.* ¶ 92.) In addition, he made it clear that she was not to tell anyone else about their relationship. (*Id.* ¶ 12.) Although the question presents a very close call, the court finds, for purposes of the Motion to Dismiss, that these allegations are sufficient to establish that Ashton occupied a "position of trust" vis-à-vis Ramsbottom. Ashton is not entitled to dismissal of the negligence *per se* claim at this juncture.

Finally, in his Reply, Ashton raises a new argument, one not included in his initial Memorandum in support of the Motion to Dismiss: that a negligence *per se* claim cannot, under Tennessee law, be premised upon the violation of "[s]erious criminal statutes such as those alleged here . . . , as they have corresponding intentional torts." (Doc. No. 99, at 7–8.) Thus, for example, the plaintiff has at her disposal the tort of battery to cover the intentional tort of statutory rape. *Accord Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9CV, 2001 WL 327906, at *2 (Tenn. Ct. App. Apr. 5, 2001) ("For the purpose of this civil proceeding, Mr. Abson's contact with Mr. Doe [age sixteen] constitutes the intentional tort of battery. A battery is an intentional act that causes an unpermitted, harmful or offensive bodily contact.").[17]

---

[17] The appeal in *Mama Taori's* arose in the context of "homosexual conduct in the workplace between an adult employee and a sixteen-year-old, part-time employee." After the adult employee was arrested and charged with statutory rape, the minor (John Doe) and his parents

The defendant may well be correct. However, he did not raise this issue in his initial brief, and the plaintiffs have not had the opportunity to respond to it. The Sixth Circuit has repeatedly recognized that arguments raised for the first time in a party's reply brief are waived. *See, e.g.*, *Hunt v. Big Lots Stores, Inc.*, 244 F.R.D. 394, 397 (N.D. Ohio 2007) (collecting cases). The court, on this basis, declines to address this argument and will, instead, deny Ashton's Motion to Dismiss the negligence *per se* claim set forth in Count IV of the Amended Complaint. The denial of his motion is without prejudice to his ability to raise the same argument in the context of a motion for summary judgment.

## III.    CONCLUSION

For the reasons set forth herein, four of the pending Motions to Dismiss (Doc. Nos. 50, 63, 70, 103 will be granted. Defendant Ashton's motion for dismissal of Count IV (Doc. No. 67) will be denied.

An appropriate order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge

---

brought suit against both the adult employee and the owner of the restaurant where John Doe and the adult employee had worked. 2001 WL 327906, at *1.