## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

RACHEL RAMSBOTTOM et al., )
)
    Plaintiffs, )
)
v. )    **Case No. 3:21-cv-00272**
)    **Judge Aleta A. Trauger**
LORIN ASHTON et al., )
)
    Defendants. )

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 255) filed by Lorin Ashton (also known by the stage name "Bassnectar"),[1] the sole remaining defendant in this case, seeking dismissal of all claims against him set forth in the Amended Complaint (Doc. No. 23). For the reasons set forth herein, the motion will be granted in one respect and otherwise denied.

## I.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

In moving for or responding to a motion for summary judgment, the "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or

---

[1] Ashton is referred to herein as "Ashton," except in direct quotations or when the context makes it clear that the reference is to his stage persona.

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In deciding whether a genuine issue of material fact exists, the court must assume the truth of the nonmoving party's evidence and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S.

at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence" that the nonmoving party is entitled to a verdict. *Id.*

## II.    PROCEDURAL BACKGROUND

The initial Complaint, asserting claims on behalf of plaintiffs Rachel Ramsbottom and Alexis Bowling, was filed on April 5, 2021. The Amended Complaint (Doc. No. 23), joining plaintiff Jenna Houston, was filed shortly thereafter, on May 7, 2021.[2] In January 2022, the court granted the Motions to Dismiss filed by the other defendants originally named in this action (*see* Doc. Nos. 110, 111), leaving intact only the claims against Ashton, against whom the Amended Complaint states four claims or causes of action. In Counts I and II, the plaintiffs collectively assert claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, which authorizes a civil action for victims of sex trafficking in violation of 18 U.S.C. § 1591 against both the perpetrator of the sex trafficking and "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). Count III states a claim based on Ashton's alleged receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A. Count IV sets forth a claim on behalf of Ramsbottom alone for negligence *per se* under Tennessee state law.

After a lengthy and contentious period of discovery, Ashton has now filed his Motion for Summary Judgment, seeking judgment in his favor on each claim against him asserted by each plaintiff. (Doc. No. 255.) The motion is supported by a Memorandum of Law, Statement of

---

[2] The Amended Complaint also added Jane Doe #1 as a plaintiff. However, Jane Doe #1 voluntarily dismissed her claims after the court denied her request for leave to pursue her claims pseudonymously. (*See* Doc. Nos. 59, 65.)

Undisputed Material Facts, and a substantial quantity of evidentiary material, including the complete transcripts of the plaintiffs' depositions. The plaintiffs have filed a Response in Opposition to the Motion for Summary Judgment, Response to the defendant's Statement of Undisputed Material Facts, an Additional Statement of Undisputed Material Facts ("Additional Statement"),[3] and additional evidentiary material, some of it duplicative of documents filed by the defendant. The defendant responded to the plaintiffs' Additional Statement and filed a Reply.

The parties have not made the task of locating the documents to which they refer easy, in some instances requiring the court to engage in a virtual scavenger hunt, wading through multiple levels of references, to find the cited evidence. The docket is further complicated by the fact that it contains two versions of nearly every document filed in support of, or in opposition to, the Motion for Summary Judgment—one redacted and one sealed. The court cites herein, for the most part, to the sealed versions, referencing them by docket number and the pagination assigned by the court's electronic filing system.[4]

Rather than providing a comprehensive overview of the facts, the court will provide the relevant facts when discussing whether each plaintiff's claims survive summary judgment.

---

[3] The court's Local Rules authorize parties opposing summary judgment to file a "concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." LR 56.01(c). Because the plaintiffs oppose summary judgment, their task is generally to establish the existence of material factual *disputes*, not additional *undisputed* facts. The court construes their additional statement as a statement of disputed facts filed in accordance with LR 56.01(c).

[4] The transcripts of the plaintiffs' depositions have been filed in condensed form, with four standard pages per page, and two different excerpts of the defendant's deposition have been filed. To avoid confusion, the court refers to deposition transcripts using the original pagination assigned by the court reporter.

## III. DISCUSSION

### A. The Trafficking Victims Protection Reauthorization Act

Congress initially passed the Trafficking Victims Protection Act of 2000 "[t]o combat trafficking in persons, especially into the sex trade, slavery, and involuntary servitude, to reauthorize certain Federal programs to prevent violence against women, and for other purposes." Victims of Trafficking and Violence Protection Act of 2000, PL 106–386 (Division A), Oct. 28, 2000, 114 Stat 1464. The legislation created criminal offenses for forced labor and sex trafficking. As specifically relevant here, the statute made it a federal crime to engage in the sex trafficking of children or in sex trafficking of adults or children by force, fraud, or coercion. *See United States v. Afyare*, 632 F. App'x 272, 277 (6th Cir. 2016) ("Congress intended to criminalize two forms of sex trafficking it considered severe forms of trafficking in persons: sex trafficking where the victim is under 18 years of age, and sex trafficking in which the act is induced by force, fraud, or coercion." (internal quotation marks and citation omitted)); *accord United States v. Biancofiori*, 94 F.4th 651, 653 (7th Cir. 2024) ("Either trafficking through force or trafficking a minor suffices."), *cert. denied*, No. 24-5114, 2024 WL 4427355 (U.S. Oct. 7, 2024).

The statute, 18 U.S.C. § 1591, has been amended several times, including in 2018, but, during the years when Ashton was involved with the plaintiffs (2012–2016), it stated:

(a) Whoever knowingly–

(1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591 (Effective Dec. 23, 2008 to May 28, 2015). In other words, the statute makes it a crime both to actively engage in sex trafficking and to knowingly benefit from participation in a venture that the defendant either knows is engaged in sex trafficking or acts in reckless disregard of that fact. *United States v. Aldridge*, 98 F.4th 787, 795 (6th Cir. 2024); *Afyare*, 632 F. App'x at 286–87.

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act ("TVPRA"), one of the stated purposes of which was to create a civil cause of action for victims of trafficking against their traffickers. In 2008, Congress expanded victims' remedies with the passage of the William Wilberforce Trafficking Victims Protection Reauthorization Act, which extended civil liability against, not only the perpetrators of trafficking, but also those who facilitate trafficking ventures. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, PL 110–457, Dec. 23, 2008, 122 Stat 5044. Following the 2008 amendment and at the time of the events giving rise to this lawsuit, section 1595(a) stated:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (2008).[5]

The plaintiffs here effectively bring three distinct claims against Ashton under § 1595(a) based on his purported violations of § 1591 (encompassed in Counts I and II of the Amended Complaint): (1) a claim based on Ashton's allegedly engaging them in sex trafficking when they

___

[5] Section 1595(a) was amended in early 2023 by inserting "or attempts or conspires to benefit" after "whoever knowingly benefits." Abolish Trafficking Reauthorization Act of 2022, PL 117-347, January 5, 2023, 136 Stat 6199.

were under eighteen years of age; (2) a claim based on Ashton's allegedly engaging them in sex trafficking induced by force, fraud, or coercion both before and after they turned eighteen; and (3) a claim based on his "knowingly benefit[ting] . . . from participation in a venture which [he] knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). (*See also* Doc. No. 23 ¶¶ 199–213.) Ashton seeks summary judgment on all three claims by each plaintiff.

Ashton acknowledges that there is a genuine factual dispute as to whether he engaged in sex acts with the plaintiffs when they were minors, but he contends that this factual dispute is not material because the plaintiffs cannot establish that he induced them to engage in a *commercial sex act*, which is a required element of all three TVPRA claims. Second, he contends that, even if the commercial sex act element were established, the plaintiffs present no evidence that he engaged in "means of force, threats of force, fraud, coercion [as defined in the statute]," or any combination thereof, to cause them to engage in a commercial sex act. Alternatively, he contends that there is no evidence that he "purposefully coerced Plaintiffs, *knowing* that the coercion *would cause or likely cause* them to engage in commercial sex acts." (Doc. No. 261-1. at 21 (emphasis in original).) In addition, while he disputes enticing any plaintiff to engage in underage sex, Ashton argues that plaintiff Houston cannot show that he had actual or constructive knowledge that she was a minor when she began a sexual relationship with him, because she went to great lengths to hide her age.

Regarding the "beneficiary" liability claim in Count II, Ashton argues that the plaintiffs fail to establish the existence of a "venture" that engaged in sex trafficking and have only ever claimed that Ashton is liable as a perpetrator rather than as a beneficiary of an alleged venture that engaged in sex trafficking.

The plaintiffs insist that material factual disputes preclude summary judgment on any of these claims.

### 1.    The "Commercial Sex Act" Element

To succeed on any of their § 1595 claims, the plaintiffs must establish that Ashton knew or recklessly disregarded that they would be "cause[d] . . . to engage in a commercial sex act." 18 U.S.C. § 1591(a). The statute defines "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3).

Ashton argues that the statute requires a "transactional sex element"—that is, that the plaintiffs must show that they were provided something "of value *in exchange for* any sex act with Defendant." (Doc. No. 261-1, at 21.) He argues that he is entitled to summary judgment on the § 1595 claims because the facts, viewed in the light most favorable to the plaintiffs, fail to establish "the necessary transactional sex element." (*Id.*)

Courts grappling with the definition of "commercial sex act" generally agree that the term "anything of value" is defined very broadly. *See, e.g.*, *United States v. Raniere*, 55 F.4th 354, 361 (2d Cir. 2022) ("Congress's repeated use of the word 'any' in its definition of 'commercial sex act' further supports an expansive understanding of the specific phrase at issue here, 'anything of value.'. . . Indeed, adding the expansive prefix 'any' onto 'thing' only underscores our understanding that 'anything of value' should be broadly understood to include intangibles."); *United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015) ("The phrase 'anything of value' [in Section 1591(e)(3)] is extremely broad."); *Treminio v. Crowley Mar. Corp.*, 649 F. Supp. 3d 1223, 1231 (M.D. Fla. 2023) (construing continued employment, the potential for career enhancement, and relief from threats of negative referrals to constitute "several things of value"); *David v. Weinstein Co.*, 431 F. Supp. 3d 290, 303–04 (S.D.N.Y. 2019) (finding that a career opportunity is a thing of value).

Courts have also held that "on account of," as used in § 1591, means "because of" and requires a causal connection between the sex act and the conveyance of a thing of value. *See, e.g.*, *Raniere*, 55 F.4th at 363 (rejecting the defendant's objection to a jury instruction defining "commercial sex act" as "any sex act of which anything of value is given to or received by any person *because of* such sex act" (instead of "on account of" such sex act), finding no meaningful distinction between the two terms); *Treminio*, 707 F. Supp. 3d at 1245 ("Courts have interpreted . . . Section 1591's language to require a causal relationship between the 'anything of value' and the sex act to constitute a commercial sex act under the TVPRA."); *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013) ("[T]he use of the phrase 'on account of which' suggests that there . . . needs to be a causal relationship between the sex act and an exchange of an item of value." (citation omitted) (alteration in original)). At the same time, courts have generally not required a *quid pro quo* transaction or express bargain. *Accord, e.g.*, *Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 772 (C.D. Cal. 2024) (construing the "on account of" language in § 1591(e)(3) as "impl[ying] a causal connection between the sex act and the commercial exchange" but "not requir[ing] a bargained for exchange").

With these principles in mind, the court considers the factual record to determine whether each plaintiff has presented sufficient evidence from which a jury could conclude that Ashton induced her to engage in a commercial sex act.[6]

---

[6] The facts set forth herein for which no citation is provided are undisputed, at least for purposes of the Motion for Summary Judgment. Unless otherwise indicated, the facts are viewed in the light most favorable to the plaintiffs as the nonmoving parties.

*a) Rachel Ramsbottom*

Rachel Ramsbottom was born on May 23, 1995 and, therefore, turned eighteen years old on May 23, 2013. She testified that she was planning to attend her first Bassnectar show in the fall of 2012, when she was seventeen, but the show was canceled. Prior to that time, even though she had not been to a Bassnectar concert, she was a fan, and she followed "Bassnectar" on social media. (Doc. No. 261-4, Ramsbottom Dep. 67.) After the concert was cancelled, Ramsbottom posted a public "tweet" on Twitter, expressing her disappointment that the show had been cancelled, and she "tagged" Ashton. (*Id.* at 66.) He responded by sending her a direct message. (*Id.*) The two exchanged a series of messages on September 28 and 29, 2012, the tone of which could be construed as flirtatious[7] and in which, in response to Ashton's question about her age, Ramsbottom responded that she was eighteen. (*See* Doc. No. 268, at 5.) Ashton, born on February 16, 1978, would have been 34 at the time. Ramsbottom ended the exchange by providing her telephone number in case he ever wanted to text her. (*Id.* at 6.) Ramsbottom acknowledged that Ashton did not ask for her telephone number, and she provided it because she "wanted to stay in touch with him." (Ramsbottom Dep. 90.)

Ramsbottom testified that they stayed in touch after that by "e-mail, text, and phone call." (*Id.* at 91.) She claims that Ashton "coerced" her into communicating with him by "putting a wedge between [her] communications with friends, boyfriends, parents." (*Id.*) She explained that he "kind of made himself to be this guide in [her] life." (*Id.*) She described a "dynamic" pursuant to which, if she did not follow some of his suggestions, he would "probably pull back and . . . withhold affection from [her] or withhold communicating with [her]." (*Id.*)

---

[7] For instance, in response to Ramsbottom saying she wanted to meet him, (and just before asking her age), Ashton asked "what would you like to do [if] we met?" (Doc. No. 268, at 4.)

She attended her first Bassnectar concert at the Bridgestone Arena in Nashville on New Year's Eve 2012–2013. (*Id.* at 67.) She did not meet Ashton then, although they had discussed that possibility in their communications, because she attended the performance with her brother and "felt uncomfortable about being in that situation" and "trying to make an excuse in front of her brother." (*Id.* at 67–68.)

Ramsbottom and Ashton met for the first time on May 3, 2013, at a Marriott Hotel in Memphis. During their communications leading up to this encounter, according to Ramsbottom, Ashton "groomed" her by "trying to get [her] to trust him and make [her] think that [she] was special and more mature and guys [her] age wouldn't be able to connect with [her] and just kind of isolat[ing her] from people." (*Id.* at 94.) She noted that sometimes he "kind of marketed himself as . . . almost like a father figure," but then there would be "sexual innuendos." (*Id.*) She explained that he "isolated" her from people simply by "kind of putting it in [her] head that [she] was . . . more mature and . . . this unique, special person," and he disapproved of her friends and wanted her to be a "homebody." (*Id.* at 94–95.)

At some point before she met him in person, she confessed to Ashton that she was only seventeen, not eighteen. (*Id.* at 152.) The day she met him on May 3, 2013, Ashton knew that Ramsbottom was seventeen years old. They arranged to meet in downtown Memphis and to go to the Beale Street Music Festival. Ramsbottom thought they would be meeting in the lobby of Ashton's hotel, because he knew that she was seventeen, and she "figured [they] needed to make it as . . . normal looking as possible." (*Id.* at 153.) Instead of going to the festival, after meeting in the lobby, they went directly up to his hotel room and had sex. (*Id.*)[8] Afterward, she wanted to go

---

[8] Again, Ashton denies that he and Ramsbottom had sex at any time before Ramsbottom turned eighteen. (*See, e.g.*, Doc. No. 289-1, Ashton Dep. 51–52.)

the festival, but he discouraged her from going by herself. As she got up to leave, he pulled a "wad of money" out of his backpack and handed it to her.[9] (*Id.* at 154.) She was "shocked." (*Id.*) Ramsbottom now believes that she was "paid for having sex with him." (*Id.* at 161.) At the time, however, Ramsbottom did not think she was being "paid for sex." (*Id.* at 163–64.) She believed the money was "for emergencies and to travel to see him," which was how Ashton characterized it. (*Id.* at 164.)

Ramsbottom left the hotel room and went to a friend's house while Ashton performed. She also told her friend about seeing Ashton and about the money, and she told her friend the money was for "emergencies and travel to see him." (*Id.* at 161, 164.) After Ashton's performance was over, he texted Ramsbottom and she returned to the hotel. (*Id.* at 154, 167.) They had sex again and she spent the night. (*Id.* at 154, 168.) Even though she was on birth control, she "got a Plan B the next day," just in case, because she was anxious about becoming pregnant. (*Id.* at 154–55.)

Ramsbottom next saw Ashton three weeks later, when she drove to Nashville for her eighteenth birthday to see him. (*Id.* at 174.) She planned this trip with him. (*Id.*) She recalled that she got to the hotel before him, and they stayed at the hotel "for a few days." (*Id.* at 177.) During this stay, Ashton did not want her to answer the phone or be seen by hotel staff. (*Id.*) They went to the gym once but otherwise did not leave the hotel room, because he did not want to be seen in public with her. (*Id.* at 177–78.) Ramsbottom had thought that they would go out to eat and be seen in public because she was now eighteen. (*Id.* at 179–80.) She claims that she felt like she was "held hostage in the room," because he did not want them to go out and did not want her to interact with hotel staff or to answer the phone—but she acknowledged that Ashton did not take her car

---

[9] The FAC asserts that Ashton gave her $1,000. (Doc. No. 23 ¶ 87.) Ashton testified that he gave her $1,000 because she was "very upset that [he] didn't have sex with her." (Doc. No. 276-7, at 19–20, Ashton Dep. 97–98.)

keys or cell phone away from her and did not physically prevent her from leaving. (*Id.* at 181–82.) He did not threaten her, use force or violence, and did not physically harm her. (*Id.* at 183.) She eventually did leave of her own accord, while he was still at the hotel. She just "got in [her] car and drove home." (*Id.* at 191.)

Ashton did not remunerate her in any way in connection with this trip to Nashville, other than by covering the hotel and room service bill. (*Id.* at 191–92.) He never suggested that his payment of expenses or her ability to stay in the room or eat the food brought in by room service was in exchange for her agreeing to have sex with him. (*Id.* at 192.)

The third time Ramsbottom saw Ashton was in June or July 2013, in Memphis. (*Id.* at 192.) This time, he came to Memphis to visit her and stayed for two or three days. (*Id.* at 193.) Again, they stayed in his hotel room the whole time he was there, hanging out and having sex. (*Id.* at 193–94.) Ramsbottom drove her car to the hotel, and she always had access to her car keys, her phone, and her wallet. She claims now that she felt she was held hostage (*id.* at 195–96), but she never reported feeling that way to the friends she told about the relationship. (*Id.* at 196.) She does not claim that she was paid for sex on that occasion. (*Id.* at 194.) This was the last time she and Ashton had a sexual interaction, and Ramsbottom began dating someone else in August 2013. (*Id.* at 202.)

The next time Ramsbottom saw Ashton was in November 2013, in New Orleans. (*Id.* at 196.) On this occasion, however, she stayed at a La Quinta Inn with a friend. She saw Ashton play at a music festival and then met up with him at his hotel. They "hung out" (sitting and talking), but they did not have sex, and she did not spend the night in his hotel room. (*Id.* at 197–98.) Ashton put her name and that of her friend on the guestlist, so they did not have to pay for tickets to attend the festival, but he did not demand a sexual interaction—or anything else—in exchange for providing her free tickets to the show. (*Id.* at 198–99.)

After this encounter, Ramsbottom and Ashton remained in touch through the spring of 2020, and she saw him at numerous other concerts. (*Id.* at 203.) He did not demand anything in exchange for giving her free tickets to these other concerts. (*Id.*)

As set forth above, the defendant argues that the facts, as alleged by Ramsbottom, do not establish that she ever engaged in a "commercial sex act," because there was nothing transactional about any of their interactions. The plaintiff herself expressed "shock" at Ashton's giving her a "wad" of money after they had sex the first time, just as she was about to leave the hotel room. The court finds that whether this money constituted payment or remuneration for sex constitutes a jury question. The mere fact that, as alleged by the plaintiff, Ashton gave her a "wad" of cash from his backpack essentially immediately after they had sex for the first time, characterizing it as money for "emergencies and to travel to see him"—presumably for the purpose of having sex again—gives rise to a reasonable inference that there is a causal connection between the sex act and the money (which clearly qualifies as a "thing of value"). And that is all that is required to establish a sex-trafficking claim under § 1591 and a basis for civil liability under § 1595 when the alleged victim is a minor under the age of eighteen. *Accord Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 772 (C.D. Cal. 2024) ("While [the 'on account of' language in § 1591(a)] implies a causal connection between the sex act and the commercial exchange, it does not require a bargained for exchange. The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act.").

Ramsbottom's allegations regarding her subsequent sexual encounters with Ashton, however, do not establish that they involved a "commercial sex act" at all. As for the encounter that took place in Nashville over the weekend of her eighteenth birthday on May 23, 2013, Ramsbottom traveled of her own accord to meet up with Ashton. Although he paid for the hotel

room and food over the course of the weekend, nothing about the interaction suggests that his payment for lodging and food was because of—or "on account of"—any sex act. 18 U.S.C. § 1591(e)(3). Ramsbottom does not allege that Ashton ever threatened to withhold food or lodging—or threatened to require her to foot the bill—if she did not engage in sex acts with him. There is simply no suggestion that his payment of the hotel expenses was causally related to her agreement to engage in sex with him. Likewise, with respect to the encounter in July 2013 when Ashton traveled to Memphis to see her, Ramsbottom affirmatively admits that she was not paid for sex on that occasion (Ramsbottom Dep. 194); nor does she suggest that she was promised or received anything else of value in exchange for, or because of, her agreeing to have sex with Ashton on that occasion.

Accordingly, insofar as Ramsbottom brings a claim against Ashton for sex trafficking her after she turned eighteen years old, that claim fails simply because she fails to point to facts in the record that would establish that she engaged in a commercial sex act with him after she turned eighteen.

### b) Alexis Bowling

Alexis Bowling was born on August 20, 1996, which means she turned eighteen years old on August 20, 2014. She graduated from high school in 2014. (Doc. No. 261-5, Bowling Dep. 41.)[10]

Bowling became a Bassnectar fan when she was in middle school and had seen three concerts before she met him. (*Id.* at 142–43.) By the time she turned seventeen, she had been following him on social media for "[a] couple years." (*Id.* at 145.) On August 21, 2013, the day

---

[10] Bowling was deposed again in June 2024, and the transcript of that deposition is in the record (Doc. No 261-6), but the court does not cite to that transcript herein.

after she turned seventeen, Bowling "tweeted": "A shout out or rt [retweet] from @bassnectar for my birthday would be priceless." (Doc. No. 261-10; *see also* Bowling Dep. 146.) Bowling confirmed that when you "tag somebody, like the @bassnectar, it alerts their account that they've been tagged in something." (Bowling Dep. 147.) She did not get a "retweet or a shout-out"; instead, Ashton direct messaged her to wish her a happy birthday. (*Id.* at 146, 161; *see also* Doc. No. 283-21, at 2 (tweet from @bassnectar to @lexcbowling stating: "HAPPY BIRTHDAY DUDE! I hope this year is happier, healthier, and more fun that the last :)").)

Over the course of the next several months, they corresponded via Twitter sporadically. Most of the time, Bowling messaged or tagged him, and he would eventually respond. (*See generally* Doc. No. 283-21, at 2–3.) Beginning in May 2014, they began emailing, and Ashton offered her and her "bestie" tickets to a "North Coast" show that would be taking place in the fall of 2014. (Doc. No. 259-4.) In their email thread, Ashton eventually asked Bowling how old she was, and she told him she was eighteen. (Doc. No. 261-11.)

In early June, Bowling asked if she could "switch out" the "secret pass" to the fall North Coast performance, as she had a conflict relating to her being on the University of Kentucky dance team, which would perform during the first home football game. (*See* Doc. No. 261-12.) She told Ashton that she thought she could make it to the Electric Daisy Carnival ("EDC") in Las Vegas, a performance that would take place in Las Vegas in June 2014. (*Id.*) Ashton eventually came through with those tickets. At some point, however, Bowling realized that EDC was "an 18-plus event" and that she would not be admitted. (Bowling Dep. 185.) She explained that she called Ashton at that point to confess that she was not actually eighteen. He was a little frustrated and essentially brushed her off, as he was performing soon. (*Id.*) She nonetheless "made it to Vegas" and was just going to turn around and go home, but he "reached out and offered a meet and greet."

(*Id.*)

According to Bowling, they met in front of the hotel where Ashton was staying. He complimented her legs, told her there was a party going on inside that he did not want to attend, and gave her a "piggyback ride" to some bushes near the hotel, where they sat in an entirely secluded area and "spent that night together," talking. (*Id.* at 186–87, 192.) At some point, he kissed her, and she believes they kissed more than once. (*Id.* at 193.) They did not have sex or engage in any sexual contact that night. (*Id.* at 193–94.) However, Ashton "slipped $300 cash" into her purse. (*Id.* at 197.) He did not "say much" about it, other than "I put something in there, like, to help you get home." (*Id.* at 199.) She did, in fact, use the funds to help her get home. (*Id.*)[11] She testified, however, that she believed the money was part of a "grooming tactic" Ashton employed to "to make [her] feel special" so that he could have sex with her later. (*Id.*)

Bowling and Ashton met up three more times during the summer of 2014, prior to her eighteenth birthday. According to Bowling, the first of these encounters took place around July 1, 2024, in Lexington, Kentucky, where she lived. He flew into Cincinnati, where she picked him up, and they drove back to Lexington. (*Id.* at 212.) That trip was arranged through the communication app, Wickr, which she downloaded shortly after the meeting in Las Vegas. (*Id.*)

They allegedly went directly to a hotel in Lexington, where Ashton checked in while Bowling stayed in the car. (*Id.* at 215.) Ashton stayed three or four days. (*Id.* at 222.) During this visit, Bowling's mother knew that she "had a friend coming into town," but Bowling was not allowed to spend the night at that person's house. (*Id.* at 214.) So she spent each day of the visit with Ashton at the hotel and then went back to her older sister's house at night, around 10:30 or

---

[11] According to Ashton, he met her outside his hotel and they leaned against the wall talking briefly. (Doc. No. 289-1, Ashton Dep. 294.) He denies giving her any money at this time. (*Id.*)

11:00. (*Id.*) While at the hotel during this visit, they had "a lot of sex," "probably every day."[12] Aside from taking a walk around the golf course, they basically stayed inside, had sex, showered, watched movies, and ate room service. (*Id.* at 218–19.) Bowling had to hide when hotel staff entered the room. (*Id.*)

At one point during the weekend, Ashton slid an envelope to her containing $1,600 and told her to "be very smart" with it and to use it for traveling to see him.[13] (*Id.* at 227.) Bowling subsequently used the money to cover travel expenses to see him. (*Id.* at 227–28; *see id.* at 229–30 ("The money was given to me to have future visits with him in which we had sex, so . . . . That's what the money was for.").)

Bowling also claimed that, every time they had sex, Ashton used a "technique" on her that she referred to as "forced orgasming"—though she did not know the term at the time and has "since learned about." (*Id.* at 215.) She described the technique as his "very, very, very forcefully using his hands to cause a lot of liquid to come out of that area." (*Id.* at 215.) She had never experienced anything like this before. (*Id.*) She never voiced any objection to him about his use of this technique. (*See id.* at 216 ("[H]e talked about how hot that was and how sexy. And, you know, I just kind of went with it because I didn't really know if it was hot or sexy. . . . But I believed him because he's an – you know, he's who he is. So I just – I went with it and I thought: Okay. That's good.").) Asked whether he ever used force on her, Bowling responded: "Psychologically, yes. Physically, also yes, I guess. Not – again, not violent. . . . [B]ut, yeah, I still feel the force today."

---

[12] Ashton denies having sex with Bowling at any time prior to her eighteenth birthday. (Doc. No. 289-1, Ashton Dep. 296.)

[13] Ashton concedes that, over the course of the six or seven years that he knew her, he likely reimbursed Bowling for a flight or gave her a gift "at some point," but "never in exchange for sex." (Doc. No. 289-1, Ashton Dep. 305.) He has "no specific recollection of giving her money at any time." (*Id.*)

(*Id.* at 224.) She confirmed, however, that she meant "psychological" force. (*Id.*)

For the duration of his visit, Bowling always had access to her cell phone, her car keys, and her identification. Once, after falling asleep watching a movie, she woke up feeling "kind of disoriented" and ready to leave, so she did leave. (*Id.* at 225.)

After this visit, they saw each other again several weeks later, this time meeting at a hotel in Cincinnati. They stayed there approximately three days, following the same routine as before: sex, showers, movies, room service. (*Id.* at 237–40.) She spent the night at the hotel, but they slept in separate beds. (*Id.* at 241.) Asked whether she received any compensation during this trip, Bowling stated that she used some of the $1,600 Ashton had previously given her to travel to Cincinnati. Otherwise, Ashton covered all of their expenses while at the hotel. (*Id.* at 245.) He did not use physical force on her, aside from the "forced orgasming" and "persistent" "psychological force." (*Id.* at 246.) Bowling explained that, by psychological force, she meant that she was very young and Ashton was "very convincing"; he put himself in the role of a "father figure" and "role model," acting as both "big brother" and "lover." (*Id.* at 246–47.) And he was also her favorite musician. (*Id.* at 247.) He knew all of these things and how much she admired him, and he took advantage of this position of influence over her. (*Id.*; *see also id.* ("[I]t was never like violent forcing . . . , but it was very, very insidious.").) She also stated that he asked her advice on matters and "just made [her] feel really important." (*Id.* at 249.)

They got together one more time before her eighteenth birthday, this time at a hotel in Covington, Kentucky, across the river from Cincinnati. (*Id.* at 249–50.) She used some of the travel money he had already given her to get there, and this visit resembled the previous two, where they met at the hotel and mostly stayed inside, had sex, and watched movies. (*Id.* at 250–51.) Ashton covered all of their expenses, but he did not give her money, and his payment of expenses, again,

was not expressly tied to her agreeing to have sex with him. (*Id.* at 255–57.) While Bowling admittedly did not feel endangered at the time, in retrospect she feels she was being "groomed," "love-bombed," and manipulated. (*Id.* at 258.)

The two stayed in contact and continued to see each other sporadically after Bowling turned eighteen, but Ashton never again went out of his way to visit her. (*Id.* at 264.) Instead, she would travel to see him. (*Id.*) He would tell her where he was going to be, invite her there, and make sure she had travel money. (*Id.* at 264.) He never gave her as much money as the first time, and it was never explicitly in exchange for sex, but "sex was the first thing to happen and then money would always . . . be there." (*Id.* at 265.)

Bowling ended her sexual relationship with Ashton in 2016. (*Id.* at 114, 260–61.) She terminated the relationship because she wanted to start a relationship with someone else she had met. (*Id.* at 263.) She stayed in touch with Ashton for years after that, however; she continued to ask him for free tickets, and "most of the time" he provided them, usually for her and a friend. (*Id.* at 265.)

Ashton, again, contends that there is insufficient evidence to establish that he ever enticed Bowling to engage in a commercial sex act, either before or after she turned eighteen. The court finds that Bowling's testimony, if believed, is sufficient to permit a jury to infer that the $1,600 Ashton gave her during their first meeting was causally connected to his allegedly enticing her to have sex with him and to provide her the means of traveling to see him and to have sex again while she was underage. Because the questions of whether they had sex at all while Bowling was underage and whether the money was causally connected to sex are both disputed, Ashton is not entitled to summary judgment on the issue of whether he sex-trafficked Bowling while she was under the age of eighteen.

Moreover, Bowling's testimony that Ashton continued to provide her "travel money" so that she could meet up with him for sex after she turned eighteen gives rise to a permissible inference that she continued to engage in commercial sex acts after she turned eighteen. In short, Ashton is not entitled to summary judgment on the § 1595 claims solely on the basis of his argument that Bowling lacks proof that she ever engaged in a "commercial sex act" under the statute.

### c) *Jenna Houston*

Jenna Houston was born on May 27, 1995; she turned eighteen on May 27, 2013.

After reaching out to Ashton on Twitter in February 2012, three or four months before her seventeenth birthday, Ashton responded, and they began communicating by text, email, and Twitter. (*See* Doc. No. 261-7, Houston Dep. 93–95.) The tone of the messages, according to Houston, was "[v]ery friendly," "very caring." (*Id.* at 95.) She does not recall specifically discussing her age with him, but she acknowledges that she presented herself as a college student living in an apartment with friends and working as an assistant manager at a dry cleaner's. (*Id.* at 98, 105–08, 176.) She specifically told him that she was looking to "transfer" from West Chester University to a different college. (*See id.* at 174–75; Doc. No. 261-14.)

They first met at a Ritz-Carlton Hotel in Philadelphia on April 20, 2012, when Houston was a month shy of her seventeenth birthday. Houston testified that, prior to that meeting, they had been communicating, and Ashton had asked her to meet him before the show. (Houston Dep. 117–18.) She and a friend drove from West Chester to Philadelphia. Houston claims that it was her intention to "just go[] up there for literally five minutes just to meet [her] "idol" while her friend waited in the car. (*Id.* at 118.) Instead, when she went up to Ashton's hotel room, he opened the door and immediately began kissing her and undressing her, and they had sex. (*Id.*) They did not talk much, and she did not stay long, as he had to get to a performance and her friend was waiting

outside in the car. (*Id.* at 119.) Houston claims that she was "confused and embarrassed" and had not expected this to happen.[14] (*Id.* at 118–21.) Houston testified that she did not "receive any gift or monetary remuneration as a result of that interaction." (*Id.* at 120.)

Despite allegedly being surprised by this encounter, Houston continued to meet with Ashton, and she continued to pose as a college student. She saw him again a month later, when he was playing a show in Rochester, New York. She drove to Rochester with three other people. She could not recall whether she saw Ashton before the concert, but she recalled spending the night with him at his hotel. (*Id.* at 122–24.) She could not remember whether she got free tickets for the Rochester show, but she believed it was "likely" that she received money from Ashton on that occasion, because he would slip money into her bag or purse "mostly every single time" they met up, purportedly for "travel expenses," but the money was "always a little bit more than what the travel was." (*Id.* at 131, 140.)

She also testified that, when he booked a plane ticket for her on one occasion before she was eighteen, she told him her birth date was March 22, 1992, which would have made her 20 years old the first time they met. (*See id.* at 155.) By the time they had the first conversation about her flying to see him and his booking a ticket for her to fly to see him, they had already met up two or three times. (*Id.* at 158.)

Bowling testified about a Baton Rouge trip where she met up with Ashton. She recalled that she was very drunk when she came back to the hotel after his show. She testified that she thought she was "16 or 17" at this time. (Houston Dep. 99.) When she got up the next morning, she saw that her ID was sitting out on a table, which confused her. (*Id.*) She now surmises that

---

[14] In email communications prior to this encounter, however, they had talked explicitly about having sex when they saw each other. (*See* Houston Dep. 137–39; *see also* Doc. No. 261-13, at 2.)

Ashton knew at that time that she was underage. However, she also confirmed that she only traveled to Baton Rouge to see him once, and she was shown an email exchange with Ashton about meeting up with him in Baton Rouge in October 2014, when she would have been 19. (*Id.* at 100–01.)

Their sexual relationship continued through early 2015, though it was very "on and off towards the end." (*Id.* at 145.) Ashton continued to send her money, even after their relationship ended. In 2020 or 2021, when she was homeless and living on the streets while addicted to drugs, he would send her money so that she could stay in a hotel or shelter. (*Id.* at 337.)

The only time Houston specifically recalls discussing her true age with Ashton was in an email thread in 2016, when their sexual relationship was already over and she would have been around 21 years old. (*Id.* at 103–05.)

As with Ramsbottom and Bowling, the court finds that there is a question of fact as to whether the "travel money," free concert tickets, and free airfare Houston received from Ashton were causally related to Ashton's allegedly enticing Houston to have sex with him and to provide her the means of traveling to see him again while she was underage in order to have sex. Because this fact is disputed, Ashton is not entitled to summary judgment on the issue of whether he induced Houston to engage in a commercial sex act when she was under the age of eighteen. Likewise, Houston's testimony that Ashton continued to provide her "travel money" by slipping money into her purse nearly every time she saw him, so that she could travel to see him for sex after she turned eighteen, gives rise to a permissible inference that she continued to engage in commercial sex acts after she turned eighteen. Consequently, Ashton is not entitled to summary judgment on this claim solely on the basis of his argument that Houston lacks proof that she ever engaged in a "commercial sex act" under the statute.

### 2. Actual or Constructive Knowledge of Jenna Houston's Age

Section 1591 requires, for *criminal* liability, that the defendant either know or recklessly disregard the fact that the person enticed to engage in a commercial sex act has not attained the age of eighteen. 18 U.S.C. § 1591(a). However, it also provides that, if the defendant "had a reasonable opportunity to observe the person so . . . enticed, . . . the Government need not prove that the defendant knew that the person had not attained the age of 18 years." *Id.* § 1591(c).

The defendant appears to argue that some lesser standard applies in the civil context when the alleged perpetrator has had an opportunity to observe the alleged victim. (*See* Doc. No. 261-1, at 37 ("Defendant proffers that the Court need not be guided by the scienter requirement as to age required for criminal prosecutions for sex trafficking, *i.e.*, the lower burden set forth in Section 1591(c), which states: "[i]n a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person . . . , the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years.'" (quoting 18 U.S.C. § 1591(c)).)

However, the Sixth Circuit appears to have applied a "recklessness" standard, even when the defendant has had ample opportunity to observe the victim. *See, e.g.*, *United States v. Jackson*, 622 F. App'x 526, 528 (6th Cir. 2015) (holding that, for a conviction under § 1591(a), the government must prove either "knowledge *or the substitute for knowledge*" and that "[r]eckless disregard of the victims' age is sufficient to obtain a conviction" (quoting U*nited States v. Robinson*, 702 F.3d 22, 32 (2d Cir. 2012))). The Sixth Circuit has also observed, in the context of a criminal prosecution under § 1591, that "the touchstone for whether a defendant recklessly disregards a victim's age is whether there are facts that 'would cause a reasonable person to question whether the victim was actually eighteen years old.'" *Id.* at 529 (quoting *United States v. Phea*, 755 F.3d 255, 261 (5th Cir. 2014)). Thus, for example, even when a victim tells a perpetrator

that she is over eighteen, "juries are entitled to consider many different types of facts when determining whether a defendant recklessly disregarded a victim's minority status, including the victim's appearance or behavior, information from the victim, or others, and [c]ircumstances of which a defendant was aware, such as the victim's grade level in school, or activities in which the victim engaged." *Id.* (internal quotation marks and citation omitted). The court finds, based on the "knowing, or, . . . in reckless disregard" language of § 1591(a), upon which perpetrator liability under § 1595(a) is based, that a recklessness standard, at a minimum, also applies to perpetrator claims under § 1595, regardless of whether the perpetrator had the opportunity to observe the victim.

The defendant also argues that he had neither actual nor constructive knowledge of Houston's age, and that Houston cannot show that he acted in reckless disregard of the possibility that she was underage, because she never told him she was underage and, to the contrary, told elaborate lies intended to make him believe that she was in college and nineteen years old when they met. The plaintiffs contend that Houston testified that she told Ashton her true age and, alternatively, that he had the opportunity to see her and, based on her appearance, knew or should have known that she was under eighteen when they first met and first had sex.

In light of the evidence in the record, no reasonable jury could find by a preponderance of the evidence that Houston ever revealed her true age to Ashton until some time after she was no longer a minor. She could not affirmatively state whether or when she told him her true age, and the evidence to which the defendant points shows that she went out of her way to maintain the illusion that she was not a minor. However, given that she was only sixteen, that Ashton was obviously able to observe her in person, and Ashton's equivocal testimony about Houston's appearance in photographs taken around the time of their relationship (*see* discussion, *infra*, at pp.

41–42), the court finds, for purposes of the defendant's Motion for Summary Judgment, that the evidence in the record is sufficient to give rise to a permissible inference that Ashton recklessly disregarded the fact that Houston was underage during the first thirteen months of their sexual relationship. Ashton is not entitled to summary judgment on Houston's claim based on his lack of actual knowledge of her age.

### 3. Force, Fraud, or Coercion

The TVPRA does not criminalize simple prostitution or commercial sex among consenting adults. Thus, to establish a § 1595 claim against Ashton based on his allegedly enticing the plaintiffs to engage in a commercial sex act after they turned eighteen, they must show that he enticed them to engage in a commercial sex act while

> knowing, or, . . . in reckless disregard of the fact, that *means of force, threats of force, fraud, coercion* described in subsection (e)(2), or any combination of such means [would] be used to cause [them] to engage in a commercial sex act . . . .

18 U.S.C. § 1591(a)(1) (emphasis added); *see also United States v. Taylor*, 44 F.4th 779, 789 (8th Cir. 2022) ("Because [the alleged victim] was an adult, the government was required to prove . . . that force, fraud, coercion, or any such combination would be used on [the victim].").

Force and fraud are not defined by the statute, so they retain their usual meanings. *Accord, e.g.*, *United States v. Frey*, No. 19-CR-00537, 2024 WL 2826141, at *4 (E.D.N.Y. Jun. 4, 2024) ("Force, threats of force, and fraud are undefined in § 1591 and therefore are construed to accord with their 'ordinary or natural meaning[s].'" (quoting *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012))). Thus, force is generally defined very broadly as any intentional, nonconsensual touch. *See, e.g.*, *Ardolf v. Weber*, 332 F.R.D. 467, 476 (S.D.N.Y. 2019) (defining "force" as "the exertion

of strength or energy" (citation omitted)).[15] And fraud means "a knowing misrepresentation . . . of a material fact made to induce another to act to his or her detriment." *Id.* at 475 (citation omitted); *see also United States v. Maynes*, 880 F.3d 110, 113–14 (4th Cir. 2018) ("[F]or any fraud to be relevant to the question of guilt [under § 1591], it must have been fraud that 'would be used to cause that person to engage in a commercial sex act'" (paraphrasing § 1591(a))).

> Coercion, however, is expressly defined by the statute to mean:
>
> (A) threats of serious harm to or physical restraint against any person;
>
> (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or
>
> (C) the abuse or threatened abuse of law or the legal process.

18 U.S.C. § 1591(e)(2). Further, "serious harm" is defined as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm.

*Id.* § 1591(e)(5). While the standard is objective—referring to whether a "reasonable" person would feel compelled to engage in commercial sex acts—it also requires that the court take into consideration "all the surrounding circumstances," including any factors that might make the victim particularly vulnerable. *See, e.g.*, *United States. v. Rivera*, 799 F.3d 180, 186–87 (2d Cir. 2015) ("The correct standard [for determining coercion] is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances."); *United States v. Williams*, 714

---

[15] Insofar as *Ardolf* arguably construes "force" even more broadly to mean essentially any intentional action, the court finds that such a definition would be overly broad, as it would encompass even consensual commercial sex among adults.

F. App'x 917, 918 (11th Cir. 2017) (affirming sex trafficking conviction based on coercion as well as actual violence and threats of physical harm, where "[t]estimony at trial established that minors who come from broken homes, drop out of school, and run away are more susceptible to trafficking because those circumstances are the very reasons why the victims are targeted and recruited[, and] each of [the defendant's] victims dealt with some combination of those circumstances").

### a) Rachel Ramsbottom

As set forth above, Ashton is entitled to summary judgment on Ramsbottom's claims that Ashton engaged her in sex trafficking after she turned eighteen, because she has not shown that she engaged in a commercial sex act with him after she turned eighteen. In addition, however, even if she could make such a showing, she also does not present any facts suggesting that Ashton used "means of force, threats of force, fraud, coercion [as defined in] subsection (e)(2), or any combination" thereof to cause her to engage in a commercial sex act. 18 U.S.C. § 1591(a).

Although Ramsbottom claims that she felt like she was a "hostage" and was in a coercive relationship, she specifically admits that Ashton never used or threatened physical force or physical restraint. She was always free to leave his presence, and she left when she chose to. She never lacked the ability to simply walk out the door, and she always maintained access to her car keys, her telephone, and her wallet.

As for alleged psychological harm, Ramsbottom does not present any evidence suggesting that she was a particularly vulnerable victim: she had access to transportation and money; she apparently had a supportive family; and she entered a new relationship and started college shortly after her sexual relationship with Ashton ended. The only evidence she offers of "coercion" is Ashton's efforts to insinuate himself into her life, to make her feel special and mature, and to cause her to fear losing his affection and attention. This is not "coercion" actionable under the TVPRA, as it is not the type of serious psychological injury that would cause a reasonable person in

Ramsbottom's circumstances to continue to engage in commercial sex acts. Nor does Ramsbottom allege that Ashton used any type of coercion knowing that it would *cause* her to engage in a *commercial* sex act. In other words, even though Ramsbottom was allegedly under Ashton's thrall, which caused her to willingly engage in sex with him, she does not allege that his coercion caused her, or was intended to cause her, to engage in any *commercial* sex act.

Finally, Ramsbottom does not point to any allegedly fraudulent statement made by Ashton that induced her to engage in commercial sex acts with him.

In short, Ramsbottom's allegations that Ashton "groomed" her to have sex with him before she turned eighteen and continued to exercise power over her psychologically even after she turned eighteen simply do not satisfy the statutory definition of "coercion." She does not allege that he ever used or threatened force or that any force, threats of force, or coercion in any way caused her to engage in a commercial sex act. Accordingly, the defendant is entitled to summary judgment in connection with Ramsbottom's claim that he sex trafficked her after she turned eighteen or ever sex trafficked her under the "means of force, threats of force, fraud, coercion" clause of § 1591.

### b)  *Alexis Bowling*

Bowling's evidence is similar to Ramsbottom's, insofar as she alleges that she was "groomed" and "manipulated" into continuing to have sexual relations with Ashton even after she turned eighteen. While there is at least arguably a factual dispute as to whether she was compensated in some form for sex acts after she turned eighteen, for purposes of the "commercial sex act" element of her post-majority § 1595 claim, the record does not contain evidence from which a reasonable jury could conclude that Ashton ever used force, fraud, or coercion, as defined by the statute, to cause Bowling to engage in commercial sex acts with him.

The only form of "force" Bowling identifies is the "forced orgasms" Ashton allegedly caused her to experience. But she does not explain what exactly that term means, and she fails to

establish that, after she turned eighteen at least, any of her sexual experiences with Ashton were anything other than consensual. The psychological force she alleges he exerted over her amounts to nothing other than a desire to please a famous man she clearly admired and whose approval she sought; as in Ramsbottom's case, it does not amount to the type of physical or psychological coercion sufficient to cause a reasonable person in her circumstances to engage in a commercial sex act. Ashton is entitled to summary judgment on Bowling's claim that he sex trafficked her after she turned eighteen or ever sex trafficked her within the meaning of the "means of force, threats of force, fraud, coercion" clause of § 1591.

### c) *Jenna Houston*

Houston, like Ramsbottom and Bowling, has not pointed to any affirmative misrepresentations in which Ashton engaged to induce her to have sex with him.

Houston also affirmatively testified that Ashton never used force or threats of violence to induce her to have sex with him; he was never verbally abusive and never told her something bad would happen if she did not agree to have sex with him. (Houston Dep. 195, 202–04.) Although she does allege that he was "overly aggressive," she has not explained what she meant by that, and she concedes that she never told him she did not want to have sex and never told him or signaled to him to stop doing anything. (*Id.* at 203.)

Ashton, in fact, "presented himself as somebody who cared for her immensely," as "somebody who wanted to help [Houston] steer the direction of [her] life in a positive way." (*Id.* at 189.) According to Houston, this amounted to "grooming," and she feels that she was not free to "break up" with him because "it would have felt like [her] whole world was crashing down." (*Id.* at 194–95.) She also points out that she was not capable of consenting to sex with an adult while she was still sixteen years old. (*Id.* at 197.) The question, however, is whether she was forced,

threatened, or coerced into having commercial sex with Ashton, either before or after she was no longer a minor.

In that regard, she claims that he manipulated her into doing things she did not want to do—namely, having phone sex and sending him pornographic pictures of herself—simply by being very persuasive: "messaging me all the time, wanting to talk all the time, like love bombing, just telling me that I'm smart and I'm pretty and telling me things that I'd never heard before, making me feel like the most special person in the world to him, or ever, making me feel very much loved and appreciated and cared for." (*Id.* at 192.)

Construing this evidence as true and viewing it in the light most favorable to the plaintiff, the court finds this evidence insufficient to establish a violation of the TVPRA. Houston does not identify any misrepresentations that caused her to have sex with Ashton, and she admits that he did not use means of force or threats of force. The conduct she identifies as coercive—conduct that allegedly manipulated her into loving and trusting him, making her afraid to do anything that would cause her to lose his affection—does not qualify as a "scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm," where "serious harm" is defined as "physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." Heartbreak is simply not the form of harm envisioned by the sex-trafficking statute.

Ashton is entitled to summary judgment on the claim that he sex trafficked Houston after she was no longer a minor and the claim that he ever sex trafficked her under the "means of force, threats of force, fraud, coercion" clause of § 1591.

#### 4. Whether the Plaintiffs Can Establish a "Beneficiary" Claim

To prove a claim under a § 1595(a) beneficiary theory, the plaintiffs must present evidence from which a jury can plausibly conclude that Ashton (1) "knowingly benefit[ted] financially or by receiving anything of value" (2) from participation in a venture (3) that he "knew or should have known has engaged in" sex trafficking under § 1591. *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 188 (E.D. Pa. 2020) (quoting 18 U.S.C. § 1595(a)). That is, section 1595 expands TVPRA liability from direct perpetrators to anyone who "knowingly benefits . . . from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a). As this court previously recognized (*see* Doc. No. 110, at 17–18), sections 1591 and 1595 differ from one another in that (1) § 1591 is relegated to sex-trafficking ventures while § 1595 refers to any kind of venture, and (2) § 1591 requires at least "reckless disregard" of illicit activity while § 1595 requires only that a defendant "should have known" about illicit activity.

Ashton moves for summary judgment on this claim on the basis that the plaintiffs have not presented any evidence of a "venture" that engaged in sex trafficking, given that "venture" is defined as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(2). He points out that the claims against the other defendants who were allegedly involved in a venture have been dismissed, and the record is devoid of evidence of his involvement in a "venture" that engaged in sex trafficking. (*See* Doc. No. 261-1, at 42 ("It goes without saying that one cannot participate in something without the involvement of at least one additional actor.").) He also argues that the plaintiffs' claims against him throughout this litigation have been based on his being a *perpetrator* of sex trafficking, rather than on his being a *beneficiary* of a venture that engaged in sex trafficking.

The plaintiffs argue that (1) Ashton performed as a musician under the name Bassnectar from 2012 through 2020, performing at "numerous shows, festivals, and tours, often selling out tickets and gaining profits"; (2) his travel and performing were supported by a "team of employees"; (3) his tour manager, Carlos Donahue, planned and paid for Ashton's travel and accommodations and other logistics related to his touring; and (4) therefore, Ashton was involved in and benefited from a venture that involved sex trafficking. (*See* Doc. No. 283-1; Doc. No. 291-2, Def's Resp. Pls.' Additional Statement ¶¶ 148–53.)

The court finds that the mere fact that the plaintiffs have presented evidence that Ashton was involved in a venture—his music and touring career—and also involved in sex trafficking does not mean that that they have presented evidence from which a jury could conclude that his music business qualifies as a venture that engaged in sex trafficking. First, the plaintiffs have not presented any evidence that any of the individuals or businesses employed by Ashton or his company, Bassnectar Touring, for purposes of pursuing his musical career was aware of or knowingly (or recklessly) participated in or facilitated his sex trafficking. That is, the mere fact that he was involved with others in a business venture does not mean that he was involved with others in a "venture [that he] knew or should have known has engaged in" sex trafficking. And second, Ashton's knowledge of his own (alleged) trafficking activities does not provide a legal basis for attributing liability for those activities to his business(es), in a sort of inverse veil-piercing. In short, a single actor is not a "venture" under the statute. Because the plaintiffs have not presented any facts that any others knew about or were involved in or facilitated Ashton's alleged sex trafficking of them, they have not alleged the existence of a "venture" that engaged in sex trafficking.

The plaintiffs' reliance on *Treminio v. Crowley Maritime Corp.*, 707 F. Supp. 3d 1234 (M.D. Fla. 2023), and *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 555 (7th Cir. 2023), is unavailing because the facts of those cases are so dissimilar to the facts at issue here. In *Treminio*, the alleged perpetrator was the victim's supervisor, and there were material factual disputes as to whether the employer itself had at least constructive knowledge of the supervisor's predatory conduct and had facilitated some of that conduct. *See id.* at 1248–49 ("Whether Blanco used the mutual business venture he engaged in with Crowley [the employer] to his advantage or acted in concert with Crowley employees to then sex traffic Plaintiff is a question for a jury.") In *G.G.*, the plaintiffs alleged that Salesforce.com, a customer relationship management software provider, knowingly benefited from its participation in the sex-trafficking venture operated by Backpage, a classified advertising website. The court found that the plaintiffs plausibly alleged the existence of a venture (Backpage's business) that violated § 1591 by advertising the plaintiff (and other minors) for sale; Salesforce's participation in that venture (entering into lucrative contracts and "providing advice and custom-tailored software for years to help Backpage grow its business"); and facts showing that Salesforce knew or should have known that Backpage's venture "had engaged in acts in violation of Section 1591," specifically the trafficking of children. *G.G.*, 76 F.4th at 548, 549, 555.

Under the facts presented in this case, the plaintiffs may be able to establish Ashton's individual liability as the perpetrator of sex trafficking, but they have not presented any evidence of his involvement in a venture involving at least two individuals that engaged in sex trafficking. Ashton is entitled to summary judgment on Count II of the Amended Complaint.

### B.    Child Pornography Claims

Count III of the Amended Complaint asserts that Ashton committed "multiple violations of 18 U.S.C. § 2252"; that the plaintiffs were minors and victims of violations of 18 U.S.C. §§ 1591, 2252, and 2252A, as a result of which they suffered personal injury; and that they are

eligible to bring suit to recover damages in association with their injuries under 18 U.S.C. § 2255. (Doc. No. 23 ¶¶ 215–16.)

As relevant here, Section 2252 criminalizes, among other behavior, the knowing receipt of any visual depiction "of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2252(a)(2). Section 2252A criminalizes, among other things, the knowing receipt or possession of child pornography. 18 U.S.C. § 2252A(a)(2) & (5)(B). Section 2255 creates a civil remedy, permitting any person who, while a minor, was a victim of a violation of § 2252 or § 2252A, among other enumerated criminal statutes, to sue to recover actual damages or liquidated damages in the amount of $150,000, plus attorney fees and costs, as well as "punitive damages and such other preliminary and equitable relief as the court determines to be appropriate." 18 U.S.C. § 2255(a).

To prevail on their claims based on violations of either § 2252 or § 2252A, each plaintiff must show that the defendant knew that she was a minor at the time he received or solicited sexually explicit images from each of them. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78, 69 (1994) (holding that "the term 'knowingly' in § 2252 extends both to the sexually explicit nature of the material and to the age of the performers"); *United States v. Szymanski*, 631 F.3d 794, 799 (6th Cir. 2011) (same); *United States v. Gray*, 641 F. App'x 462, 464 (6th Cir. 2016) (applying "knowing" requirement to possession charge under § 2252A(a)(5)(B)). The defendant's knowledge that the contents involved the visual depiction of a minor engaging in sexually explicit conduct may be proven by circumstantial evidence. *United States v. Hentzen*, 638 F. App'x 427, 431 (6th Cir. 2015).

The defendant argues that the plaintiffs' claims under §§ 2252 and 2252A fail because, with respect to Ramsbottom and Bowling, the plaintiffs have "failed to produce evidence that Defendant transported, received, distributed, or reproduced *any* sexually explicit images of minors

or child pornography depicting Ramsbottom or Bowling," much less that he did so with knowledge of their ages at the time the images were allegedly conveyed to Ashton. (Doc. No. 261-1, at 45 (emphasis in original).) With respect to Houston, the defendant argues that she will not be able to establish the actual knowledge requirement, because she misled Ashton about her age until she was older than eighteen. (*Id.* at 48–49.)

        *1.*    *Rachel Ramsbottom*

As set forth above, Ramsbottom and Ashton began communicating sporadically beginning in the fall of 2012, when she was still seventeen. Initially, Ramsbottom told him she was eighteen, but she corrected that statement before they actually met. They first met and, according to Ramsbottom, had sex on May 3, 2013, approximately three weeks before her eighteenth birthday. The next time they met up, it was on her eighteenth birthday.

Ramsbottom confirmed during her deposition that she is making a claim based on Ashton's receiving child pornography from her. (Doc. No. 261-4, Ramsbottom Dep. 175.) Asked whether she created child pornography of herself, she responded, "I believe that I did, yes." (Doc. No. 261-4, Ramsbottom Dep. 175.) Asked whether she was unsure, she responded, "I'm pretty positive, by the nature of our relationship, that I did." (*Id.*) However, she does not have "an independent distinctive recollection" of creating child pornography of herself, does not have a specific recollection of transmitting child pornography of herself to Ashton, and does not possess any child pornography of herself. (*Id.*) She does not possess any communications in which Ashton requested that she send photos of herself when she was still seventeen or communications in which she sent them. (*Id.* at 176.) Asked why she is so sure that she sent sexually explicit photos of herself when she was still a minor to him, she responded: "I mean, I know what the nature of our relationship was and the amount of times we had had phone sex conversations. I recall, like, playing into a sexual role with him. I just – I don't have the exact photos." (*Id.* at 176.)

In August 2014, well after they were no longer seeing each other, Ramsbottom emailed Ashton asking him to "delete . . . any nudes" he might have of her. (*See id.* at 346–47.) Ramsbottom answered in the affirmative when asked by her own attorney whether the "nudes" she was referring to were "images you had sent to him where you were nude or in otherwise pornographic poses, both before your 18th birthday and after your 18th birthday?" (*Id.* at 347.) She also confirmed that she no longer possesses the telephone that she used to take and send pictures of herself before she turned eighteen. (*Id.*)

The defendant maintains that this evidence, standing alone, is vague and equivocal, unsupported by any documentary evidence, and insufficient to permit a jury to conclude that Ramsbottom actually sent him, and that he ever received, child pornography images of herself. Notably, however, while the defendant purports to deny Ramsbottom's statements about sending child pornography to Ashton, his denials are not supported by reference to any evidence in the record, such as a declaration or deposition testimony. In other words, Ashton does not even offer, at this juncture, evidence to contradict Ramsbottom's testimony that she is "pretty positive" that she sent him pornographic images of herself when she was still a minor.

The court finds that, while Ramsbottom's evidence is, indeed, scant and lacking in documentary support, the court may not make credibility judgments in ruling on a motion for summary judgment. A reasonable jury could believe Ramsbottom's testimony, and it could also believe that she simply did not maintain possession of the devices on which she created and sent the images.

### 2. Alexis Bowling

The only functional device still in Bowling's possession dating from the time of her relationship with Ashton, a laptop computer, was turned over to the repository for child sex abuse

material ("CSAM") produced in this case.[16] The parties' joint forensic expert located eight images on the device that possibly qualify as CSAM, all of which appear to have been created on April 17, 2014, when Bowling would have been seventeen, and were "captured on a Cannon still camera." (*See* Doc. No. 261-3 ¶ 12(b)(ii).) The device contains no evidence that the images were transmitted to Ashton. (*Id.*)

Nonetheless, Bowling testified—with somewhat greater specificity than Ramsbottom— that she created pornographic images and videos of herself, at Ashton's direction, at a time when she was still a minor and when he knew she was a minor. (*See* Bowling Dep. 274–75.) More specifically, she testified that she sent him child pornography "[s]ometime between meeting him in Las Vegas" and her eighteenth birthday. (*Id.* at 274.) She estimated that she did this approximately twenty times before she turned eighteen. (*Id.* at 275.) She stated that she no longer has the phone on which she created the images (*id.* at 276) and, in any event, that she deleted the "encrypted messaging app" she used to send the images, Wickr, from her phone in 2019, "right before COVID," when she became serious with her then-boyfriend. (*Id.* at 98, 271–72.)

The defendant, again, denies Bowling's allegations about her transmitting child pornography to him at his request, characterizing Bowling's testimony as "self-serving" and unsupported, and pointing out that "Plaintiffs' counsel failed to ask Defendant about this topic at Defendant's deposition." (Doc. No. 291-2, Def's Resp. Pls.' Additional Statement ¶ 87.) The defendant, however, has not offered a declaration or other sworn statement refuting Bowling's testimony, and, even if he had, the court, at this juncture, must accept Bowling's testimony as true.

---

[16] She also produced an iPhone 4, but the forensic expert reported that the device would not power on and could not be searched. (*See* Doc. No. 261-3 ¶ 12(b)(i).)

The defendant, therefore, is not entitled to summary judgment on Bowling's claim under 18 U.S.C. § 2255.

### 3. Jenna Houston

There appears to be at least a question of fact in the record as to whether Houston sent child pornography or sexually explicit images of herself to Ashton while she was still a minor, and the defendant makes no attempt to argue otherwise in support of summary judgment on this claim. (*See* Doc. No. 261-1, at 48.) Instead, he argues that Houston will not be able to establish Ashton's actual knowledge of her age. And, indeed, as set forth above, Houston has failed to present any evidence from which it could reasonably be deduced that Ashton had actual knowledge that she was underage, given that she continually represented to him that she was a college student, made herself out to be older than she was, and affirmatively told him her birth date was March 27, 1992. The defendant, in fact, points to data mined by the parties' joint forensic expert, showing that Houston repeatedly, for years—from at least September 2012 through March 2014—told Ashton that her birth date was March 27, 1992. (*See* Doc. No. 291-1, at 12 & nn. 39–44 and evidence cited therein.)

The plaintiffs seek to create a factual dispute as to this question, asserting that "Houston testified at her deposition that she informed Defendant of her true age and date of birth by telephone after Defendant planned a trip for her to visit him in June of 2012." (Doc. No. 283-1, at 35 (citing Doc. No. 283-2, Pls.' Additional Statement ¶ 114, which cites Houston Dep. 19–20, 103–04,157–58; Houston Dep. Ex. 8).). The cited portions of Houston's deposition do not support that assertion, however. Rather, Houston testified: "I do remember a phone conversation that we had where it is possible – I believe I may have given him my real date of birth. And I truly believe I never flew under a different date of birth, to my knowledge of. And so that's what I can remember, but, again, this was many years ago." (Houston Dep. at 18–19.) Exhibit 8 to her

deposition does not appear to be in the record, but Houston confirmed during her deposition testimony that, in the email that comprises Exhibit 8, she told Ashton to "book [her] a plane ticket using [her] name and a date of birth of March 22nd, 1992." (Houston Dep. 158.) She testified that, in connection with booking that flight, there was "a discussion surrounding a birth date" (*id.* at 103), but she did not specify whether it was her actual birth date or simply a fictitious birth date. The only time she affirmatively recalled having a discussion with Ashton about the fact that she was sixteen when they met was in 2016, when she would have been twenty years old. (*Id.* at 103–04.)

She reiterated in her deposition that she "believes" she gave Ashton her real date of birth at some point and recalled that her ID was out on the table in a hotel room in Baton Rouge for him to see. But she also confirmed that she only saw him once in Baton Rouge, and the record appears to establish that she was actually nineteen when she went to Baton Rouge to see Ashton perform in 2014. (*Id.* at 19; *see id.* at 99–100.)

In light of the clearly established fact that Houston affirmatively and repeatedly misled Ashton about her age and Houston's equivocal testimony about when and whether she ever told him her true age, the court finds that no reasonable jury could find that Ashton had *actual* knowledge of Houston's true age from the time they began talking in 2012 until she turned eighteen in 2013.

The Sixth Circuit does not appear to have directly addressed whether deliberate ignorance can satisfy the "knowledge" requirement in § 2252 or § 2252A. *See United States v. Childers*, No. 23-5778, 2024 WL 2105947, at *7 (6th Cir. May 10, 2024) (addressing the defendant's challenge to a deliberate ignorance jury instruction as harmless error without deciding whether the instruction was, in fact, error in the context of possession of child pornography). Other courts, however, have

approved a deliberate ignorance or "willful blindness" instruction in the context of convictions for knowing transfer or possession of child porn. *See, e.g., United States v. Figueroa-Lugo*, 793 F.3d 179, 191–92 (1st Cir. 2015) (affirming use of willful blindness instruction under the circumstances presented there); *Tilton v. Playboy Ent. Grp., Inc.*, 554 F.3d 1371, 1378 (11th Cir. 2009) (reconfirming that "the knowledge element of a . . . statute can be proved by demonstrating either actual knowledge or deliberate ignorance" and that "knowledge through deliberate indifference occurs where a party acts "with an awareness of the high probability of the existence of the fact in question," but that evidence of such was lacking in that case (citation omitted)).

In light of this authority, the court finds it appropriate to apply a "deliberate ignorance" or "willful blindness" standard. Under this standard, the question is whether Ashton should have realized from the first time he saw Houston that she was younger than eighteen but deliberately ignored the evidence before his eyes. As with the question of whether Ashton violated § 1591 for purposes of Houston's claim under § 1595 for sex trafficking a minor, the court finds that a jury must resolve the question of whether Ashton deliberately disregarded obvious facts from which he should have known that Houston was still a minor when they met. While the evidence in that regard is scant, a reasonable jury could believe—based on photographs of Houston taken at or around the time she met Ashton and Ashton's confusing testimony when he was confronted with such photos—that no reasonable person would have believed she was eighteen or older. (*See* Doc. No. 283-16, Ashton Dep. 265 (agreeing that Houston "does not look like she's 19 years old" in a photograph she appears to have sent him attached to an email), 268 (equivocating as to whether Houston appeared to be 17, 18, or 20 in a particular photograph and then stating that he has "no idea, having just seen this picture, how old this person is"), 270–73 (testifying that Houston's

photograph from her prom was how he "remember[s] meeting Jenna" and that she could be "17 to 25" in the picture, but that when he met her, she looked "like 19, 20, 21").)

In sum, Ashton is not entitled to summary judgment on Houston's claims under § 2255. The motion for summary judgment as to Count III will be denied.

### C.     Negligence *Per Se* Under Tennessee Law

As set forth above, Count IV of the Amended Complaint, asserted on behalf of Ramsbottom only, asserts a claim for negligence *per se* under Tennessee law. The negligence *per se* claim is premised upon Ashton's violation of Tenn. Code Ann. § 39-13-506(c), which criminalizes "aggravated statutory rape," and § 39-13-532(a), which criminalizes "statutory rape by an authority figure." Aggravated statutory rape is defined as the unlawful penetration of a victim by the defendant, or of the defendant by the victim, when the victim is at least thirteen but less than eighteen years old and the defendant is at least ten years older than the victim. Statutory rape by an authority figure is defined as the unlawful sexual penetration of a victim by the defendant, or of the defendant by the victim, when the victim is at least thirteen but less than eighteen years old; the defendant is at least four years older than the victim; and the defendant, at the time of the offense, had either parental or custodial authority over the victim or was "in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration." Tenn. Code Ann. § 39-13-532(a). The Amended Complaint asserts that Ashton's violation of these statutes constitutes negligence *per se* and caused Ramsbottom serious physical, psychological, financial, and reputational harm. (Doc. No. 23 ¶ 235.)

Ashton argues that he is entitled to summary judgment on this claim because: (1) the claim is time-barred; (2) a negligence *per se* claim cannot be based upon a violation of Tennessee's statutory rape statutes; and (3) the claim based on a violation of Tenn. Code Ann. § 39-13-252

fails because Ramsbottom cannot establish that Ashton occupied a "position of trust" as required by that statute. The court is not persuaded by the defendant's arguments.

### 1. Statute of Limitations

"A defense predicated on the statute of limitations triggers the consideration of three components—the length of the limitations period, the accrual of the cause of action, and the applicability of any relevant tolling doctrines." *Redwing v. Cath. Bishop*, 363 S.W.3d 436, 456 (Tenn. 2012). These "elements are inter-related and, therefore, should not be considered in isolation." *Id.*

The Tennessee Supreme Court recognizes the length of the limitations period as "perhaps the most straightforward" of these elements, as it is generally defined by statute. *Id.* at 457. This court previously ruled that the three-year statute of limitations in Tenn. Code Ann. § 28-3-116(b)(1) (applying to sexual abuse of a minor) is applicable to Ramsbottom's negligence *per se* claim. (*See* Doc. No. 110, at 52.) As for tolling, there is no dispute that the running of the limitations period was tolled at least until Ramsbottom turned eighteen years old (in May 2013), under Tenn. Code Ann. § 28-1-106. The plaintiffs also argue, in response to the defendant's motion, that her claim did not accrue, under Tennessee's discovery rule, until 2019 and further, that the limitations period was tolled by the fraudulent concealment doctrine until then.

### a) Accrual

"The concept of accrual relates to the date on which the applicable statute of limitations begins to run." *Redwing*, 363 S.W.3d at 457 (citations omitted). "[A] cause of action accrues and the statute of limitations commences to run when the [plaintiff] discovers, or in the exercise of reasonable care and diligence . . . , should have discovered the resulting injury." *Teeters v. Currey*, 518 S.W.2d 512, 517 (Tenn. 1974). The discovery rule, however, is not intended to allow a plaintiff to delay filing suit until she discovers all the facts affecting the merits of her claim. *Redwing*, 363

S.W.3d at 459. "[T]he discovery rule does not delay the accrual of a cause of action and the commencement of the statute of limitations until the plaintiff knows the full extent of the damages[.]" *Id.* (citing *B & B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 849 (Tenn. 2010); *Weber v. Mose*s, 938 S.W.2d 387, 393 (Tenn. 1996)). "The statute of limitations is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and, as a reasonable person, was not put on inquiry." *Wyatt v. A-Best, Co.*, 910 S.W.2d 851, 854 (Tenn. 1995) (internal quotation marks omitted). "[O]nce the plaintiff has information sufficient to alert a reasonable person of the need to investigate the injury," the statute of limitations begins to run. *Woodruff by & through Cockrell v. Walker*, 542 S.W.3d 486, 495 (Tenn. Ct. App. 2017) (citing *Sherrill v. Souder*, 325 S.W.3d 584, 593 n.7 (Tenn. 2010)).

> Under Tennessee law, however, in the context of claims relating to child sexual abuse,

> "Discovery" means when the injured person becomes aware that the injury or illness was caused by child sexual abuse . . . . Discovery that the injury or illness was caused by child sexual abuse or trafficking for a commercial sex act shall not be deemed to have occurred solely by virtue of the injured person's awareness, knowledge, or memory of the acts of abuse.

Tenn. Code Ann. § 28-3-116(a)(2) (Effective: July 1, 2019 to June 30, 2024). In addition, "injury or illness" is defined to include "either a physical injury or illness or a psychological injury or illness." *Id.* § 28-3-116(a)(3).

Because the statute of limitations is an affirmative defense, the defendant bears the burden of proving its application. *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013); *Sherrill v. Souder*, 325 S.W.3d 584, 596 (Tenn. 2010). When a party seeks judgment as a matter of law on a statute of limitations, the court must decide "(1) whether the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued." *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)). Ashton,

as the party invoking the statute of limitations, has the burden to prove that the statute of limitations has run on the negligence *per se* claim and that no genuine issue of material fact exists as to when the claim accrued. *Id.*

Ramsbottom alleges that the statutory rape occurred on May 3, 2013 and that she turned eighteen on May 23, 2013. She did not file this suit until April 5, 2021, nearly eight years later. She alleges in the Amended Complaint that she did not "discover" her injuries arising from her sexual abuse, for purposes of accrual, until 2019, within three years of the date her lawsuit was filed in April 2021. Ramsbottom testified generally at her deposition that she suffers from anxiety, depression, trust issues, and difficulty in romantic relationships, symptoms that began when she was in college and "[k]ind of got worse with time." (Ramsbottom Dep. 265–66, 280–81.) She also confirmed that she did not "fully and truly appreciate the injuries" that stemmed from her alleged sexual abuse by Ashton until she began therapy with Tina Hazlewood in 2019. (*Id.* at 248–49.)

Ashton argues that, now that discovery is completed, it is clear that Ramsbottom "had knowledge of sufficient facts to put her on notice of a potential claim against Defendant at the time of the alleged May 3, 2013, sexual activity." (Doc. No. 261-1, at 53.) He also argues that the plaintiff's assertion that "she did not fully appreciate the extent of her alleged emotional injuries until she started therapy in 2019 is immaterial" under Tennessee law. (*Id.* (citing FAC ¶¶ 96, 97).)

Under Tennessee's traditional discovery rule, the plaintiff's claim would almost certainly be time-barred. Ramsbottom was clearly aware that she had sexual relations with Ashton on May 3, 2013, when she was seventeen years old and he was more than ten years older. This act qualified as aggravated statutory rape. *See* Tenn. Code Ann. § 39-13-506(c). The injurious action was the statutory rape itself, and Ramsbottom knew who the perpetrator of the statutory rape was when it happened. Under Tennessee's common law discovery rule, "[a] cause of action is deemed to be

discovered when the plaintiff knows that he or she has been injured and who caused the injury." *Doe v. Coffee County Board of Education*, 852 S.W.2d 899, 904 (Tenn. Ct. App. 1992). "Discovery is not postponed until the plaintiff becomes fully aware of all the injurious effects of the defendant's conduct." *Id.* Thus, in *Doe*, where the plaintiffs were minors when they were molested by their teacher but clearly knew that they had been molested, the cause of action was deemed to accrue when the wrong occurred and was tolled only until the plaintiffs reached the age of eighteen. Although the plaintiffs claimed that they did not "become fully aware that they had been 'emotionally harmed' until much later, that assertion was "not enough to toll the statute of limitations." *Id.*;[17] *accord Doe v. Vanderbilt Univ.*, No. 3:23-cv-00426, 2024 WL 4886055, at *8 (M.D. Tenn. Nov. 25, 2024) (Richardson, J.) ("That the full emotional significance of the sexual encounters—or that they could . . . appropriately be categorized specifically as abusive—had not become clear to Jane Doe does not allow her to 'delay filing suit until [she] became fully aware of all the injurious effects' of Defendant's actions." (quoting *Doe v. Coffee Cnty. Bd. of Educ.*, 852 S.W.2d at 904)).

However, Tenn. Code Ann. § 28-3-116(a)(3) was not in effect in 1992, when *Doe v. Coffee County* was issued, and the plaintiff in *Doe v. Vanderbilt University* was not a minor when the alleged abuse occurred, so the statute did not apply. The defendant in this case fails to grapple with the effect of § 28-3-116(a)(3) or the fact that he bears the burden of proof on whether the claim is time-barred.[18] While the plaintiff may have an uphill battle proving that she was not on notice of

---

[17] In addition, the plaintiffs clearly knew that they had incurred some injury at the time of the abuse, as they alleged that they felt humiliated, embarrassed, and angry while the acts were occurring. *Doe v. Coffee Cnty.*, 852 S.W.2d at 904.

[18] It does not appear that any Tennessee state or federal court has applied this discovery rule. In *Jackson v. Kingdom Hall of Jehovah Witness*, No. 1:22-cv-01133-STA-jay, 2023 WL 2674181, at *3 (W.D. Tenn. Mar. 1, 2023), *report and recommendation adopted*, No. 1:22-cv-1133-STA-jay, 2023 WL 2668004 (W.D. Tenn. Mar. 28, 2023), the court referenced the statute

her alleged injuries and their cause well before 2019, the defendant has failed to present facts from which the court could affirmatively conclude, as a factual matter, that the cause of action accrued prior to the plaintiff's beginning therapy in 2019, within three years of bringing this suit. Ashton is not entitled to summary judgment on this claim based on the running of the statute of limitations.[19]

> 2. *Whether a Negligence Per Se Claim Can Be Based on a Violation of Tennessee's Statutory Rape Statutes*

Ashton next argues that Ramsbottom's negligence *per se* claim fails because "negligence *per se* cannot be premised on violations of criminal statutes that have corresponding intentional torts." (Doc. No. 261-1, at 53 (capitalization omitted).) He argues that he can find no other Tennessee case allowing a negligence *per se* claim premised upon statutory rape to proceed, and he identifies some intentional torts—including sexual battery and intentional infliction of emotional distress—that he proposes might have provided "a more appropriate vehicle for the relief Ramsbottom seeks." (*Id.* at 54.)

Tennessee recognizes a cause of action for negligence, the elements of which are: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the applicable standard of care; (3) the plaintiff suffered an injury; (4) the defendant's conduct was a cause in fact of the injury; and (5) the defendant's conduct was a proximate cause of the injury. *Giggers v. Memphis*

---

but found that it did not apply to extend the limitations period beyond three years from the date of the plaintiff's majority, because it was clear from the face of the complaint that the plaintiff "knew she was being abused at the time the abuse took place."

[19] Having found that a material factual dispute exists as to the date of accrual, the court has no call to reach the question of whether the plaintiff can establish fraudulent concealment. The court nonetheless observes that, even assuming she can meet the other elements of fraudulent concealment, Ramsbottom has not alleged facts supporting the fourth element: that the defendant "concealed material information from the plaintiff by withholding information or making use of some device to mislead [her] in order to exclude suspicion or prevent inquiry." *Redwing*, 363 S.W.3d at 463 (citations and internal quotation marks omitted).

*Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). The common-law standard to which individuals "must conform to avoid being negligent is the familiar 'reasonable person under similar circumstances' standard." *Rains v. Bend of the River*, 124 S.W.3d 580, 588 (Tenn. Ct. App. 2003) (citation omitted).

But the common law "is not the only source of legal duties or standards of conduct in negligence cases." *Id.* The state's General Assembly may "create a legal duty and then provide a civil cause of action for its breach." *Id.* at 589. In addition, "the General Assembly may enact a penal statute that does not explicitly provide a civil remedy, and the courts may then derive a civil legal duty from the penal statute." *Id.* The doctrine associated with the latter process is "negligence *per se*." *Id.*

As the Tennessee Court of Appeals has explained:

> The negligence *per se* doctrine does not create a new cause of action. Rather, it is a form of ordinary negligence that enables the courts to use a penal statute to define a reasonably prudent person's standard of care. Negligence *per se* arises when a legislative body pronounces in a penal statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct.

*Id.* (internal citations omitted; emphasis added). The doctrine does not "automatically create[] a private negligence action for the violation of every statute." *Id.* at 590. Rather, "[t]o trigger the doctrine, the statute must establish a specific standard of conduct." *Id.* Thus, the effect of "declaring conduct negligent *per se* is to render the conduct negligent as a matter of law." *Id.* As a result, "a person whose conduct is negligent *per se* cannot escape liability by attempting to prove that he or she acted reasonably under the circumstances," though the plaintiff asserting negligence *per se* must still establish the other elements of a negligence claim, including causation and damages. *Id.*

However, "[n]ot every statutory violation amounts to negligence *per se*. . . . [T]he courts must ultimately decide whether they will adopt a statutory standard to define the standard of conduct of reasonable persons in specific circumstances." *Est. of French v. Stratford House*, 333

S.W.3d 546, 561 (Tenn. 2011) (internal quotation marks and citation omitted) (alterations in original). Typically, to establish negligence *per se* based on the violation of a criminal statute, the plaintiff must show that (1) "the statute violated was designed to impose a duty or prohibit an act for the benefit of a person or the public," and (2) "the injured party [is] within the class of persons to be protected." *Id.* (citing *Cook ex re. Uithoven v. Spinnaker's of Rivergate, Inc.*, 878 S.W.2d 934, 937 (Tenn. 1994)). Other factors also apply, including, but not limited to:

> (1) the nature of the legislative provision; (2) the adequacy of existing remedies; (3) the extent to which recognizing a cause of action in negligence *per se* would aid, supplement, or interfere with existing remedies; (4) the significance of the purpose that the legislative body was seeking to effectuate in the statute, regulation, or ordinance; (5) the extent of the change in tort law that would result from recognizing the action; and (6) the burden that the new cause of action would place on the judiciary."

*Est. of French*, 333 S.W.3d at 566 (quoting *Restatement (Second) of Torts* § 874A, cmt. h (1979)).

In the present case, the statutory rape statutes at issue clearly were "designed to impose a duty or prohibit an act" for the benefit of minors and the public at large, and Ramsbottom is (or was at the time) "within the class of persons to be protected." *Cook*, 878 S.W.2d at 937. The statutes, by their nature, appear to lend themselves to civil enforcement, and the defendant has not identified existing alternative remedies that would be adequate—particularly given that a perpetrator's lack of intent to cause harm or a minor's apparent consent to sexual contact that qualifies as statutory rape might obviate assault and battery or other intentional tort claims. *See Spearman v. Shelby Cnty. Bd. of Educ.*, 637 S.W.3d 719, 734 (Tenn. Ct. App. 2021) ("[U]nder both the criminal and civil applications of assault, an assault does not take place unless the person intends to cause harmful or offensive contact with another or intends to create an apprehension of harm." (quoting *Hughes v. Metro. Gov't*, 340 S.W.3d 352, 379–71 (Tenn. 2011))); *see also Doe v. Mama Taori's Premium Pizza, LLC*, No. M1998-00992-COA-R9CV, 2001 WL 327906, at *4 (Tenn. Ct. App. Apr. 5, 2001) (applying a rebuttable presumption that children between fifteen

and eighteen have the capacity to consent and finding, therefore, that "the issue of consent is material and relevant to the issue of damages in civil proceedings where monetary damages are sought" for assault and battery claims premised on statutory rape).

In that regard, because a civil cause of action based on statutory rape would not necessarily require non-consensual or offensive touching, nor actual knowledge of the victim's age,[20] recognizing such a claim would appear to supplement, and would not interfere with, existing remedies. In addition, it would serve to further the state legislature's purpose in criminalizing statutory rape, would not constitute a significant change in the tort law, and would not place a significant burden on the judiciary. The fact that such a cause of action has not heretofore been recognized by the State of Tennessee means little other than that the state courts have not been asked to consider such a claim.[21] The court finds that, if confronted with the question, Tennessee courts would likely authorize such a claim to proceed.[22]

The defendant has not established that statutory rape should not form the basis of a

---

[20] The provision criminalizing aggravated statutory rape, Tenn. Code Ann. § 39-13-506(c), does not specify the required *mens rea*, which "typically indicates that any of the three mental states—intentional, knowing, or reckless—would be sufficient" for a *criminal* conviction. *State v. Bible*, No. E2023-00593-CCA-R3-CD, 2024 WL 3519982, at *5 (Tenn. Ct. Crim. App. July 24, 2024). A *civil* negligence *per se* claim based on aggravated statutory rape would apparently permit a claim based simply on the victim's and perpetrator's ages, without necessarily requiring negligence (or any other standard of conduct) on the part of the defendant in failing to ascertain the victim's age. However, the court has no need to define what mental state is required for liability, because Ashton admittedly knew that Ramsbottom was seventeen on May 3, 2013 (though he disputes having sexual relations with her when she was still seventeen).

[21] It is difficult to find many reported cases concerning civil liability for any type of violent criminal conduct (such as rape, assault, or even murder), likely because most victims of crime do not bring civil actions and most criminals lack the resources to pay civil damages. However, despite the absence of caselaw, it seems inarguable that most crimes have civil tort analogs. And the court sees no obvious reason why statutory rape would be an exception.

[22] To be clear, recognizing the possibility that statutory rape may support a negligence *per se* claim does not mean that statutory rape gives rise to strict liability. As set forth above, the plaintiff must still prove injury and causation. *Giggers*, 277 S.W.3d at 364.

negligence *per se* claim under Tennessee law, and his motion for summary judgment of the claim on this ground will be denied.

### 3. Whether the Plaintiff Can Prove that Ashton Held a "Position of Trust"

Finally, Ashton contends that the plaintiff's negligence *per se* claim fails as a matter of law, insofar as it is premised upon an alleged violation of § 39-13-532(a), because the plaintiff fails to establish facts sufficient to show that he meets the statutory definition of "authority figure"—specifically, that she cannot show that he occupied a "position of trust." (Doc. No. 261-1, at 55.)

> The crime of statutory rape by an authority figure requires, among other things, that
>
> (A) The defendant was, at the time of the offense, in a position of trust, or had supervisory or disciplinary power over the victim by virtue of the defendant's legal, professional, or occupational status and used the position of trust or power to accomplish the sexual penetration; or
>
> (B) The defendant had, at the time of the offense, parental or custodial authority over the victim by virtue of the defendant's legal, professional, or occupational status and used the position to accomplish the sexual penetration.

Tenn. Code Ann. § 39-13-532. Subsection (B) clearly does not apply in this case. A conviction under subsection (A) requires proof that the defendant was in a "position of trust or had supervisory or disciplinary power over the victim . . . ; the State is not required to prove both." *State v. McGrowder*, No. M2013-01184-CCA-R3CD, 2014 WL 4723100, at *9 (Tenn. Crim. App. Sept. 23, 2014). In this case, Ramsbottom alleges only that Ashton was in a "position of trust" and that he used that position to "accomplish" statutory rape.

The statute does not define the term "position of trust," so Tennessee courts look to the plain and ordinary meaning of its language. *Id.* In the context of reviewing a criminal conviction challenging the evidence supporting the existence of a position of trust, the Tennessee Court of Criminal Appeals has explained that

a court must look to the nature of the relationship, and whether that relationship promoted confidence, reliability, or faith. A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability. . . . [T]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith.

*Id.* at \*10 (citations and quotation marks omitted). In *State v. Hodges*, No. M2016-01057-CCA-R3-CD, 2017 WL 3085434, at \*7 (Tenn. Crim. App. July 20, 2017), the court found that the trial court did not abuse its discretion in imposing a sentence enhancement based on the defendant's abusing a position of trust, where the evidence showed that she had "groomed" her minor victim by "spending money on [him], buying presents, going to movie, and setting up rules to not tell and progression of sexual contact."

In the present case, Ramsbottom testified that she "believed" that Ashton "groomed" her by coming into her life, trying to get her to trust him, and "market[ing] himself as, like, almost a father figure," while also inserting "sexual innuendos" into their communications. (Ramsbottom Dep. 93–94.) As examples, she testified that he had her watch the movie *American Beauty*, in which an older man falls in love with a younger girl; he told her her name was sexy; he made her think that she was special and "more mature," so that "guys [her] age wouldn't be able to connect with [her]." (*Id.* at 94.) He provided "unsolicited advice" and made her believe that she "needed to listen to him, or he had better advice for [her], he knew better for [her]." (*Id.* at 96.) He did that by "acting like he really cared." (*Id.*) He also told her to keep their relationship a secret. (*Id.* at 150.)

Ramsbottom also presented evidence, in the form of a recorded telephone call with Ashton on July 3, 2020, years after their sexual relationship ended, in which he appeared to acknowledge that a "power dynamic" was created between him and others that could "cause[] damage," simply

by virtue of his "being [an] entertainer and . . . having this power position and wielding it so recklessly." (Doc. No. 289-1, Ashton Dep. 49–50.) According to Ramsbottom, she was young, and Ashton "had a lot of manipulation and control over [her] mind" and did "things to get [her] to trust him." (Ramsbottom Dep. 107.) She testified that she believed that he was reliable and that she trusted him because of his position and their relationship. (*Id.* at 348.)

The question of whether a defendant occupies a "position of trust" is an intensely fact-specific inquiry, the resolution of which depends on the circumstances presented in a particular case. The court finds that a jury presented with these facts—that Ashton was more than fifteen years older than Ramsbottom and that he was a famous entertainer whom she idolized, who inserted himself into her life and generally offered advice and mentorship, paid attention to her, and made her feel good about herself—could find that he occupied a position of trust, for purposes of the plaintiff's negligence *per se* claim based on § 39-13-532.

In sum, Ashton is not entitled to summary judgment on the negligence *per se* claim.

## IV.     CONCLUSION

For the reasons set forth herein, Ashton's Motion for Summary Judgment (Doc. No. 255) will be granted in part and denied in part. The motion will be granted with respect to the plaintiffs' claims in Counts I and II of the Amended Complaint under 18 U.S.C. § 1595 that are based on allegations (1) that Ashton sex trafficked them by "means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination [thereof]," 18 U.S.C. § 1591(a), and (2) that he benefitted "from participation in a venture" that he knew or should have known engaged in sex trafficking, *id.* § 1595(a). In addition, the defendant is entitled to summary judgment on plaintiff Rachel Ramsbottom's claim that Ashton sex trafficked her after she turned eighteen years old,

because Ramsbottom has failed to present evidence showing that she engaged in a commercial sex act with him after she turned eighteen. In all other respects, the motion will be denied.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge