# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **RACHEL RAMSBOTTOM, ALEXIS BOWLING, JENNA HOUSTON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 3:21-cv-00272** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **LORIN ASHTON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are motions to exclude the testimony of three of the parties' proposed experts: (1) defendant Lorin Ashton's Motion in Limine No. 1 to Exclude Expert Testimony of Rebecca Bender, MACT (Doc. No. 308); (2) the plaintiffs' *Daubert* Motion to Preclude Testimony of Defendant's Litigation Expert Dr. Kimberly Mehlman-Orozco (Doc. No. 318); and (3) the plaintiffs' *Daubert* Motion in Limine No. 8 to Preclude the Testimony of Dr. Marc A. Martinez (Doc. No. 319). Each party has filed a Response in Opposition to each of the other's motions (*see* Doc. Nos. 378, 387, 393), and a Reply brief in further support of its own motions (Doc. Nos.415, 441, 442).

For the reasons set forth herein, the motions to exclude the expert testimony of Rebecca Bender and Dr. Mehlman-Orozco (Doc. Nos. 308, 318) will be granted, and the motion to exclude the testimony of Dr. Martinez (Doc. No. 319) will be denied.

## I. LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert's opinion is admissible, at the trial court's discretion, if: (1) the expert is qualified as such by knowledge, skill, experience, training, or education; (2) the testimony is relevant, meaning that it will assist the trier of fact to understand

the evidence or to determine a fact in issue; and (3) the testimony is reliable, meaning that it is based on sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). In short: the expert must be qualified, and her testimony must be both relevant and reliable. *Id.* When an expert is challenged, "the proponent of the testimony . . . must establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993)); *see also Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

In *Daubert*, the Supreme Court held that, while the evaluation of expert testimony is generally left to juries, district courts must serve in a "gatekeeping" capacity, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597–98. Generally, however, "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal*, 527 F.3d at 530 (quotation marks omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir. 1998)). "A court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel." *Id.* at 376–77. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

At the same time, trial courts enjoy "broad discretion . . . to determine the admissibility of [expert] testimony." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert*, 509

U.S. at 593). In exercising that discretion, courts should be mindful of the risk that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (citation omitted). "Because of this risk, the judge in weighing possible prejudice against probative force . . . exercises more control over experts than over lay witnesses." *Id.* (citation omitted).

In assessing a challenge to an expert's qualifications, the court must decide whether the expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). Courts in the Sixth Circuit do not consider "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Burgett*, 579 F. App'x at 376 (6th Cir. 2014) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). "Determining where experience-based opinion falls on this spectrum [between lay and expert testimony] has proven particularly challenging to the courts." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 562 (E.D. Mich. 2022) (quoting Anne Bowen Poulin, *Experience-Based Opinion Testimony: Strengthening the Lay Opinion Rule*, 39 Pepp. L. Rev. 551, 553 (2012)).

Regarding reliability, the Supreme Court in *Daubert* articulated a nonexclusive list of considerations for assessing a scientific expert's testimony, including (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Id.* at 593–94. In *Kumho Tire*, the Supreme Court clarified that the reliability inquiry *Daubert* outlined covers not just scientific testimony, but also expert testimony based on "technical" and "other specialized knowledge." 526 U.S. 137, 141 (1999) (citing Fed. R. Evid. 702). The Supreme Court also recognized that, in such cases, the *Daubert* factors "may or

may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150; *see also Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001) (explaining that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of reliability of expert testimony").

Finally, an expert's proposed testimony may be excluded if it is not relevant. Under Rule 401, evidence is relevant if it has "any tendency to make a fact of consequence more or less probable than it would be without the evidence" and is "of consequence in determining the action." A fact is "of consequence" when it relates, directly or indirectly, to an element of a claim or defense. *United States v. D'Ambrosio*, No. 1:15-CR-003, 2016 WL 1385281, at *2 (M.D. Pa. Apr. 7, 2016) (granting motion to exclude sex trafficking expert), *aff'd and remanded sub nom. United States v. Delgado*, 677 F. App'x 84 (3d Cir. 2017). Relevant evidence is admissible; irrelevant evidence is not. Fed. R. Evid. 402. And relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403.

To determine whether an expert's testimony will assist the trier of fact, courts must "look to 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.'" *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting Fed. R. Evid. 702, advisory committee's note to 1972 proposed rules). Accordingly, "[a] district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror." *Id.* (citation omitted).

## II.     MOTION TO EXCLUDE PLAINTIFFS' EXPERT REBECCA BENDER

The plaintiffs have provided notice that they intend to call Rebecca Bender, MACT,[1] as a "sex trafficking expert." The defendant argues that Bender's testimony should be excluded in its entirety.

### A.     Bender's Expert Report

Based on her review of the plaintiffs' and other witnesses' depositions and the discovery produced in this case generally, Bender, "[a]s an expert in the field of commercial sexual exploitation and trafficking," submits her Subject Matter Expert Report (Doc. No. 311-1) ("Bender Report")[2] to

> provide comprehensive insights into the legal and psychological dimensions of these grave offenses [of sex trafficking and victimization of minors for sexual purposes]. Drawing upon established case law, psychological theories, published academic and other materials, legislative frameworks, and [her] own training, education, and experience, [she] aims to elucidate the intricate dynamics underlying commercial sexual exploitation and trafficking, thereby assisting in better understanding the dynamics between Lorin Ashton and the three plaintiffs . . . .

(Bender Report 2.)

At the outset of her Report, Bender compares Ashton's conduct to that of R. Kelly and Jeffrey Epstein in the federal cases against them,[3] insofar as she sees Ashton has having "leverage[ed] significantly his prominence and authority as a renowned musician" to gain access to and then sexually exploit his young fans. (*Id.* at 2–3.) Bender summarizes her expert opinions as follows:

---

[1] Neither Bender nor the plaintiffs explain what "MACT" signifies, but, because Bender testified that she has a Master's degree in "Christian thought" (Doc. No. 311-2, Bender Dep. 25), the court surmises that it stands for Master of Arts in Christian Thought.

[2] The court cites the original pagination of the Report, rather than that assigned by the court's electronic filing system.

[3] She provides no citations in her Report for her references to the cases against R. Kelly and Jeffrey Epstein.

> Mr. Ashton's grooming tactics with Alexis, Rachel, and Jenna specifically are evident in how he targeted vulnerable, at-risk youth, groomed them to feel important, special and different. Ashton love bombed the Plaintiffs by, among other things, seeking their opinions and making them believe their situation was unique. Love bombing is the action or practice of lavishing someone with attention, compliments or affection in order to influence or manipulate them. He engaged in behaviors that I observed from many classic predators; for example by testing with small rules that would increase in demand and would vacillate between derogatory exchanges, mocking, what can appear as controlling boyfriend behaviors to the victim – not wanting them to hang out with specific groups of people, demeaning their friend groups to make them think they're "older" and should only be with him, threatening to withdraw attention for non-compliance, etc. This further emphasizes the belief in the victim, here each of the plaintiffs, that they are in a "regular" relationship even though the perpetrator's motive is to extend the use of power and control, especially over the minor female. It is especially important to note the intersectionality between intimate partner violence and exploitation, unlike a toxic, consensual relationship, a trafficker's intent is not to enter a "normal" relationship then it becomes increasingly controlling and emotionally, physically or financially abusive. A trafficker's goal is to enter the relationship with the intent to exploit. Whether that is to exploit for their own sexual prowess or to profit off of it.

(*Id.* at 3 (footnote to article discussing the "signs of love-bombing" omitted).)

The remainder of the Report appears intended to substantiate or elaborate upon that summary. Bender relies on purportedly "common" behavior and tactics of sex traffickers and compares them to Ashton's alleged conduct, which she characterizes as controlling and psychologically coercive. While acknowledging that there is no one "profile" of a sex trafficking victim, she purports to identify the plaintiffs as particularly vulnerable to being victimized. In drawing these conclusions, she devotes several pages to analyzing the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1595(a) (2008), and purporting to define its terms. (*Id.* at 8–10.) She cites what appear to be academic studies and publications that she believes support her opinions, including the Adverse Childhood Experiences study ("ACEs"),[4]

---

[4] Bender cites this study as follows: *Adverse Childhood Experiences Study (ACES)*, Felitti, V. J., *et al.* (1998). She describes it as a "landmark research study . . . which examines the correlation between childhood trauma and long-term health outcomes." (Bender Report 11 & n.44.)

which, she asserts, is "[c]entral to the understanding of commercial sexual exploitation . . . and its profound psychological ramifications" (Bender Report 11–12); "Biderman's Theory of Control"[5] (*id.* at 6); Biderman's Theory of Coercion[6] (*id.* at 13); the "Power and Control Wheel,"[7] which she describes as being "[a]t the crux of understanding abusive relationships" and as offering a "comprehensive framework for assessing the dynamics of exploitation and understanding the mechanisms through which perpetrators maintain control over victims" (*id.* at 14). She references "publications concerning Narcissism and Intimate Partner Violence." (*Id.* at 5 (citing online blogs).) She broadly discusses the potential effects of sexual trauma, noting that

> [t]hose who have endured trauma, including the plaintiffs, may experience heightened emotional distress, including anxiety, depression, or post-traumatic stress disorder (PTSD). Trauma can overwhelm an individual's ability to cope, leading to various maladaptive behaviors such as substance abuse, alcohol abuse, or sexual activity, as individuals strive to alleviate emotional pain or regain a sense of control. Moreover, trauma can trigger the onset of mental health issues that were previously dormant or undiagnosed, manifesting as delayed symptoms that emerge during the processing of trauma. This delayed presentation of mental health concerns underscores the complex interplay between past experiences and psychological well-being, highlighting the importance of comprehensive support and intervention to address both immediate and long-term mental health needs.

(*Id.* at 15–16 (footnoted citations omitted).) She discusses the phenomenon of "trauma bonding" as "reminiscent of Stockholm syndrome" and opines that the plaintiffs here appear to be suffering from it as a result of their victimization by Ashton. (*Id.* at 17.)

She concludes by stating that it is her "expert opinion within a reasonable degree of professional certainty" that Ashton

---

[5] No citation is provided for this publication.

[6] Cited as "Biderman, A.D. (1960)." It is unclear whether "Biderman's Theory of Control" and "Biderman's Theory of Coercion" are, in fact, one publication.

[7] Cited as National Human Trafficking Hotline. (n.d.). *Power and Control Wheel.* Retrieved from https://humantraffickinghotline.org/sites/default/files/HT%20Power%26Control%20Wheel%20NEW.pdf.

transported (bought plane tickets and taxis), harbored (provided hotel and food accommodations), obtained (actively sought out a victim that fit his profile: young and vulnerable), recruited (actively looked for fans via social media), provided (provided the means for this minor victim to meet him to be victimized), patronized (paid for the violent sexual services he received with cash as well as CSAM material) and maintained (maintained control through manipulation, intimidation and psychological coercion) [each plaintiff] for the purpose of commercial exploitation, committing seven out of nine qualifiers defined in the Trafficking Victim Protection Act.

(*Id.* at 20, 21, 22.)

### B.    The Parties' Arguments

The defendant asserts, as a threshold matter, that Bender is not qualified through specialized knowledge, skill, training, experience, or education on the subject matter of sex trafficking to testify as an expert in this case. In particular, he points out that Bender's formal education has nothing to do with sex trafficking, and he argues that her "lived experience" as either a survivor of pimp-based sex trafficking or as an advocate for victims of pimp-based sex trafficking does not apply to the situation presented here, which does not involve allegations of pimp-based trafficking. (Doc. No. 308 at 3–6.) The defendant also argues that, even if Bender is qualified, her expert opinions are not reliable, as they are based on belief and speculation rather than science or methodology. Finally, he contends that Bender's limited areas of qualification—pimp-controlled trafficking and communicating and assisting victims of that type of sex trafficking through victim advocacy—is not relevant to this case and that any potential relevance is substantially outweighed by the danger of unfair prejudice.

In response to these arguments, the plaintiffs highlight Bender's vast experience as an "advocate, teacher, and mentor," interviewing "hundreds and hundreds of victims of trafficking," "participating" in academic research and serving as a consultant on research projects, training law enforcement officers and first responders, speaking at countless conferences as a "subject matter expert," serving as a "survivor leader on countless federally funded task forces," and so forth.

(Doc. No. 393 at 5.) Although the plaintiffs do not "concede" that Ms. Bender lacks "education" and "training" "as an expert in her designated field" (*id.* at 2), they emphasize her experience over her formal education.[8] Regarding reliability, the plaintiffs conflate the question of reliability with that of her qualification to testify as an expert, asserting only that Bender "discusses her experience throughout the report," "testified for hours in response to counsel's questions about her qualifications," and "author[ed] a twenty-four page report that contains seventy footnotes to the record and other legal and academic materials in support of her opinions." (Doc. No. 393 at 7.) As for relevance, Bender contends that her testimony about "the concept and complexities of 'buyer trafficking'" is clearly relevant and not likely to mislead the jury.

C.     **Discussion**

The court finds that Bender's testimony should be excluded. To the extent that she is qualified as an expert to talk about certain aspects of sex trafficking, she has not established that her expertise extends to the type of case presented here. Moreover, the court finds that the potential relevance of her testimony is substantially outweighed by the risk of misleading and confusing the jury.

In the "Qualifications" section of her Subject Matter Expert Report (Doc. No. 311-1) ("Bender Report")[9], Bender states:

> I have assisted in thirteen cases including testifying at trials, interviewing victims or assisting in evidence review. As an internationally recognized expert, I have trained over 118,000 community professionals in the trafficking space including

---

[8] The plaintiffs de-emphasize her formal education for good reason. Bender never obtained an undergraduate degree, though she maintains that she accumulated class credits equivalent to an undergraduate degree, during which she took one or two criminal justice classes in which books containing chapters focused on sex trafficking may have been assigned. (Doc. No. 311-2, Bender Dep. 25.) She has an online Master's degree from Bethel Seminary in "Christian thought" with a focus on "cultural contextualization." (*Id.* at 19.)

[9] The court cites the original pagination of the Report, rather than that assigned by the court's electronic filing system.

FBI, Homeland Security, Chief of Police Associations, Medical Professionals, Child Welfare professionals, local police departments, police academy and undercover academies around the world. My trainings include various topics from victim mindset, undercover operations, trauma informed interviewing, coercive love, the intersectionality of intimate partner violence and exploitation, money laundering, writing reports, and more. I . . . am the CEO & Founder of Elevate Academy, the largest online school in the world, allowing me to work with nearly 1,600 survivors of human trafficking in my career. Additionally, I have worked undercover operations on numerous occasions with FBI, DFW HSI, Atlanta Human Trafficking Unit and Miami Human Trafficking Unit. I was appointed by the U.S. Attorney General to the National Advisory Council, informing Congress on suggested policies per state concerning human trafficking and exploitation and co-chaired the Dept. of Justice Oregon Human Trafficking Task Force.

(*Id.* at 2.) Her resume, attached to her Report, also summarizes her experiences and states that, "[a]s a subject matter expert, [Bender] has spoken on topics that pertain to policy, prevention, intervention, restoration, recovery, demand reduction, predatory tactics employed by traffickers, typologies of crime and best practice for both non-profit management and response by those who have an ability intercept." (Doc. No. 308-1 at 2.) She has testified as an expert in three criminal cases, all of which involved pimp-controlled sex trafficking of adults.

In her deposition, Bender emphasized that she obtained the expertise to engage in these endeavors through the "lived experience of being trafficked for six years and watching it in person every single day for six years," during which she was subjected to pimp-based sex trafficking, plus sixteen years of "boots-on-the-ground" experience of working with law enforcement as "a part of undercover operations" and participating in "ride-alongs" and "crisis response calls," primarily as a "crisis response advocate." (*Id.* at 26–27.) These activities have required "a lot of personal, individual engaging with victims" of sex trafficking. (*Id.* at 29.) The work has also entailed reviewing evidence, interviewing victims, and coordinating with victims' families. (*Id.* at 30.) In addition, Bender has also worked through her online school with more than 1,700 survivors of human trafficking, which involves "hearing each individual's story, recounting their lived experience, [and] assisting and identifying those barriers to reentry." (Id. at 30.) She has no formal

licenses, but she has attended many conferences with sex trafficking "tracks," and she has certifications for outsourced investigations and forensic and trauma-informed interviewing. (*Id.* at 31.) She has no formal training in law or psychology. (*Id.* at 33, 213–14.) But she clearly has substantial experience in the field of sex trafficking and victim advocacy.

The Sixth Circuit has acknowledged that district courts evaluating the reliability of expert testimony based on the expert's personal knowledge or experience may forgo the *Daubert* factors and focus instead on whether the expert's testimony "explain[s] how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005). However, the district court is required to do more than simply take "the expert's word for it" as part of its gatekeeping function. *Id.* The Supreme Court and the Sixth Circuit have both observed that the admissibility of expert testimony is a flexible inquiry when "non-scientific expert testimony is involved," since the "law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (emphasis in original); *accord Daubert*, 509 U.S. at 594.

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529–30. Generally, any issue regarding the credibility or accuracy of admitted expert testimony goes to the weight rather than the admissibility of the evidence, and it can be addressed via cross-examination and the "presentation of contrary evidence" by opposing counsel. *Id.* at 530 (quoting *Daubert*, 509 U.S. at 596). Thus, "rejection of expert testimony is the exception, rather than the rule." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). That said, "nothing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

In the present case, Bender makes no attempt to explain how her experience makes her an expert on the topics she addresses. Instead, Bender and the plaintiffs seem to think that the fact that Bender has been involved in training thousands of law enforcement officers and first responders and in teaching her online courses to thousands of survivors of sex trafficking makes her an expert on all aspects of sex trafficking. Notably absent from Bender's CV, Report, or deposition testimony is an explanation of *what* exactly she teaches or talks about at these conferences and training seminar sessions (aside from her own experience as a survivor of pimp-based sex trafficking) or what experiences she has lived through that qualify her to teach those topics, aside from attending numerous conferences with sex trafficking "tracks." In other words, by analogy, to be a university professor on a particular topic, a person typically must go to school and study and write papers on that topic in order to become an expert qualified to teach that topic. In Bender's case, she suggests that teaching is what makes her an expert, without explaining what expertise qualified her to teach in the first place (or explaining what she teaches).

Moreover, while it is reasonable to infer that her experiences in being a survivor of pimp-based sex trafficking, her involvement in interviewing and advocating for victims of sex trafficking, and her participation in law enforcement efforts targeting pimp-based sex trafficking are sufficient to make her an expert in some aspects of sex trafficking, Bender is not a lawyer. Her lived experiences do not qualify her to talk about the legal interpretation of the TVPRA, the definition of the terms employed by the TVPRA, or whether the plaintiffs' proof establishes that they satisfied the elements of a claim under the TVPRA, specifically including whether the

plaintiffs have established the commercial transaction element of a sex-trafficking claim under the TVPRA. Further, her lack of qualification as a legal expert makes her proffered testimony in this area unreliable.

She is also not trained as a psychologist, psychiatrist, social worker, or other mental health professional. Consequently, she is not qualified to offer opinions couched in terms of jargon from the mental health field (e.g., "grooming," "love-bombing," "narcissism," "psychologically coercive," the psychological effects of trauma, "trauma bonding," etc.), nor are such opinions reliable. Thus, for example, she may not offer opinions to the effect that the plaintiffs fit the model of particularly vulnerable individuals as identified in ACEs or that Ashton engaged in "love-bombing" or otherwise fits the models discussed in "Biderman's Theory of Control," "Biderman's Theory of Coercion," the "Power and Control Wheel, or any other academic study on which Bender purports to rely. Not being a mental health professional (and not even having interviewed the plaintiffs), she is also not qualified to talk about the plaintiffs' mental and emotional injuries— or about whether there is a causal connection between their having been the victims of sex trafficking (if they prove as much) and the mental health problems from which they allegedly suffer or have suffered.[10] That is, insofar as Bender seeks to offer opinions about the typical mindset of trafficked victims who are manipulated by traffickers or about how the plaintiffs in particular reacted to or were damaged by Ashton's conduct, this type of testimony requires professional training outside the scope of whatever expertise Bender may possess. In short, she is

---

[10] Insofar as she attempts to draw a connection between Ashton's allegedly sex trafficking each plaintiff and the subsequent mental health issues each suffered, her opinion is pure speculation. Even if she were qualified as an expert, an expert may not offer speculation as evidence. *See In re Scrap Metal,* 527 F.3d at 530 ( "Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony . . . ." (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993))).

not qualified to provide "insights into the legal and psychological dimensions" of sex trafficking, nor are her opinions in that regard reliable. (*See* Bender Report 2.).

In addition, while Bender purports to opine about "buyer trafficking," she provides no evidence that she has experience with this type of sex trafficking. Instead of drawing on her own experience, Bender attempts to compare Ashton to R. Kelly and Jeffrey Epstein, whose cases she knows about only through the media and court documents. (*See* Doc. No. 311-2, Bender Dep. 220–21.) Aside from the fact that this comparison is ludicrous, based solely on publicly available criminal indictments and other court filings regarding R. Kelly and Epstein, Bender's statement that Ashton apparently used "recruiting and grooming methodologies akin to those" used by R. Kelly and Epstein (Bender Report 2) appears to be based on nothing but speculation rather than reliable facts and is, in any event, substantially more prejudicial than probative.

Insofar as Bender seeks to offer opinion testimony—based on her experiences interviewing and working with victims of sex trafficking—about the tactics pimps and other sex traffickers typically use to obtain the cooperation of their victims or about victims' typical responses to such tactics, Bender has made no attempt to draw a connection between her experience and her opinions or to explain any methodology she might have employed to identify specific tactics or responses. In making this assessment, the court's focus is entirely on the proposed expert's "principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595. As set forth above, the court's gatekeeping role under *Daubert* requires the court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Bender's report does not reflect the type of intellectual rigor required of a testifying expert. She does not appear to have employed any

methodology. Rather, her opinions seem to be based upon a hodgepodge of popular articles and online blogs and the application of armchair psychiatry rather than on her own experience working with sex trafficking victims.

Finally, the plaintiffs have not established that Bender's testimony is relevant to establish any fact of consequence in this case. Generally, her testimony is geared toward establishing that Ashton engaged in "typical" techniques employed by traffickers to induce cooperation in their victims. But whether his behavior was "typical" of traffickers is simply not relevant. What he actually did with reference to these three plaintiffs is what is relevant.

Bender herself characterizes her report as intended to "provide comprehensive insights into the legal and psychological dimensions of the[] grave offenses" alleged here. (Bender Report 2.) She is simply not qualified to offer opinions on the legal or psychological dimensions of the plaintiffs' allegations, and the limited arenas in which she is potentially qualified to offer opinions are not relevant here and will not assist the jury in determining any fact at issue in this case. The defendant's motion to exclude her testimony will be granted.

## III.  MOTION TO EXCLUDE DEFENDANT'S EXPERT DR. KIMBERLY MEHLMAN-OROZCO

Dr. Kimberly Mehlman-Orozco has been retained by the defendant to "provide opinion as an expert on human trafficking." (Doc. No. 387-1 ("Mehlman-Orozco Report"), at 4.) She is imminently qualified as an expert in the field of sex trafficking, and the plaintiffs do not question her qualifications.

Mehlman-Orozco seeks to offer opinions regarding (1) the congressional intent in enacting statutes addressing human trafficking, which she claims is to "address modern slavery"; (2) how trafficking is often conflated with other crimes; (3) what truly constitutes "modern slavery"; and (4) why, based on these parameters, the plaintiffs' allegations, even if true, "are not consistent with

human trafficking indicia or legal precedent." (Mehlman-Orozco Report at 12 ¶¶ I–IV.) She also opines that it is reasonable to infer from the evidence presented that the defendant did not benefit from or facilitate sex trafficking, that he did not "recruit, entice, . . . harbor, transport, provide, obtain or maintain the Plaintiffs for the purpose of sexual servitude, and that the plaintiffs were not sex trafficked by Lorin Ashton. (*Id.* at 13–14 ¶¶ V–IX.) And she argues that Bender's testimony is based entirely on "anecdotal experiences, her theological beliefs, misinformation, unsupported speculation or subjective belief, ecological fallacies, or fallacies of composition, and are counterfactual." (*Id.* at 14 ¶ X.)

Based on her review of the evidence, Mehlman-Orozco also offers opinions related to each of the three plaintiffs that largely mirror those summarized above:

I. Even if [the plaintiffs'] allegations were all accepted as true, the actions described are not consistent with human trafficking indicia or legal precedent that falls within the scope of human trafficking.

II. It is reasonable to infer that [the plaintiffs were] not sex trafficked by Mr. Ashton.

III. It is reasonable to infer that Mr. Ashton did not benefit from the purported sex trafficking of [the plaintiffs].

IV. It is reasonable to infer that Mr. Ashton did not facilitate the purported sex trafficking of [the plaintiffs].

V. It is reasonable to infer that Mr. Ashton did not recruit, entice, solicit, advertise, harbor, transport, provide, obtain or maintain [the plaintiffs] for the purpose of sexual servitude.

VI. Based on the evidence provided thus far in this case and my expertise on human trafficking, it is reasonable to infer that Mr. Ashton did not benefit financially or receive anything of value from recruiting, enticing, soliciting, advertising, harboring, transporting, providing, obtaining or maintaining [the plaintiffs] for the purpose of sexual servitude.

(*Id.* at 31–32, 36, 39–40.) Mehlman-Orozco's position, essentially, is that the plaintiffs are not true victims of sex trafficking.

As the plaintiffs point out, as an initial matter, several of Mehlman-Orozco's opinions are no longer relevant in light of the court's ruling in the defendant's favor at the summary judgment stage on the plaintiffs' claims that the defendant trafficked any plaintiff after she turned eighteen or that he can be liable under a "beneficiary" theory (*i.e.*, that Ashton benefitted financially or received anything of value from his participation in a trafficking venture). This conclusion makes opinions III, IV, and VI irrelevant. Her rebuttal of Bender's opinions is also irrelevant, because the court will exclude Bender's testimony.

Regarding Mehlman-Orozco's other opinions based on her review of the evidence, those opinions are based nearly entirely on her view of the proper interpretation of the sex trafficking statutes and what constitutes "true" sex trafficking. Her opinions are grounded in the legislative history of the statute, pursuant to which it is her view that the plaintiffs' allegations, even if true, do not qualify as "modern slavery" and do not fall within the scope of what Congress intended to address in enacting the laws creating criminal and civil penalties for sex trafficking and human trafficking more generally.

While Mehlman-Orozco raises important policy considerations, and she is likely correct that allegations like those raised here are not what Congress had in mind when it attempted to address sex trafficking, her opinions in that regard are irrelevant. The Supreme Court has made it clear that "legislative history is not the law." *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019) (quoting *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 523 (2018). And courts—and proposed experts—are not "free to rewrite clear statutes under the banner of [their] own policy concerns." *United States v. Hunter*, 12 F.4th 555, 568 (6th Cir. 2021) (quoting *Azar*, 587 U.S. at 581). The question presented by this case is not whether the conduct as alleged in this case *should* qualify as sex trafficking but simply whether, under the governing statutes as written, it does. Mehlman-

Orozco's opinions about "secondary exploitation" (Doc. No. 387-1 at 71–73). her *pro bono* work with true sex trafficking victims, and the typical "indicia and contours of modern-day sex trafficking" (Doc. No. 441 at 5) will not assist the jury in determining any fact at issue in this case.

The court will grant the plaintiffs' motion and exclude Mehlman-Orozco's opinions in their entirety as irrelevant to this case and because, to the extent they may be relevant, their probative value is substantially outweighed by a risk of misleading the jury.[11]

## IV. PLAINTIFFS' *DAUBERT* MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF DR. MARC A. MARTINEZ

The defendant proposes to offer the expert testimony of Dr. Marc A. Martinez, a licensed psychologist certified in forensic psychology by the American Board of Professional Psychology. Dr. Martinez proposes to offer opinions regarding the concept of "sexual grooming," specifically that the concept of "sexual grooming" is too unreliable and undefined to be useful. (*See generally* Doc. No. 378-1.) As the defendant points out, the plaintiffs use the term "grooming" repeatedly in their Amended Complaint and in their deposition testimony. Their proposed experts use the term repeatedly in their Reports. Dr. Martinez's testimony is intended to point out that there is little scientific study of the concept, that it lacks reliability, and that many people use the term as if it were accepted scientifically when it is not.

The plaintiffs seek to exclude Martinez's testimony solely on the basis that his "opinions involve entirely legal issues upon which an expert is not permitted to testify." (Doc. No. 319 at 3.) They point to a portion of his deposition testimony that they characterize as confirming that "his

---

[11] The plaintiffs, inexplicably, do not contest Mehlman-Orozco's ability to proffer her proposed Opinion II, that it is "reasonable to infer that [the plaintiffs were] not sex trafficked by Mr. Ashton." However, such an opinion invades the province of the jury, who will decide for themselves whether the evidence presented by the plaintiffs qualifies as sex trafficking, based on the instructions the jury will receive regarding the elements of this cause of action.

purpose was not just to analyze the concept of grooming using the *Daubert* factors but to offer an opinion as to whether testimony related to grooming is admissible at trial." (*Id.* at 5 (citing Doc. No. 319-2 at 26–27, Martinez Dep. 57–58).)

The plaintiffs, to be clear, do not challenge Dr. Martinez's qualifications, nor the reliability or relevance of his testimony. The court finds that, insofar as Dr. Martinez seeks or attempts to testify about *admissibility* of the term "grooming" or "sexual grooming" at trial as used by other witnesses, such testimony would not be permissible and would obviously invade the province of the court. However, Dr. Martinez is clearly qualified to discuss the concept of the term and the lack of general consensus in the scientific community as to its meaning and usefulness. The plaintiffs' motion to exclude Dr. Martinez's testimony, therefore, will be denied.

## V.    CONCLUSION

As set forth herein, the motions to exclude the expert testimony of Rebecca Bender and Dr. Kimberly Mehlman-Orozco (Doc. Nos. 308, 318) will be granted, and the motion to exclude the testimony of Dr. Martinez (Doc. No. 319) will be denied.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge